UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
                                        )
UNITED STATES OF AMERICA                )
                                        )
            v.                          )       Criminal No. 19-10080-NMG
                                        )
(1)   DAVID SIDOO,                      )
(2)   GREGORY COLBURN,                  )
(3)   AMY COLBURN,                      )       **FILED UNDER SEAL**[1]
(4)   DIANE BLAKE,                      )
(5)   TODD BLAKE,                       )
(8)   MOSSIMO GIANNULLI,                )
(9)   ELIZABETH HENRIQUEZ,              )
(11)  DOUGLAS HODGE,                    )
(14)  LORI LOUGHLIN,                    )
(18)  HOMAYOUN ZADEH, and              )
(19)  ROBERT ZANGRILLO,                 )
                                        )
            Defendants.                 )
_____ )

GOVERNMENT'S MOTION FOR HEARING REGARDING CONFLICTS OF INTEREST

The government respectfully moves for a hearing pursuant to *United States v. Foster*, 469

F.2d 1, 5 (1st Cir. 1972), and Federal Rule of Criminal Procedure 44(c), to address the following

conflicts of interest involving defense counsel in this case:

- 

- *Second,* the law firm of Boies Schiller Flexner LLP ("Boies Schiller") represents
  defendant Robert Zangrillo as well as his alleged co-conspirator, Davina Isackson,

---

[1] The government respectfully moves to file this brief under seal insofar as it references the potential cooperation of a defendant in a related matter. Attached to this filing as Exhibit A is a proposed redacted version of the motion, which the government proposes to file on the public docket with the Court's approval.

who has entered into a cooperation agreement with the government and is likely to testify at trial.

- *Third*, the law firm of Ropes and Gray LLP ("Ropes") represents defendant Douglas Hodge, the law firm of Latham and Watkins LLP ("Latham") represents defendants Lori Loughlin and Mossimo Giannulli, and the law firm of Nixon Peabody LLP ("Nixon") represents defendant Gamal Abdelaziz. Ropes, Latham and Nixon each also actively represent the University of Southern California ("U.S.C."), the university that their individual clients are charged with defrauding.

- *Fourth*, multiple law firms represent multiple individual defendants. Latham represents both Loughlin and Giannulli. The law firm of Hooper Lundy & Bookman represents both Amy Colburn and Gregory Colburn. The law firms Todd & Weld and Duane Morris LLP represent both Diane Blake and Todd Blake. Ropes represents Douglas Hodge and Elizabeth Henriquez. Finally, the law firm of Martin G. Weinberg, PC represents both David Sidoo and Robert Zangrillo.

As set forth below, while some of these conflicts may, upon inquiry, prove waivable, the government respectfully submits that others could require the disqualification of counsel in the event the conflicts cannot be adequately addressed.

## BACKGROUND

This case arises out of a long-running scheme to facilitate the admission of students to elite colleges and universities through bribery and other forms of fraud. The government has charged more than 50 defendants in connection with the scheme, including numerous defendants who have been separately indicted or charged by information. Of those, 20 defendants have pled guilty or entered into plea agreements with the government. Several defendants have also entered into cooperation agreements and are likely to testify at trial.

The instant indictment charges 19 defendants—all of them parents who participated in the scheme on behalf of their children—with one count of conspiracy to commit wire and mail fraud and honest services wire and mail fraud, and one count of conspiracy to commit money laundering.

I.  Boies Schiller Represent Defendants
And Actual or Potential Cooperating Witnesses

Defendant Robert Zangrillo is represented here by Matthew L. Schwartz, a Florida-based partner at Boies Schiller, as well as by Foley Hoag LLP and Martin G. Weinberg, PC.  Two attorneys from Boies Schiller's Los Angeles office, Michael V. Schafler and David K. Willingham, represent defendant Davina Isackson, who recently pled guilty to an Information charging her with conspiracy to commit mail fraud and honest services mail fraud in connection with the same scheme.  *See United States v. Isackson, et al.*, 19-CR-10115-PBS.[3]  Isackson, who is also represented by the law firm of Donnelly, Conroy & Gelhaar, LLP, is cooperating with the government's investigation and may well testify at any trial in this case as a witness for the government.  Boies Schiller has represented to the government that it has established a "wall" to

---

[2] ████████████████████████████████████████████████████████

[3] A courtesy copy of this motion will be filed in *United States v. Isackson*, 19-CR-10115-PBS.

prevent the flow of confidential information between and among the attorneys representing Zangrillo and Isackson.

Though separately charged, all four of the above-mentioned defendants are alleged to be members of the same criminal conspiracy. As set forth in the charging documents, all of them are alleged to have agreed with William "Rick" Singer, as well as with other parents of college applicants and other members and associates of Singer's enterprise, to use bribery and other forms of fraud to facilitate the admission of children to elite colleges and universities, and to commit money laundering in the process.

At trial in this case, the government expects that any cooperating witnesses would testify about the nature and scope of the conspiracy as they understood it. Davina Isackson, for example, would testify, among other things, about her understanding of how the scheme worked, as well as her understanding that other parents were involved in the scheme. Her testimony would corroborate the testimony of other potential government witnesses, including Singer himself, about the scheme's operation and the representations Singer made to parents who participated in it. Isackson's testimony would thus provide direct evidence against all the other parents involved in the scheme—insofar as she would testify that the conspiracy existed, that she was a part of it, that she knew how it worked, and that she knew other parents were a part of it as well—and indirect evidence against the other parents, insofar as she would corroborate the testimony of other witnesses, like Singer, who interacted directly with those other parents. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮

[REDACTED]

[REDACTED]

Accordingly, at any trial in this case, Isackson would be represented by attorneys from the same law firm, Boies Schiller, that is representing Zangrillo, one of the remaining defendants against whom she may testify. [REDACTED]

[REDACTED]

[REDACTED]

## II.   Latham, Nixon and Ropes Each Represent Defendants and One of the Victims, the University of Southern California

Four defendants—Gamal Abdelaziz, Douglas Hodge, Mossimo Giannulli and Lori Loughlin (collectively, the "U.S.C. defendants")—are represented by three law firms—Nixon, Ropes and Latham, respectively—that also actively represent U.S.C. in other matters.[4]  Abdelaziz, Hodge, Giannulli and Loughlin are each specifically charged with defrauding U.S.C. by conspiring to use bribery and other forms of fraud to have their children admitted to that university as purported athletic recruits.  *See* Dkt. 314, ¶ 125 ("In or about 2016 and 2017, GIANNULLI and LOUGHLIN agreed with Singer to pay an amount, ultimately totaling $500,000, to facilitate the admission of their two daughters to U.S.C. as purported crew recruits"); ¶ 167 ("Beginning in or about [ ] 2012, HODGE agreed to pay Singer an amount, ultimately totaling $200,000 to facilitate his younger daughter's admission to U.S.C. as a purported soccer recruit"); ¶ 280 ("On or about March 26, 2018, ABDELAZIZ wired a payment of $300,000 to KWF in exchange for Singer's facilitation of his daughter's admission to U.S.C. as a purported basketball recruit").  U.S.C. has

---

[4] Loughlin is also represented by the law firm of Scheper Kim & Harris, while Giannulli is also represented by Donnelly, Conroy & Gelhaar, LLP, which also represents cooperating witness Davina Isackson.

advised the government that it declines to waive any conflict.  The law firms, in turn, have advised the government that they do not believe there is a conflict, because they do not represent U.S.C. in connection with this case, and that the U.S.C. defendants have, in any event, waived any conflict.[5]

### III.   Multiple Law Firms Represent Multiple Defendants

As noted, multiple law firms represent multiple individual defendants.  Ropes represents Hodge and Henriquez.  Martin G. Weinberg, PC represents Sidoo and Zangrillo.  Latham represents Loughlin and Giannulli, who are married.  Likewise, Hooper Lundy & Bookman represents a married couple—Amy Colburn and Gregory Colburn—and both Todd & Weld and Duane Morris LLP represent a third married couple, Diane Blake and Todd Blake.  In some cases, those defendants are also represented by additional counsel.  As noted, for example, Zangrillo is also represented by Boies Schiller.  Sidoo is also represented by the law firm of Chesnoff & Schonfeld.  And Hodge is also represented by Pepper Hamilton.

### ARGUMENT

The Sixth Amendment right to choose one's counsel is not absolute.  Although there is a presumption in favor of counsel of choice, that presumption may be overcome by federal courts' "independent interest in ensuring that criminal trials are conducted within the ethical standards of

---

[5] Bruce Isackson, who is the spouse of Davina Isackson, pled guilty to an Information charging him with conspiracy to commit mail fraud and honest services mail fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States, and is also cooperating with the government's investigation.  *See United States v. Isackson, et al.*, 19-CR-10115-PBS.  Bruce Isackson is represented by the law firm of Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel"), which also represents U.S.C..  U.S.C. has not waived any potential conflict with Quinn Emanuel.  The government did not learn of this conflict until after Bruce Isackson executed his plea and cooperation agreements.  The government has not, to date, moved for a *Foster* hearing with respect to Quinn Emanuel's involvement in the case, although it may yet do so to the extent the conflict has not been addressed prior to Bruce Isackson's sentencing, which the government will seek to adjourn pending the resolution of this case.

the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988). Both interests are implicated here, where law firms seek to represent multiple clients on both the same and opposite sides of this case. It is well-settled in the First Circuit that a court must inquire—and determine whether disqualification is appropriate— "not only in those rare cases where an actual conflict may be demonstrated before trial, but [also] in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *In re Grand Jury Proceedings*, 859 F.2d 1021, 1023–24 (1st Cir. 1988) (alteration original, further citation omitted); *see also United States v. Laureano-Perez*, 797 F.3d 45, 56 (1st Cir. 2015) (disqualification is appropriate where there is a "realistic *potential* for conflict of interest") (emphasis added).

I.   <u>Applicable Law</u>

The Sixth Amendment right to the assistance of counsel encompasses the corollary right to choose one's counsel. *Powell v. Alabama*, 287 U.S. 45, 53 (1932); *United States v. Richardson*, 894 F.2d 492, 495–96 (1st Cir. 1990). That right "is circumscribed in several important respects," however, including by the conflicts of interest that may arise when the chosen attorney represents other participants in the same or related criminal proceedings. *Wheat*, 486 U.S. at 159–60 ("[M]ultiple representation of criminal defendants engenders special dangers of which a court must be aware."). Indeed, the American Bar Association ("ABA") emphasizes, in its commentary to the Model Rules of Professional Conduct, that "[t]he potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one codefendant." ABA R. Prof'l C. 1.7 cmt. 23. Likewise, Rule 1.7 of the Massachusetts Rules of Professional Conduct (hereinafter, "Rule 1.7") provides that "a lawyer *shall not* represent a client" where "(1) the representation of one client will be directly

adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client . . . ."  Mass R. Prof'l C. 1.7 (emphasis added); *see also* Mass R. Prof'l C. 1.10(a) (imputing the conflict of one attorney in a law firm to all others in that firm).[6]

Such conflicts may be waived only where, among other things, a lawyer "*reasonably* believes that the lawyer will be able to provide competent and diligent representation to each affected client," and the affected clients provide "informed consent" in writing.  Mass R. Prof'l C. 1.7 (emphasis added).   The commentary to the rules recognizes that "some conflicts are nonconsentable."  Mass R. Prof'l C. 1.7 cmt. 14; ABA R. Prof'l C. 1.7 cmt. 14.  Even if a conflict is waivable, the rules mandate that "*each* affected client" must give "informed consent, confirmed in writing."  Mass R. Prof'l C. 1.7(b)(4) (emphasis added).

The dangers associated with representing different defendants in the same case, or in different but related cases, are well-recognized.  For example, "one client may stand to gain through negotiations with prosecutors that will injure another, raising concerns of loyalty; or information obtained in the representation of one client may be potentially useful to another, raising concerns of confidentiality."  *Reyes–Vejerano v. United States*, 276 F.3d 94, 100 (1st Cir. 2002); *accord In re Grand Jury Proceedings*, 859 F.2d 1021, 1025–26 (1st Cir. 1988) (observing the tension between an attorney's obligation not to disclose information gained in the representation of one defendant and the competing obligation to use that information to the extent it could aid in the defense of another).  These risks are heightened—significantly—where one defendant is cooperating against the other.  In addition, a conflict of interest may also "'prevent an

---

[6]   Local Rule 83.6(4) provides that the rules adopted by the Supreme Judicial Court of Massachusetts govern the ethical obligations of attorneys in this District.

attorney from . . . arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another.'" *Wheat*, 486 U.S. at 160 (quoting *Holloway v. Arkansas*, 435 U.S. 475, 489–90 (1978)); *see also United States v. Coneo-Guerrero*, 148 F.3d 44, 48 (1st Cir. 1998) (listing "myriad issues that potentially would give rise to a conflict of interest" in multiple representation). Such dangers pose a threat to a defendant's right to a defense conducted by an attorney who is free of conflicts of interest, as well as to the court's institutional interests in preserving the fairness and integrity of the judicial process. *See Wheat*, 486 U.S. at 160.

A district court is vested with the power and responsibility to determine whether constitutional and professional standards permit multiple representation of criminal defendants in a given case. "In making this determination, a court balances the defendant's right to choose his representative against *both* the defendant's countervailing right to conflict-free representation *and* the court's independent interest in the integrity of criminal proceedings." *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 200 (D.C. Cir. 2013) (emphasis in original).

In *Foster*, a case involving jointly-represented defendants, the First Circuit set forth a procedure for the inquiry trial courts must conduct when a potential conflict of interest is brought to the court's attention:

> [I]t shall be the duty of the trial court, as early in the litigation as practicable, to comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of such risks, and to inquire diligently whether they have discussed the risks with their attorney, and whether they understand that they may retain separate counsel, or if qualified, may have such counsel appointed by the court and paid for by the government.

469 F.2d at 5. Rule 44(c), in turn, "expands these duties by requiring an inquiry into the possibility of a conflict in all cases where jointly-charged defendants retain the same counsel." *United States v. Hernandez-Lebron*, 23 F.3d 600, 604 (1st Cir. 1994) ("Under Rule 44(c), the trial court must

'inquire with respect to such joint representation and . . . personally advise each defendant of the right to the effective assistance of counsel, including separate representation.'") (alteration in original, further citation omitted); *see also United States v. Cardona-Vicenty*, 842 F.3d 766, 772 (1st Cir. 2016) (Rule 44(c) requires a "district court [to] inquire into each instance of joint representation of multiple defendants, and [requires the court to] advise each defendant of his right to separate counsel.") (alteration in original, further citation omitted).[7]

Because "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict," the trial court has "substantial latitude" to refuse to accept a defendant's waiver of a conflict of interest and order disqualification, even where a potential conflict has not yet ripened into an actual conflict. *Wheat*, 486 U.S. at 162–63. As the First Circuit has made clear, "the loyalty a lawyer owes to his client is so basic . . . it should not be sullied by even the appearance of a possible conflict." *United States v. Mazzaferro*, 865 F.2d 450, 456 (1st Cir. 1989).

II.    The Simultaneous Representation of Cooperating Witnesses
       And Defendants in the Same Conspiracy Poses Serious Conflicts

Boies Schiller's simultaneous representation of Davina Isackson and Zangrillo poses a conflict of interest, ███████████████████████████████████████████████████
███████████████████████████.[8] These firms represent, on the one hand, defendants charged with conspiring to bribe coaches to secure their children's admission to college, and, on the other, alleged co-conspirators who, should they testify as cooperating witnesses at trial, will provide

---

[7] The failure to hold a *Foster* hearing means that, in the event that there is a conviction, the government, on appeal, "has the burden of persuasion of demonstrating that prejudice to the defendant was improbable." *See United States v. Mazzaferro*, 865 F.2d 450, 454 (1st Cir. 1989).

[8] The simultaneous representation by Donnelly, Conroy & Gelhaar, LLP of cooperating witness Davina Isackson and defendant Giannulli poses a similarly serious conflict, which is further addressed in Part III below.

inculpatory evidence concerning the nature, operation and scope of that very conspiracy.  It is difficult to conceive of a more paradigmatic example of a conflict.  *See, e.g.*, *United States v. Daugerdas*, 735 F. Supp. 2d 113, 116 (S.D.N.Y. 2010) ("[T]he unusual circumstance of a law firm seeking to simultaneously represent a defendant and a cooperating witness in the same criminal proceeding . . . creates a clear conflict of interest."); *United States v. Culp*, 934 F. Supp. 394, 397 (M.D. Fla. 1996) ("[T]he simultaneous representation of clients with adverse interests is the most egregious form of a lawyer's conflict of interest[.]").

On the one hand, counsel will presumably seek to challenge the conspiracy's existence and their clients' knowledge of its scope and operation; on the other, they will represent witnesses who will testify that the conspiracy existed and will describe its scope and operation.  On the one hand, counsel will presumably argue that their clients did not have the requisite knowledge or intent to be guilty of a crime; on the other, they will represent witnesses who will testify that, based on interactions with many of the same co-conspirators, they did have the requisite knowledge and intent and were, in fact, guilty.  On the one hand, counsel will presumably challenge the credibility of the government's other potential witnesses, including the architect of the conspiracy, William "Rick" Singer; on the other, counsel will represent witnesses who corroborate Singer's testimony.

The concerns associated with multiple representation are greatest where, as here, one defendant testifies at a trial of the other.  An attorney cross-examining his or her own client must "make important, and presumably rapid, decisions about whether any cross-examination is the result of information that he had earlier received from the [testifying client] or was derived independently," resulting in "an unacceptable risk" that the attorney will "either us[e] confidential information obtained from [the testifying client] . . . or . . . may fail to rigorously cross-examine [that client] in order to ensure that he does not inadvertently disclose such confidential information,

which would be to the detriment of [the client on trial]." *United States v. Lemieux*, 532 F. Supp.

2d 225, 233–34 (D. Mass. 2008); *accord United States v. Alfonzo-Reyes*, 592 F.3d 280, 294–95

(1st Cir. 2010) (citing such concerns in affirming the disqualification of an attorney who previously

represented a potential government witness who would testify against the defendant's co-

defendant in a conspiracy case).  An attorney's freedom to cross-examine one defendant on behalf

of another is inherently restricted where the attorney represents both.  *See also* Mass. R. Prof. C.

1.7 cmt. 6 ("a directly adverse conflict may arise when a lawyer is required to cross-examine a

client who appears as a witness in a lawsuit involving another client, as when the testimony will

be damaging to the client who is represented in the lawsuit"); *United States v. Arias*, 351 F. Supp.

3d 198 (D. Mass. 2019) ("Attorney Gleason will have to cross-examine the CW at trial, which will

put him directly adverse to a client."); *Commonwealth v. Martinez*, 425 Mass. 382, 389 (1997)

("When an attorney simultaneously represents a criminal defendant and a prosecution witness,

there is the potential for a serious conflict of interest."); *Commonwealth v. Geraway*, 364 Mass.

168 (1973) (ordering new trial where attorney cross-examined witnesses who were represented by

attorney's law firm).

Left unchecked, the conflicts also threaten to undermine the integrity of the adversarial

process.  *See generally United States v. Panzardi Alvarez*, 816 F.2d 813, 816 (1st Cir. 1987) (the

exercise of the right to counsel of choice "cannot unduly hinder the fair, efficient and orderly

administration of justice"); *United States v. Diozzi*, 807 F.2d 10, 12 (1st Cir. 1986) (district court

has discretion to limit defendant's choice of counsel "when insistence upon it would

disproportionately disadvantage the government or interfere with the ethical and orderly

administration of justice").  Permitting the same firms to represent both cooperating witnesses and

other defendants could both create the appearance that defendants represented by the attorneys of

cooperating witnesses have an unfair advantage, and could, in fact, confer an advantage on such defendants, while disadvantaging the government. For example, an attorney who represents both a cooperating witness and a defendant will be able to attend meetings with the government in which their cooperating client is prepared for trial—thus gaining insight into the government's trial strategy—and then use those insights, consciously or not, in preparing their other client's defense. The simultaneous representation of cooperating witnesses and other defendants thus has the potential to undermine both the perception that the process is fair and its actual fairness.

    a. <u>Boies Schiller</u>

The government understands that, in recognition of the conflict raised by its simultaneous representation of Davina Isackson and Zangrillo, Boies Schiller has established a "wall" intended to prevent the exchange of confidential information between and among attorneys for those two defendants, both of whom the government understands to have waived any conflicts. Though "[a]n attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences," some courts have allowed the presumption to be rebutted upon a showing that effective measures have been taken to prevent confidences from being shared between lawyers handling conflicting matters. *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005) (describing the "'strong trend' . . . toward allowing the presumption of confidence sharing within a firm to be rebutted," at least in cases of prior representation, and collecting cases); *see also United States v. Stein*, 410 F. Supp. 2d 316, 325 (S.D.N.Y. 2006) (applying *Hempstead* in the context of a criminal case involving successive representation). The burden is on the firm seeking to represent both clients to demonstrate the adequacy of its safeguards. *Stein*, 410 F. Supp. 2d at 326. Relevant factors may include the size of the firm, geographical divisions between attorneys representing the respective clients, and

limitations on access to files and other information.  *See, e.g.*, *Schiessle v. Stephens*, 717 F.2d 417, 421 (7th Cir. 1983).

Here, the attorneys representing Davina Isackson and Zangrillo work in different offices located on opposite sides of the country.  Boies Schiller has also advised the government that it has undertaken additional measures to prevent the sharing of information between the two teams, including by limiting electronic access to documents relevant to each of the clients.  The government respectfully requests that the Court conduct a hearing to determine first, whether these measures are sufficient to address any conflicts between the firm's representation of Zangrillo and its concurrent representation of Isackson, and second, whether they will adequately ensure the public's perception of fairness in these proceedings.  *See Wheat*, 486 U.S. at 163 (affirming a district court's discretion to reject a defendant's knowing and intelligent waiver when his attorney's conflict jeopardizes the integrity of judicial proceedings).  Should the Court conclude that the procedures are sufficient, the government further requests that the Court advise Zangrillo of the dangers arising from the conflict and determine whether he knowingly and intelligently waives them.  *See Foster*, 469 F.2d at 5 (requiring courts to "comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of such risks, and to inquire diligently whether they have discussed the risks with their attorney, and whether they understand that they may retain separate counsel"); *see also* Fed. R. Crim. P. 44(c) (requiring courts to "promptly inquire about the propriety of joint representation" and, "[u]nless there is good cause to believe no conflict of interest is likely to arise," to "take appropriate measures to protect each defendant's right to counsel").

b. 



███████████████████████████████████████████

███████████████████████████████

III.    The Simultaneous Representation of Defendants and Victim U.S.C.
        Poses Serious Conflicts That U.S.C. Declines to Waive

The Second Superseding Indictment alleges that the U.S.C. defendants—Hodge, Giannulli,

Loughlin and Abdelaziz—defrauded U.S.C. as part of the charged conspiracy.  The law firms that

represent these defendants—Ropes, Latham and Nixon, respectively—simultaneously represent

U.S.C. in other matters.  U.S.C. recently contacted the government to advise of the conflict and of

the university's decision not to waive it.  Accordingly, the government respectfully requests that

the Court conduct an inquiry to determine whether Ropes, Latham and Nixon may continue to

represent the U.S.C. defendants in this case absent such a waiver, particularly in light of the fact

that, as set forth below, the conflict is serious, and the steps the firms propose to take to address it

are themselves problematic.

Rule 1.7 is clear:  a lawyer is prohibited from representing a client if that representation is

"directly adverse" to another client—or even if there is a "significant risk" that the representation

"will be materially limited" by the lawyer's responsibilities to another client or to a former client—

absent a written waiver from *both* clients.  *See* Mass. R. Prof. C. 1.7(b); *see also* Mass. R. Prof. C.

1.7 cmt. 6 ("[A]bsent consent, a lawyer ordinarily may not act as an advocate in one matter against

a person the lawyer represents in some other matter."); *see also Altova GmbH v. Syncro Soft SRL*,

320 F. Supp. 3d 314, 319 (D. Mass. 2018) (noting that Rule 1.7 requires "every affected client" to

provide "written informed consent"). As Chief Judge Saris recently explained,

> Rule 1.7 "serves as a 'prophylactic [measure] to protect confidences that a client
> may have shared with his or her attorney . . . [and] safeguard[s] loyalty as a feature
> of the lawyer-client relationship.'" *Maling v. Finnegan, Henderson, Farabow,*
> *Garrett & Dunner, LLP*, 473 Mass. 336, 42 N.E.3d 199, 202 (2015) (quoting *SWS*
> *Fin. Fund A v. Salomon Bros., Inc.*, 790 F.Supp. 1392, 1401 (N.D. Ill. 1992))

(alteration in original). Particularly important in a case like this one is the duty of loyalty. *See* Mass. R. Prof. C. 1.7 cmt. 6 ("Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent."); *Bryan Corp. v. Abrano*, 474 Mass. 504, 511 (2016) (stating that duty of loyalty "forms the bedrock of the attorney-client relationship").

*Syncro Soft SRL*, 320 F. Supp. 3d at 319. *See also Strickland v. Washington*, 466 U.S. 668, 692 (1984) (duty of loyalty is "perhaps the most basic of counsel's duties"); *Bryan Corp.*, 474 Mass. at 511 ("By prohibiting the simultaneous representation of clients with adverse interests absent informed consent, Rule 1.7 fosters a sense of trust between the lawyer and client that promotes the lawyer's ability to competently represent the client's interests."); Mass R. Prof. C. 1.7 cmt. 1 ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client.").

In this case, the U.S.C. defendants are accused of conspiring to defraud U.S.C. by engaging in a scheme to obtain property from the university through false pretenses, and to use bribery to corrupt U.S.C. employees.  In the event of a trial, multiple witnesses from U.S.C. are expected to testify that the university was, in fact, defrauded.  Defense counsel will, presumably, seek to cross-examine these witnesses, who are clients of their own firms.  And, if the defendants are convicted, U.S.C. will be entitled as a matter of law to restitution and to provide a victim-impact statement, either of which defense counsel will also have an obligation on behalf of their individual clients to scrutinize and potentially challenge.

In discussions with the government, the law firms have made several arguments for why their disqualification is not required in the absence of a waiver by U.S.C.  First, they contend that there is no conflict because U.S.C. is not a "party" to these proceedings, notwithstanding its status as a victim and witness, and notwithstanding the firms' apparent decision to seek conflict waivers from the individual defendants.  Second, they contend that there is no conflict because the firms

represent U.S.C. in matters unrelated to this criminal case.[11]  <u>Third</u>, they propose to address any

conflicts by having conflict counsel handle those portions of the litigation that relate specifically

to U.S.C., such as the cross-examination of U.S.C. witnesses.  <u>Fourth</u>, the Nixon firm contends

that U.S.C. signed an advance waiver of conflicts as part of Nixon's standard engagement letter,

and thus has waived any conflicts of interest.  The government respectfully submits that the firms'

legal arguments are without merit, and that their proposed reliance on conflict counsel does not

adequately address the issues here.

    <u>First</u>, the fact that U.S.C. is not technically a party to these proceedings, insofar as it is

neither the plaintiff nor a defendant, does not mean that there is no conflict.  Thus, Latham's

contention that its representation of Loughlin and Giannulli "is 'against' only the United States,

not against U.S.C.," Exhibit B at 3, misses the mark, because a client's status as a "party" to

particular proceedings is of no moment to the inquiry.  *Cf. In re Cendant Corp. Sec. Litig.*, 124 F.

Supp. 2d 235, 242 (D.N.J. 2000) (noting that multiple jurisdictions "have embraced the view

that adverse witnesses, in addition to parties, may be 'directly adverse' within the meaning of

Rule 1.7(a)").  Here, U.S.C. is both an alleged victim and a likely prosecution witness.  Its

representatives are expected to testify that the university was defrauded by the defendants and their

co-conspirators.  Its interests are thus "directly adverse" to those of the defendants.  Rule 1.7

---

[11]  Ropes and Nixon have not advised the government of the specific nature of their concurrent representation of U.S.C.  Latham has advised the government that it actively represents U.S.C. in a matter concerning a dispute with the Los Angeles Memorial Coliseum Commission over U.S.C.'s lease rights, and that it previously represented U.S.C. in connection with other, unspecified matters.  *See* May 6, 2019 Letter of B.J. Trach to E. Rosen at 1–2, attached hereto as Exhibit B.  In addition to the conflict arising out of the instant proceedings, U.S.C. has apparently advised Latham that its representation of Loughlin and Giannulli "poses foreseeable conflicts because it is possible that U.S.C. may have civil disputes with one or both sometime in the future, and because the fact that U.S.C. concurrently uses for the Coliseum matter the same counsel . . . may cause U.S.C. public embarrassment." *Id.*

prohibits a lawyer from representing two clients with "directly adverse" interests absent the consent of both. *See, e.g., Arias*, 351 F. Supp. 3d at 198 (attorney disqualified from representing cooperating witness and defendant in same proceeding) (Saris, J.).

The response by both Latham and Ropes—that there is no direct adversity of interests because "[t]he court will not adjudicate any of U.S.C.'s *legal* rights, duties, or interests," Exhibit B at 4; *see also* May 1, 2019 Letter of B. O'Connor and J. McPhee to E. Rosen, at 1, attached hereto as Exhibit C—is incorrect, insofar as the Court *will* adjudicate U.S.C.'s legal right to restitution in the context of any sentencing proceeding. It is also contrary to Rule 1.7's underlying purpose of safeguarding loyalty in the lawyer-client relationship. *See Bryan Corp.*, 474 Mass. at 511 (noting that Rule 1.7 "fosters a sense of trust between the lawyer and client"). Nor does a waiver by one client alone resolve this conflict. *See Arias*, 351 F. Supp. 3d at 201 ("The defendant's waiver alone does not cure this conflict because the Massachusetts Rules of Professional Conduct require both affected clients to agree to waive the conflict and the CW has refused to do so.") (emphasis in original). Indeed, the suggestion by Latham and Ropes that they have obtained written conflict waivers from Loughlin, Giannulli and Hodge, *see* Exhibit B at 6, Exhibit C at 2, is telling in light of their contention that no waiver is required, and simply underscores their failure to secure such a waiver from U.S.C.

Second, the fact that the law firms represent U.S.C. in connection with unrelated litigation does not eliminate these conflicts. Where the interests of two clients are adverse, "it is irrelevant" to the analysis that litigation is "unrelated in subject matter," or even that one client "will not in fact be prejudiced" by a law firm's concurrent representation of the other. *Bryan Corp.,* 474 Mass. at 512; *see also, e.g., Syncro Soft SRL,* 320 F. Supp. 3d at 319 (citing Rule 1.7 for the proposition that representation is "directly adverse" when a lawyer "act[s] as an advocate in one matter against

a person the lawyer represents in *some other matter*" even when the matters are unrelated) (emphasis added). Disqualification may yet be appropriate in such circumstances. *See Bryan Corp.*, 474 Mass. at 516; *see also Syncro Soft SRL*, 320 F. Supp. 3d at 321 ("Because Sunstein violated its duty of undivided loyalty to Syncro Soft in violation of Rule 1.7, the Court finds in its discretion that disqualification is appropriate in this litigation."); *Harrison v. Fisons Corp.*, 819 F. Supp. 1039, 1041 (M.D. Fla 1993) (large, multi-office law firm could not litigate against bank while also representing bank in "wholly unrelated" matters, despite the fact that matters involved different attorneys in different offices and attorneys did not have access to confidential information "which would in any way taint the representation"); *State ex rel. Neb. State Bar Ass'n v. Frank*, 631 N.W. 2d 485 (Neb. 2001) (lawyer could not represent client in workers' compensation claim against insurer while also representing insurer in unrelated litigation).

Third, the use of conflict counsel to handle particular cross-examinations or matters related to U.S.C. poses inherent problems on the facts of this case because of U.S.C.'s centrality to the allegations. The charges against the U.S.C. defendants focus on whether they conspired to defraud U.S.C. Among the likely legal and factual issues that will arise over the course of these proceedings is whether the university's coaches and athletic administrators owed it a fiduciary duty; whether the university was aware of or sanctioned its employees' actions; whether the university's admissions and athletic recruitment policies and procedures otherwise condoned those actions; whether the employees breached their duties to the university by accepting payments from the defendants, directly and indirectly, to themselves and to university accounts over which they exercised discretion, in exchange for facilitating the admission of the defendants' children; and whether the alleged misrepresentations by the defendants and their co-conspirators were material. Yet notwithstanding the centrality of U.S.C. to the charges against the U.S.C. defendants, Ropes

has taken the position that "it is premature to assume that any cross-examination of a U.S.C. representative would be on a critical issue," Exhibit C at 2, while Latham has indicated—even before receiving any discovery—that its defense of Loughlin and Giannulli "will focus on their knowledge and intent," and on "legal deficiencies in the government's mail fraud and honest services theories," and that the firm will "recuse itself entirely from . . . cross-examination [of any U.S.C. witnesses], as well as all underlying strategic advice . . . [and] any aspect of the case that concerns restitution to U.S.C." *See* Exhibit B at 2.

It is difficult to imagine that defendants could, at the outset of this litigation, intelligently disclaim such critical lines of potential defense, or agree to hand them off to conflict counsel without any involvement from the rest of the defense team or any plan for whether and, if so, how they fit into an overall defense strategy. Nor, indeed, is it plausible that a defense team could even develop a coherent strategy when part of the team is walled off from certain defenses—or, alternately, that conflict counsel could prepare and coordinate such defenses in isolation, without involving the entire defense team in a manner that is adverse to the interests of U.S.C. Moreover, Giannulli's conflict counsel—the 11-member law firm of Donnelly, Conroy & Gelhaar, LLP— also represents Davina Isackson, who, as noted, is a cooperating witness for the government. Accordingly, for all the reasons set forth above, that firm is itself conflicted, and cannot continue to represent both clients.

<u>Fourth</u>, the government respectfully submits that any inquiry into these issues should specifically address Nixon's contention that U.S.C. waived any conflicts by signing the firm's standard engagement letter, which Nixon has advised contains an advance waiver of any conflicts. Even if such an advance waiver were sufficient to constitute "informed consent, confirmed in writing" to address a conflict that arises subsequently, Rule 1.7 permits clients, at least in certain

circumstances, to revoke any consent they previously provided.  *See* Mass. R. Prof. C. 1.7 cmt. 21.

Here, U.S.C. appears to seek to do just that, insofar as the university has advised the government

that it does *not* consent to Nixon's representation of Abdelaziz in this case.  In such circumstances,

the commentary to Rule 1.7 provides that whether the revocation of consent "precludes the lawyer

from continuing to represent other clients depends on the circumstances, including the nature of

the conflict, whether the client revoked consent because of a material change in circumstances, the

reasonable expectations of the other client and whether material detriment to the other clients

would result."  For all the reasons set forth above, Nixon's simultaneous representation of U.S.C.

and a defendant accused of defrauding the university poses a serious conflict that was both

unforeseeable prior to the filing of criminal charges in this case, and that likely represents a

material change in circumstance as contemplated by the rule.  Likewise, none of the defendants

would suffer any material detriment at this stage of the litigation from retaining new counsel of

their choice who are free from conflicts.  Nevertheless, the government respectfully submits that

the Court should make any ultimate determination on these issues only after conducting an

adequate inquiry.

    IV.    The Simultaneous Representation of Multiple Defendants
             Poses Potential Conflicts

Rule 44(c)(2) is clear that where a lawyer or law firm represents multiple joined defendants,

the Court "must promptly inquire about the propriety of joint representation."  *See also Cardona-*

*Vicenty*, 842 F.3d at 772 ("the Sixth Amendment imposes a duty on trial courts to . . . inquire into

the propriety of multiple representation," and Rule 44(c) "expands theses duties by requiring an

inquiry into the possibility of a conflict in all cases where jointly-charged defendants retain the

same counsel").  Here, as noted, the same attorneys at Latham represent both Loughlin and

Giannulli; the same attorneys at Hooper Lundy & Bookman represent both Gregory and Amy

Colburn; the same attorneys at Todd & Weld and Duane Morris represent both Diane and Todd

Blake; and Attorney Martin Weinberg represents both David Sidoo and Robert Zangrillo.   In

addition, Ropes represents both Douglas Hodge and Elizabeth Henriquez, although different

attorneys at the firm are involved on behalf of each client.   While all of these defendants appear,

at least at this point, likely to proceed to trial, the government respectfully request that the Court

conduct  a  hearing,  pursuant  to  Rule  44(c)(2),  to  "inquire  about  the  propriety  of  joint

representation," and to "personally advise each defendant of the right to the effective assistance of

counsel, including separate representation."

<u>CONCLUSION</u>

For  the  foregoing  reasons,  the  government  respectfully  requests  that  the  Court  hold  a

hearing pursuant to *Foster* and Rule 44(c) to inquire into the conflicts set forth above, ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:   */s/ Eric S. Rosen*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant United States Attorneys

Date: May 23, 2019

## Local Rule 7.1 Certification

I hereby certify that the government has conferred with counsel for the referenced defendants.  Several defendants, through their counsel, have indicated that they do not oppose the government's motion for a hearing to address these issues, while others have indicated that they do not think a hearing is required.

/s/ Eric S. Rosen
ERIC S. ROSEN
Assistant United States Attorney

## Certificate of Service

I hereby certify that on May 23, 2019, I served a copy of the foregoing on counsel of record in this case via electronic mail.

/s/ Eric S. Rosen
ERIC S. ROSEN
Assistant United States Attorney