UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 19-10080-NMG |
| (4)  GAMAL ABDELAZIZ,<br>(8)  MOSSIMO GIANNULLI,<br>(11) DOUGLAS HODGE,<br>(14) LORI LOUGHLIN, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

GOVERNMENT'S REPLY TO DEFENDANTS' RESPONSE
TO MOTION REGARDING CONFLICTS OF INTEREST

The government respectfully submits this reply to the responses of defendants Gamal Abdelaziz, Mossimo Giannulli, Douglas Hodge, and Lori Loughlin in opposition to the government's motion for a hearing concerning conflicts of interest.

The defendants' responses make clear both that their interests are directly adverse to those of U.S.C.—the university they are alleged to have defrauded as part of the charged conspiracy—and that their defense may be materially limited by their attorneys' concurrent representation of the alleged victim. Indeed, Giannulli, Loughlin, and Hodge each concede at least some aspects of this conflict.[1] Accordingly, the principal issues for the Court to address are <u>first</u>, the extent to which defense counsels' conflicts of interest are sufficiently significant that they require

---

[1] The intemperate effort by Abdelaziz's counsel to falsely impugn the government's motives in raising these issues merits little response. (*See* Abdelaziz Br. at 1–5). This Court has an obligation to inquire as to conflicts of interest implicating a defendant's right to conflict-free counsel, and the government is duty-bound to bring such conflicts to the Court's attention, particularly where, as here, the conflicts are significant and may require disqualification.

disqualification in the absence of the victim's consent, and second, whether, even if they do not, they are appropriately addressed by the defendants' proposed work-arounds.

For the reasons set forth below and in its opening brief, the government submits that the conflicts could require disqualification, but that, regardless of how the Court resolves that issue, the defendants' proposed use of conflict counsel poses independent concerns.

ARGUMENT

I. The Conflicts of Interest Are Significant and May Require Disqualification in the Absence of U.S.C.'s Consent

A. U.S.C.'s Interests Are Directly Adverse to the Defendants' Interests

"Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent." Mass. R. Prof. C. 1.7 cmt. 6; *see also Bryan Corp. v. Abrano*, 474 Mass. 504, 511 (2016) (stating that duty of loyalty "forms the bedrock of the attorney-client relationship"). Rule 1.7 is clear: a lawyer is prohibited from representing a client if that representation is "directly adverse" to another client absent the consent of *both* clients. *See, e.g., United States v. Arias*, 351 F. Supp. 3d 198, 201 (D. Mass. 2019) ("The defendant's waiver alone does not cure this conflict because the Massachusetts Rules of Professional Conduct require *both* affected clients to agree to waive the conflict and the CW has refused to do so." (emphasis in original)).

Here, all of the defendants effectively *concede* that, in the event they are convicted, their interests will be directly adverse to those of U.S.C., creating an actual conflict between their attorneys and the university.[2] (*See* Abdelaziz Br. at 7; Giannulli Br. at 12; Hodge Br. at 10). The

---

[2] As a victim of the offense, U.S.C. will have certain rights in the event that the defendants are convicted. These include the right to address the Court at sentencing and to describe the harm that the defendants' conduct caused, *see* 18 U.S.C. § 3771(a)(4), and the right to restitution for any pecuniary loss the university suffered, *see* 18 U.S.C. § 3663A(b)(4) & (c)(1)(A)(ii). The

2

principal dispute is *at what point* the direct adversity arises, and whether it requires disqualification in the absence of U.S.C.'s consent.[3]

Latham, on behalf of Giannulli and Loughlin, acknowledges that, even prior to conviction, cross-examining witnesses from U.S.C. at trial would "would require direct adversity with U.S.C.," and proposes to resolve this issue by not cross-examining any U.S.C. representatives, or participating in the preparation for such cross-examination, "while U.S.C. remains a Latham client." (Giannulli Br. at 14). Nixon and Ropes, by contrast—on behalf of Abdelaziz and Hodge, respectively—contend that there can be no "direct adversity" with U.S.C. before their clients are convicted, because until that point, U.S.C.'s legal rights will not be adjudicated. (Abdelaziz Br. at 6–7; Hodge Br. at 8–9). This position is both aggressive and legally dubious, as the firms themselves seem to acknowledge by suggesting that they will rely on co-counsel to cross-examine any U.S.C. witness.

As an initial matter, the contention that "direct adversity" is limited to instances implicating only adjudication of a client's legal rights and duties is incorrect. In support of this contention, Ropes and Nixon rely on cases and commentary concerning purely economic adversity that do not

---

defendants argue that, until U.S.C. actually exercises its restitution rights, any conflict is "hypothetical and premature," (*see, e,g.*, Hodge Br. at 10), and dismiss U.S.C.'s interest in seeing the defendants punished as "an 'interest' only in a colloquial sense," (Giannulli Br. at 16). But they do not, because they cannot, dispute that U.S.C.'s exercise of such rights—including its advocacy for the defendants' punishment and its effort to recover financial losses—would be directly adverse to the defendants' interests.

[3] Notably, even if disqualification is required, the defendants—who are all represented by multiple law firms—will continue to be represented by highly capable counsel of their choice. (*See, e.g.*, Giannulli Br. at 2 (noting that Giannulli and Loughlin have a "robust defense team— made up of several firms working in tandem . . . who will defend them competently and diligently"); Hodge Br. at 11 (noting that Hodge retained Pepper Hamilton "prior to engaging Ropes & Gray," and that firm "remains an integral part of the defense team"); Abdelaziz Br. at 10 (noting that Abdelaziz is represented by Nevada co-counsel)).

address the concerns at issue here. (*See* Abdelaziz Br. at 6–7 (citing, *inter alia*, *Maling v. Finnegan, Henderson, Farabow, Garrett & Dunner, LLP*, 473 Mass. 336 (2016), concerning dual representation of clients prosecuting similar patents); Hodge Br. at 8–9 (citing Mass. R. Prof. Conduct 1.7, cmt. 6 and ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 05-435 (2004), concerning economic adversity)). As the commentary to Rule 1.7 makes clear, "a directly adverse conflict may arise when a lawyer is required to cross-examine a client who appears as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client who is represented in the lawsuit." Mass. R. Prof. Resp. 1.7 cmt. 6.  Similarly, the ABA has concluded that "[a] lawyer who in the course of representing a client examines another client as an adverse witness in a matter unrelated to the lawyer's representation of the other client . . . . *will likely face a conflict that is disqualifying* in the absence of appropriate client consent." ABA Formal Op. 92-367 at 1 (Oct. 16, 1992) (emphasis added); *see also id.* at 3 (explaining that "the lawyer's duty of loyalty demands that a client not be concerned with whether the lawyer may subconsciously be influenced by the differing interests of another," but that "[w]hen a lawyer is called upon to cross-examine her own client, the lawyer may well be torn between a 'soft,' or deferential, cross-examination, which compromises the representation of the litigation client, and a vigorous one, which breaches the duty of loyalty to the client-witness").

The potential for such conflict extends to the pre-trial phase of the proceedings. The New York City Bar Association's ("NYCBA") Professional Ethics Committee has explained that it will "ordinarily" be the case that "'a lawyer's taking discovery, whether testimony or documentary, on behalf of one client, of a third party who is also a client, will present . . . direct adverseness, so as to be disqualifying under Rule 1.7(a).'" NYCBA Formal Op. 2017-6 at 3–4 (2001) (quoting NYCBA Formal Op. 2001-3 (2001)). The exceptions, according to the Committee, are

"exceptional." *Id.* at 4 (identifying cases where subpoenaing a current client will likely not give rise to a conflict of interest as those in which "the subpoenaed client is not burdened and has no objection"). Other jurisdictions have gone further, concluding that "discovery is coercion" and that serving discovery on a current client invariably entails direct adversity. *See* California State Bar Formal Op. 2011-182 (Jan. 2011).

While Ropes has suggested that Hodge's defense is likely to focus on his alleged lack of intent to defraud, rather than any "technical defenses," (Hodge Br. at 10), none of the defendants has disclaimed any potential defenses, nor could they reasonably do so at this early stage of the litigation.[4] As the government's opening brief made clear, such defenses could include: disputing that U.S.C.'s coaches and athletic administrators owed it a fiduciary duty; suggesting that the university was aware of or sanctioned its employees' actions, or that its admissions and athletic recruitment policies and procedures otherwise condoned those actions; denying that the employees breached any duties to the university by accepting payments to themselves and to university accounts over which they exercised discretion; and disputing that the alleged misrepresentations by the defendants and their co-conspirators were material. (Gov. Br. at 23). Investigating and pursuing such defenses could involve demanding documents from U.S.C. via subpoena, requesting to interview U.S.C. witnesses pre-trial, and challenging and confronting U.S.C. witnesses at trial.[5]

---

[4] Latham initially suggested that its defense of Giannulli and Loughlin would focus on their knowledge and intent, but now contends that "[i]t is far too soon to know with any degree of certainty what defenses" they will raise. (Giannulli Br. at 18).

[5] Nixon and Ropes make much of the fact that another defendant, Bruce Isackson—who is also represented by a law firm that represents U.S.C. in unrelated matters—pled guilty in the absence of a hearing regarding the potential conflicts. (Abdelaziz Br. at 2–5; Hodge Br. at 14). As an initial matter, the government did not learn of the concurrent representation until *Ropes* advised the government of that fact, *after* Isackson had already signed a plea agreement. The government did not learn of U.S.C.'s decision not to waive the conflict until after the hearing itself. By contrast, the government learned of the conflicts set forth in this motion from U.S.C., which

All of these actions would be directly adverse to the interests of U.S.C., which has not consented to waive the conflict. Accordingly, defense counsels' representation of both directly adverse parties is presumptively disallowed by Rule 1.7.

> B. The Representation of the Defendants May be Materially Limited By Defense Counsels' Obligations to U.S.C.

Even if the Court were to conclude that the direct adversity alone does not require disqualification in the absence of U.S.C.'s consent, there remains a significant risk that the law firms' representation of the defendants will be materially limited by their concurrent representation of the alleged victim, and disqualification may yet be required on those grounds.

While Ropes acknowledges that its concurrent representation of U.S.C. and Hodge could materially limit its representation of Hodge—prompting it to seek a waiver from Hodge and to represent that it will not seek to cross-examine any U.S.C. witnesses, (Hodge Br. at 8, 11)—Nixon disputes even this risk, asserting flatly that "there is no risk" that its representation of Abdelaziz

---

affirmatively contacted the government to notify it of the conflicts and to advise the government that it was not waiving them.

Furthermore, it is not the fact of dual representation by itself that gives rise to direct adversity. For this reason, there is, in fact, a relevant difference between defendants who have accepted responsibility for their crimes and those have not. By pleading guilty, Isackson specifically *gave up* the defenses, discovery, and cross-examination that create direct adversity with U.S.C. in the pre-conviction context. The defendants here, on the other hand, dispute that they victimized the university. Accordingly, the conflicts analysis is different; the conflicts involving defendants who are challenging their guilt are both more extensive and more serious. Nevertheless, as noted, the government may yet move for a *Foster* hearing to the extent any remaining conflict has not been addressed by the court prior to Isackson's sentencing. The government will also seek a conflicts hearing with respect to defendant William McGlashan's representation by a law firm that represents U.S.C. in unrelated matters, notwithstanding the fact that U.S.C. has waived that conflict. (Abdelaziz Br. at 15 n.8). Likewise, the government will seek hearings prior to the sentencings of defendants Devin Sloane and Gregory Abbott—both of whom are represented by law firms that also represent Georgetown University in unrelated litigation—notwithstanding the fact that Georgetown has waived any conflicts.

"will be limited by [its] responsibility to maintain USC's client confidences." (Abdelaziz Br. at 9). But this contention misses the mark.

In emphasizing the duty of confidentiality, Nixon gives short shrift to its duty of loyalty. Rule 1.7 protects *both*. *See, e.g.*, *Altova GmbH v. Syncro Soft SRL*, 320 F. Supp. 3d 314, 319 (D. Mass. 2018) (Rule 1.7 "serves as a prophylactic [measure] to protect confidences that a client may have shared with his or her attorney . . . [and] safeguard[s] loyalty as a feature of the lawyer-client relationship." (further citation and internal quotation marks omitted, alteration in original)); *see also Bryan Corp. v. Abrano*, 474 Mass. 504, 511 (2016) (the duty of loyalty "forms the bedrock of the attorney-client relationship"); Mass R. Prof. C. 1.7 cmt. 1 ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."). An ethical wall may in some circumstances serve as an adequate prophylactic to protect client confidences, but it does not ensure undivided loyalty.[6]

Failing to recognize even the possibility that its duty to Abdelaziz is in tension with its duty to the client Abdelziz is charged with defrauding, Nixon relies on the "presumption" that a "'lawyer will subordinate his pecuniary interests and honor his primary professional responsibility to his clients in the matter at hand,'" (Abdelaziz Br. at 10 (quoting *Bucuvalas v. United States*, 98 F.3d 652, 656 (1st Cir. 1996))). But in setting forth that presumption, the First Circuit was

---

[6] While each of the firms has properly recognized the need for an ethical wall to prevent the sharing of information between lawyers representing the defendants and lawyers representing U.S.C., the extent of these measures is not entirely clear. Latham, for example, represents that "timekeepers who have performed material work" for either the defendants or U.S.C. do not have access to case files of the other matter, (Giannulli Br. at 13)—suggesting that at least some attorneys who perform some work on the matters may have such access, provided that Latham does not unilaterally deem it "material." Nixon, for its part, has failed to provide *any* information describing the measures it has taken, or when they went into effect. (*See* Abdelaziz Br. at 9 n.4). Absent such information, neither the Court nor the government has the ability to assess whether the measures are adequate, or whether they were taken in a timely manner.

describing a situation in which the law firm's pecuniary interests were "solely speculative," involving "the mere possibility of additional work for a former client." *See United States v. DiCarlo*, 575 F.2d 952, 957 (1st Cir. 1978). The presumption does not apply here, where the law firms' pecuniary interest is not speculative but actual, insofar as Nixon, Ropes, and Latham *presently* represent both U.S.C. and the defendants, and are actively being paid by both. Indeed, Nixon's position is undermined by one of the very cases on which it relies, *United States v. Zarrab*, in which the parties and the court *agreed* that Kirkland & Ellis's concurrent representation of the defendant and multiple banks that were the alleged victims of his fraud posed an inherent risk of material limitation.[7] No. 15-cr-867 (RMB), 2017 WL 946334 (S.D.N.Y. Feb. 15, 2017). While the court ultimately denied the government's motion to disqualify the firm, even though not all of the bank victims consented to the concurrent representation, *id*. at *5, the waiver in that case specified, among other things, that Kirkland attorneys were "unavailab[le] to participate in the examination or cross examination" of bank witnesses, could "not use or share with" the defendant "any confidential information obtained in the course of their representation" of the banks, and were not permitted to "develop[] or advance[e] any argument that the Client Banks were anything but 'victims' of [the defendant's] alleged illegal transactions." *Id*. at *3; *see also id.* at *2 n.4 & 3 (specifying that matters concerning the banks—including discovery and cross-examination—would be handled by unconflicted co-counsel). Moreover, even with the agreed-upon limitations

---

[7] Ropes also relies on *Zarrab* for the proposition that a law firm can represent both a defendant and a victim of the defendant without the victim's concurrence, where the firm represents the victim in unrelated matters. (Hodge Br. at 6). Ropes argues that, notwithstanding a material limitation, U.S.C. is not an "affected" client whose consent to the representation is required under Rule 1.7(b)(4). (*Id*. at 8). While *Zarrab* lends some support to that conclusion, the court offered no analysis of the issue. Other cases interpreting rules that parallel the Massachusetts rule suggest a contrary result. *See United States v. Earley*, No. 5:18-CR-00026-9, 2018 WL 3910995, at *11 (S.D.W. Va. Aug. 15, 2018); *United States v. Dunlap*, No. 2:08-CR-00283-RCJ, 2010 WL 2723166, at *6 (D. Nev. July 6, 2010).

on the law firm's participation, the court's concerns about the defendant's right to conflict-free representation prompted it to solicit an opinion from independent ethics counsel, to appoint independent counsel to advise the defendant during the conflicts inquiry, and to conduct multiple hearings on the issue. *See id.* at *1–2. And, although the court ultimately concluded that disqualification was not required "at this time," it cautioned that "these conflict matters must be closely monitored." *Id.* at *5.

The court's concerns in *Zarrab* were well-founded. At the very least, the case demonstrates that Nixon's blithe disregard of its responsibilities is untenable, and that a rigorous inquiry—potentially involving the appointment of independent ethics counsel and independent counsel to advise the defendants during the inquiry—is required before the court determines whether the defendants may continue to be represented by Nixon, Latham and Ropes, despite U.S.C.'s failure to consent.

### C. The Applicability of U.S.C.'s Advance Waiver of Nixon's Conflicts Requires Further Inquiry

Nixon argues that U.S.C. waived any conflict by signing an engagement letter containing an advance waiver that U.S.C. can only revoke by terminating its own representation, but concedes that determining the waiver's applicability here would "break new ground." (Abdelaziz Br. at 15–17). The government respectfully submits that the Court should make any ultimate determination on this issue only after conducting an adequate inquiry. *See generally Celgene Corp. v. KV Pharm. Co.*, No. 07-4819SDW, 2008 WL 2937415, at *5 (D.N.J. July 29, 2008) (noting that courts must often "look beyond the words in a waiver provision to determine whether the client gave truly informed consent").

An evaluation of the enforceability of an advance waiver in a given case is a fact-intensive inquiry, and courts have considered factors such as

9

> the breadth of the waiver, the temporal scope of the waiver (whether it waived a current conflict or whether it was intended to waive all conflicts in the future), the quality of the conflicts discussion between the attorney and the client, the specificity of the waiver, the nature of the actual conflict (whether the attorney sought to represent both clients in the same dispute or in unrelated disputes), the sophistication of the client, and the interests of justice.

*Simpson Strong-Tie Co., Inc. v. Oz-Post Int'l, LLC*, No. 3:18-CV-01188-WHO, 2018 WL 3956430, at *13 (N.D. Cal. Aug. 17, 2018) (citation and alteration omitted); *see also Galderma Labs., L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390, 394–406 (N.D. Tex. 2013) (considering similar factors). Nixon cites no cases analyzing how such factors apply in the context of a criminal proceeding, and the government is aware of none.[8]

Notably, the advance waiver contained in U.S.C.'s engagement letter provides as illustrative examples of the conflicts being waived those concerning U.S.C.'s "debtors, creditors, and direct competitors," and refers to Nixon's representation of "numerous clients . . . over a wide range of industries and businesses and in a wide variety of matters." (Abdelaziz Br. at 15). It is implausible to suggest that a client agreeing to an advance waiver couched in terms of business disputes could be said to have been fully informed that it was waiving its right to object to its law firm's representation of defendants accused of criminally defrauding it. *See* Mass. R. Prof. Resp. 1.7 cmt. 22 ("The more comprehensive the explanation of the types of future representations that might arise and the actual and reasonably foreseeable adverse consequences of those representations, the greater the likelihood that the client will have the requisite understanding. Thus, if the client agrees to consent to a particular type of conflict with which the client is already

---

[8] While Nixon notes that the right to counsel of one's choice is weightier in a criminal case than in a civil one, (*see* Abdelaziz Br. at 17), so, too, is the need to protect a defendant from conflicts. *See, e.g., Harris by & Through Ramseyer v. Blodgett*, 853 F. Supp. 1239, 1272 (W.D. Wash. 1994) ("In a criminal context, the need to protect the criminal defendant from conflict of interest is greater than in a civil case.").

familiar, then the consent ordinarily will be effective *with regard to that type of conflict.*" (emphasis added)). That U.S.C. has objected to Nixon's representation of Abdelaziz in this litigation notwithstanding the waiver underscores this point.

II. The Defendants' Proposed Use of Conflict Counsel Presents Additional Problems

The defendants all propose to resolve any conflicts issue by having co-counsel cross-examine U.S.C. witnesses. (Abdelaziz Br. at 10; Hodge Br. at 11; Giannulli Br. at 14). But the centrality of U.S.C. to the allegations renders that proposal problematic.

Abdelaziz, Hodge, Giannulli, and Loughlin are each charged with participating in the bribery conspiracy by agreeing to use bribery and other forms of fraud to have their children admitted to U.S.C. as purported athletic recruits. While the defendants may choose to focus their defense on their own knowledge and intent, it strains credulity to suggest that they will simply concede that U.S.C. was defrauded in a material way—and, as noted, they decline to make any such representation. Instead, they dismiss such defenses as "technical" and "peripheral," (Hodge Br. at 10-11), or as "background matters," (Abdelaziz Br. at 12). But whether there was a scheme to defraud, whether it involved the misrepresentation of material facts or matters, and whether it involved bribes or kickbacks, is hardly "peripheral" or a "background matter." These are elements of the charged crimes, and the defendants will undoubtedly challenge some or all of them.

Pursuit of such defenses will entail not only cross-examination of U.S.C. witnesses but likely also discovery aimed at U.S.C., and effective presentation of those defenses will necessarily extend beyond witness testimony to opening statements and closing arguments. The use of conflict counsel to handle the cross-examination of U.S.C. witnesses does not even purport to address these manifestations of the conflict. *See United States v. Bikundi*, 80 F. Supp. 3d 9, 21 (D.D.C. 2015) (rejecting conflict counsel arrangement where the conflict "extend[ed] beyond just the cross-

examination of [co-defendant] and infect[ed] every aspect of the trial presentation"); *United States v. Locascio*, 357 F. Supp. 2d 536, 557 (E.D.N.Y. 2004) (rejecting conflict counsel arrangement where court was "not convinced that the use of an independent counsel would suffice to eliminate the conflicts in their entirety" because "the specter of Ms. Jaffe as a potential witness and the impact of her testimony will extend beyond her mere cross-examination; it will permeate the entire trial, including the opening statement, summation, and advice to [defendant] as to whether or not he should testify").

Moreover, even with respect to cross-examination, the defendants now *concede*—contrary to their earlier representations—the very concerns the government identified in its opening brief: that lead counsel will *not* be walled off from such defenses that are adverse to U.S.C., and that conflict counsel will *not* prepare them in isolation. Thus, having previously represented to the government that it would "recuse itself entirely from . . . cross-examination [of any U.S.C. witnesses], as well as *all underlying strategic advice* . . . [and] any aspect of the case that concerns restitution to U.S.C.," (Gov. Br., Exhibit B, at 2 (emphasis added)), Latham now backtracks, promising only to recuse itself from participation in "any cross-examination of U.S.C. witnesses or . . . any restitution proceedings that might arise," (Giannulli Br. at 1). And it goes further, making explicit that "[c]o-counsel are full members of the defense team—and will remain *fully involved in all keys aspects of the case, including formulating the overall defense strategy*." (*Id.* at 19 (internal quotation marks omitted)). Nixon similarly represents that it "has committed *only* that it will not cross-examine any USC witness at trial," and that "[n]o further restriction . . . is necessary." (Abdelaziz Br. at 10 n.6 (emphasis added)). Yet ample authority makes clear that this is not enough. The NYCBA Professional Ethics Committee, for example, has said that conflicted counsel "'may not assist, or otherwise participate with, new counsel in litigating against her own

client.'" NYCBA Formal Op. 2017-6 at 6 (2001) (quoting NYCBA Formal Op. 2001-3 (2001)). The Committee explained that "[t]his means that the lawyer may not instruct the other lawyer or strategize on the best way to proceed or indicate which evidence already developed pertains to the case against the other client." NYCBA Formal Op. 2001-3 (2001). Likewise, the parties and court in *Zarrab*—a case on which the defendants rely—agreed that the law firm could not participate in "advancing" *or* "developing" "any argument that the Client Banks were anything but 'victims' of the defendant's conduct." 2017 WL 946334, at *3 (emphasis added). The rationale is clear: absent such limitations, "conflict counsel" is not, in fact, conflict counsel. The limitations on the law firms' representation of the defendants vis-à-vis U.S.C. must be adequate to eliminate potential conflicts, and absent a bar on the firms' participation in all underlying strategic advice concerning defenses that implicate U.S.C.—which would itself be problematic[9]—they are not.

Finally, in the case of Giannulli, the inadequacy of the proposed conflict-counsel arrangement is exacerbated by the fact that the defendant's proposed conflict counsel—the 11-member law firm of Donnelly, Conroy & Gelhaar, LLP ("DCG")—also represents Davina Isackson, a cooperating witness for the government. While DCG represents that it, too, has implemented an ethical wall, (*see* Giannulli Br. at 5 n.1), it is highly questionable, even assuming the best intentions by highly ethical counsel, that such a wall could adequately safeguard client confidences in a firm of DCG's size. *See, e.g.*, *United States v. Stein*, 410 F. Supp. 2d 316, 325 (S.D.N.Y. 2006) (rejecting adequacy of ethical wall in 13-member firm, citing the "relatively intimate environment" and the highly-publicized nature of the case, despite "good faith of all

---

[9] *See* Restatement (Third) of The Law Governing Lawyers § 121, cmt. c(iii) (2000) ("Some conflicts can be eliminated by an agreement limiting the scope of the lawyer's representation *if the limitation can be given effect without rendering the remaining representation objectively inadequate*." (emphasis added)).

13

concerned"); *United States v. Uzzi*, 549 F. Supp. 979, 984 (S.D.N.Y. 1982) (disqualifying 11-member firm based on doubts that ethical wall could prevent disclosures in a firm that size). DCG's involvement as "conflict counsel" therefore only serves to introduce more conflict.[10]

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court conduct an inquiry to determine whether Ropes, Latham, and Nixon may continue to represent the U.S.C. defendants in light of the conflicts set forth above.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    */s Alexia R. DeVincentis*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
ALEXIA R. DEVINCENTIS
Assistant United States Attorneys

Date: July 12, 2019

---

[10] Irrespective of the resolution of the government's motion concerning the law firms' concurrent representation of the defendants and U.S.C., the government respectfully submits that any continued representation of Giannulli by DCG requires a hearing.

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

          /s Alexia R. DeVincentis
          ALEXIA R. DEVINCENTIS
          Assistant United States Attorney

Date: July 12, 2019