<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2

 3    UNITED STATES OF AMERICA,          )
                                         )
 4                 Plaintiff             )
                                         )
 5          -VS-                         )  Criminal No. 19-10080-NMG
                                         )  Pages 1 - 28
 6    MOSSIMO GIANNULLI and              )
      LORI LOUGHLIN,                     )
 7                                       )
                   Defendants            )
 8

 9                    RULE 44(c) HEARING

10
                 BEFORE THE HONORABLE M. PAGE KELLEY
11                  UNITED STATES MAGISTRATE JUDGE

12

13

14                               United States District Court
                                 1 Courthouse Way, Courtroom 1
15                               Boston, Massachusetts  02210
                                 August 27, 2019, 3:00 p.m.
16

17

18

19

20                    LEE A. MARZILLI
                   OFFICIAL COURT REPORTER
21              United States District Court
                1 Courthouse Way, Room 7200
22                  Boston, MA  02210
                     (617)345-6787
23

24

25
</pre>

1      A P P E A R A N C E S:

2          ERIC A. ROSEN, ESQ., JUSTIN D. O'CONNELL, ESQ.,
       KRISTEN A. KEARNEY, ESQ., and LESLIE WRIGHT, ESQ.,
3      Assistant United States Attorneys, Office of the United States
       Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
4      02210, for the Plaintiff.

5          SEAN M. BERKOWITZ, ESQ., Latham & Watkins LLP,
       330 North Wabash Avenue, Suite 2800, Chicago, Illinois, 60611,
6      for the Defendants.

7          WILLIAM J. TRACH, ESQ., Latham & Watkins LLP,
       John Hancock Tower, 27th Floor, 200 Clarendon Street, Boston,
8      Massachusetts, 02116, for the Defendants.

9          GEORGE W. VIEN, ESQ., Donnelly, Conroy & Watkins LLP,
       260 Franklin Street, Boston, Massachusetts, 02110, for the
10     Defendant, Mossimo Giannulli.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

THE CLERK:  You may be seated.  Today is Tuesday

August 27, 2019.  We're on the record in Criminal Case

No. 19-10080, the United States of America v. Mossimo Giannulli

and Lori Loughlin, the Honorable M. Page Kelley presiding.

Will counsel please identify themselves for the record.

MR. ROSEN:  Good afternoon, your Honor.  For the

government, Eric Rosen, Justin O'Connell, Kristen Kearney, and

Leslie Wright.

THE COURT:  Good afternoon.

MR. O'CONNELL:  Good afternoon.

THE COURT:  Counsel?

MR. VIEN:  Good afternoon, your Honor.  George Vien

for Mossimo Giannulli.

THE COURT:  Okay.

MR. TRACH:  Good afternoon, your Honor.  William Trach

for Mossimo Giannulli and Lori Loughlin.

THE COURT:  Good afternoon.

MR. BERKOWITZ:  Good afternoon, your Honor.  Sean

Berkowitz on behalf of Mossimo Giannulli and Lori Loughlin, who

are present in court.

THE COURT:  Okay, and good afternoon to you.  So I'm

going to talk for a while, and then I'm going to ask to hear

from the lawyers, and so I will not ask either of you any

questions for a while.  I'm going to have you sworn in at some

```
 1   point, and then eventually I'm going to ask you a series of
 2   questions about your waiver.
 3         So at the outset of the hearing, I'd like to caution
 4   the parties that the microphones in front of you are live, and
 5   that there is an overflow courtroom set up today, and I've
 6   heard that even if you're speaking softly at counsel table, the
 7   mic will pick up your voice and play it fairly loudly in the
 8   overflow room.  So if you want to speak, there is a button at
 9   the back of the microphone, and you can press it and the light
10   should go from red to green, and then you won't be heard.  Or
11   you could always just ask to take a short break, and I'll give
12   you a chance to talk to each other, okay, at any time during
13   the hearing.
14         DEFENDANT LOUGHLIN:  Thank you.
15         THE COURT:  So, Ms. Loughlin and Mr. Giannulli, we're
16   having this hearing because it has been brought to my attention
17   that the attorneys you retained to represent you have a
18   potential, and I think even actual, conflict of interest, so
19   I'm required to have a colloquy with you by law and to hear
20   from your lawyers as well to make sure that you understand the
21   risks that you're facing, that you've discussed the risks with
22   your lawyers, and that you understand you have the right to
23   retain lawyers who only represent you and not other defendants
24   in the case; and at the end of the hearing, I'll ask you a
25   series of questions about whether you waive the conflict.
```

1          So a person who is charged with a crime absolutely has

2     a right to hire a lawyer of their own choosing, but that also

3     conflicts with another important legal principle; that if

4     you're charged with a crime, you ought to have a lawyer who has

5     undivided loyalty to you alone.  And so the reason we have this

6     hearing is that there really is a bedrock principle in our

7     system of justice that when a person is charged with a crime,

8     their lawyers should have undivided loyalty to them and put

9     them first in everything.  And when a lawyer takes on the

10    representation of a client, they owe that person a duty of

11    loyalty and a duty of confidentiality.  And the reason the

12    Rules of Professional Conduct protect this relationship is that

13    people must have good legal advice all through the proceedings

14    so that they can have a fair trial, and the only way you know

15    you're getting the best legal advice you can is if you have an

16    attorney who has undivided loyalty to you and you alone.

17          The duty of loyalty and confidentiality continues even

18    if the lawyer stops representing a client.  So, in other words,

19    if a conflict arose between you and another client that your

20    lawyer represented, the lawyer cannot really just pick one

21    person and go on with the representation because the attorney

22    still has a duty of loyalty and confidentiality to the other

23    client.

24          So I also want to say by way of explanation that under

25    the law and according to the Rules of Professional Conduct, if

1    attorneys are in the same firm, they are considered to be the

2    same lawyer.  In other words, attorneys from the same firm are

3    not generally allowed to represent clients who have conflicts

4    of interest, and firms typically go to great lengths to avoid

5    that situation.  And so in this colloquy, when I say "counsel,"

6    I'm really referring to a firm and not just a single lawyer.

7           So I also want to say -- and I'm only going to say

8    this once, but it's very, very important -- no one can know

9    what problems may arise in the future because of a conflict.

10   I'm going to go over some potential issues, but no one can say

11   that they know now everything that will happen down the road.

12          It sometimes happens that when an attorney has a

13   conflict of interest and when the case is over, the client will

14   attempt to raise an issue on appeal saying, "I didn't get a

15   fair trial because my lawyer had a conflict of interest and

16   they didn't adequately represent me."  If you waive your

17   conflict today, I want you to understand that you will have a

18   very hard time raising such an issue on appeal because this

19   waiver hearing will effectively act as a barrier to you raising

20   such an issue as that.  So if you waive your conflict, you will

21   in effect be saying, "I don't care what prejudice, even

22   unknown, that I might suffer in the future; I still decided to

23   take that risk."

24          So, of course, if you waive the conflict today, you

25   can always change your mind.  And in the future, if you think

1     you need a lawyer who only represents you, then you can

2     obviously hire another lawyer.  But I will tell you that, first

3     of all, the lawyer with the conflict will still owe a duty to

4     you and to someone else.  And, also, the District Judge is not

5     obligated to continue the case to let a new lawyer get up to

6     speed, and I'm not obligated to slow down the progress of the

7     case either.  So you may in the future find yourself in a bind

8     with regard to timing if you switch lawyers.

9          So I'm going to ask the attorneys now to speak, and I

10    think I'll ask the government to go first and outline their

11    position.

12          MR. ROSEN:  Judge, the way the government sees the

13    issues now, that there are really two issues for the Court to

14    deal with:  The first is the dual representation of

15    Defendant Loughlin and Defendant Giannulli, and the second is

16    the representation by Donnelly, Conroy & Gelhaar of at least

17    three defendants and one other connected individual to the

18    case, the most important issue here being the dual

19    representation of both Mr. Giannulli and Ms. Davina Isackson,

20    who has already pled guilty and is cooperating with the

21    government against Ms. Loughlin, Mr. Giannulli, and others.

22          The USC issue I think has, as I relayed to your Clerk

23    I think last week, I think has sort of resolved itself.  It's

24    now on the sort of former client track because of the

25    defendants' filing, and I don't see any major issues with that,

1    just because there really were two very separate essentially

2    unrelated matters which I think would sort of moot any actual

3    or future client that I see.

4        The issue of dual representation of the two defendants

5    is obviously something we've dealt with before involving, you

6    know, other sort of husband and wife charged defendants.  It is

7    a waivable conflict to some degree.  I mean, there is a

8    concurrent conflict of interest where there's a significant

9    risk that the representation of one or more clients will be

10   materially limited by the lawyer's responsibility to another

11   client.

12       Now, in this case involving the defendants, I do think

13   the evidence here is a little bit more challenging than some of

14   the other husband and wife defendants that we've dealt with.

15   Now, the reason for that is, I don't think there's any

16   dispute -- well, there's going to be a dispute, but let me just

17   talk a little bit about what the government's allegations and

18   what the evidence I have reviewed thus far indicates.

19       I do think both the defendants obviously knew,

20   according to what emails and phone calls we've received, that

21   their daughters would be designated as recruited coxswains for

22   the crew team in exchange for payments, both directly and

23   indirectly, to USC employees or designated accounts of USC

24   employees, and also that they did not play the sport for which

25   they were recruited.  There are emails to that effect beginning

1    in the spring of 2016.  But importantly, especially for this

2    case, there are issues and there's evidence that indicates that

3    they were involved in also separate events that could raise a

4    potential conflict, which would impact the ability of their

5    lawyers to successfully navigate it for one or both of the

6    defendants.  And I'll just give an example.  In April of 2018,

7    there is an incident at the high school of the older daughter

8    where, by the evidence as shown, the allegations are that after

9    she was admitted as a recruited coxswain, it came to light,

10   according to the high school, that they had no, obviously,

11   involvement in the sport, and that there was a confrontation

12   between the guidance counselor and Mr. Giannulli.

13           Now, it appears, at least from the evidence, that

14   portions of that were relayed to Ms. Loughlin as well, but the

15   problem is that that's going to be obviously an important event

16   or an event in the government's presentation of the case; and,

17   you know, if they had separate counsel that weren't

18   representing both, there would obviously be some finger

19   pointing as to who was involved and what people's knowledge of

20   the events actually was.  You couldn't do that if you were

21   represented by both people.

22           There's also issues involving just essentially who was

23   making the payments to Mr. Singer, whether they were involved

24   with other people, and, you know, there are obviously emails

25   that one of them was on while the other was not on.  So I do

1    believe that there are obviously limitations to the sort of

2    united front defense that they do wish to present; but

3    probably, looking through all the evidence, it probably is a

4    waivable conflict, but it obviously is better brought to the

5    Court's attention at this stage rather than waiting until

6    trial.

7           The representation by Mr. Vien of Mr. Giannulli is a

8    little bit different, and it calls into a question we've been

9    dealing with sort of throughout this case.  It requires a

10   little bit of an explanation as to the parties' involvement.

11   Defendant Davina Isackson's daughter was admitted to USC as a

12   fake rower in exchange for a bribe payment.  She has pled

13   guilty, is cooperating, and has acknowledged participating in a

14   wide-ranging conspiracy together with other parents.  She is

15   represented by Mr. Peter Gelhaar of Donnelly, Conroy & Gelhaar.

16   And, you know, I bring in the lawyers' names, and I have the

17   utmost respect for all the lawyers involved in this case.  I

18   simply believe it's best to bring it to the Court's attention

19   so that everything is with sunlight.

20          Defendant Mr. Giannulli's daughter was admitted to

21   USC, the allegations show, as a fake coxswain, part of the crew

22   team, in exchange for a bribe payment.  He has pled not guilty.

23   He is represented by George Vien of the same law firm, which is

24   an eleven-member law firm.  Thus, we have the same school

25   that's involved, the same sport, and one client is cooperating

1  against the other client.  As I've said in previous proceedings,

2  I have not seen a court that's really sanctioned this dual

3  representation of this nature.  I'm talking specifically about

4  the *Daugerdas* case that I brought up in prior proceedings,

5  *United States v. Daugerdas*.  That's D-a-u-g-e-r-d-a-s.  That's

6  75 F. Supplement 2d from the Southern District of New York

7  involving the Sonnenschein law firm.  A firm owes a duty of

8  loyalty obviously to all its clients, and simply counseling

9  Ms. Isackson to provide and cooperate and tell the truth at

10  trial will necessarily harm Mr. Giannulli's defense because

11  they are cooperating one against the other.

12          It also raises an issue of juror confusion where the

13  jury might be confused as to why the same firm is representing

14  both a cooperator and a defendant, and it also raises issues of

15  fundamental fairness where a wealthy defendant can simply

16  purchase access to a cooperator by hiring their attorney, as

17  well as the integrity of the proceedings.

18          It could be that in some large, multi-office firms, as

19  we've gone through in this case, like the case of Boies

20  Schiller, an ethical wall could save the representation and

21  make it consentable; but here we're talking about an

22  eleven-person law firm with a single office that now represents

23  three defendants, including a cooperator and a person also

24  involved in the case.  The government in their papers pointed

25  out two cases from the Southern District of New York, one

1    involving a thirteen-person firm and one involving an

2    eleven-person firm where such dual representation was not

3    approved.  It's just very difficult to see how an eleven-person

4    firm could properly maintain an ethical wall with two

5    defendants, given that such firms share office space, printers,

6    computer networks.  Let alone with three defendants here and

7    another individual, I don't really see how it could work.

8            Notably, the ethical wall here that they describe in

9    the affidavit of Mr. Vien was only erected after April 17 of

10   2019, which was when Mr. Giannulli retained Mr. Vien.  At that

11   point the firm had already been representing Ms. Isackson as

12   well as Mr. Sartorio.  The firm simply had learned confidential

13   information about those individuals, and it's difficult to see,

14   given the circumstances of the size of the firm and the office,

15   how they could then unlearn that for purposes of the

16   proceeding.

17           THE COURT:  Can you just elaborate on -- I presume

18   Ms. Isackson doesn't know Mr. Giannulli.

19           MR. ROSEN:  I don't believe they know each other, your

20   Honor.

21           THE COURT:  So assuming they don't know each other,

22   can you just explain what type of evidence she might be able to

23   give against him.

24           MR. ROSEN:  Absolutely.  They're both very similarly

25   situated individuals who both did the, quote/unquote,

1    "side door" Mr. Singer offered into USC through Donna Heinel.

2    They would describe what Mr. Singer told them about the side

3    door, whether they knew other individuals were participating in

4    it.  They would discuss the creation of the fake profiles in

5    the sport that was used.  In essence we would say, and we've

6    done this in numerous other cases, that a similarly situated

7    person, this is what they knew, this is what they learned, and

8    this is how they knew it; and we'd impute that, you know, ask a

9    jury to make that same imputation to Mr. Giannulli.  And they

10   also used, I believe, the same person to create the fake

11   profile created for both people as well, and she too is

12   cooperating with the government.

13           THE COURT:  Okay.  And anything to say about

14   Mr. Sartorio's representation?

15           MR. ROSEN:  He's pled guilty, and I don't think it

16   presents much of a problem.  He's pled guilty.  He's getting

17   sentenced fairly soon.  And he did the SAT cheating as opposed

18   to the fake sport thing, so I don't believe that will be a big

19   problem.  The main thrust is the conflicts between Ms. Isackson

20   and Mr. Giannulli.

21           THE COURT:  Okay, so you don't see a problem with USC

22   or Mr. Sartorio, nor any major problem with the Giannullis,

23   with this married couple having the same lawyer, but your main

24   concern is with the representation by Mr. Vien and Mr. Gelhaar?

25           MR. ROSEN:  Well, it's not that I don't see a concern

1   with the dual representation of both Ms. Loughlin and

2   Mr. Giannulli.  It's just that I think, in this instance, it's

3   probably most likely waivable.  I think the decision that they

4   make is their decision as to how they want to present the

5   defense.  It's not my decision.  I do see a concern, but it's a

6   waivable category.

7           I do think the other category, the dual representation

8   of the Isackson, who has not yet, at least formally in a Foster

9   hearing, waived the conflict, although they say it in the

10  papers that she intends to waive, and Mr. Giannulli in my mind

11  is far more troubling.

12          THE COURT:  Okay, thank you.

13          So I'd like to hear from defense counsel, and I'd like

14  defense counsel to explain what steps have been taken to

15  mitigate any conflict of interest that has arisen or may arise,

16  and what steps have been taken to comply with Rule 1.7 of the

17  Rules of Professional Conduct, which requires that each

18  affected client must give informed consent in writing.  So in

19  whatever order you wish.

20          MR. VIEN:  Your Honor, I think my representation seems

21  to be more troubling to the government, so why don't I start.

22          First, this is a waivable actual or potential

23  conflict, as evidenced by the cases that the government cites

24  in their brief, *Stein* and *Uzzi*.  And in fact in *Stein*, the

25  court found that the defendants, the clients properly waived

1    any conflict and allowed the representation to continue.

2           I just wanted to point out in the beginning that as

3    your question focused on, Ms. Isackson, as I understand, has

4    never met my client, Mr. Giannulli, and has no idea who he is

5    other than the press reports once this case came about.

6           Now, what happened, as my declaration states, is that

7    prior to getting involved in the case, I went to Mr. Gelhaar

8    because I had heard he represented Ms. Isackson, and I said,

9    "Is there any ethical problem with me representing

10   Mr. Giannulli?"  And he told me "no," he didn't see one at all,

11   and that his client, as far as he understood, didn't even know

12   Mr. Giannulli.  Despite that, your Honor, we put in place I

13   think very robust protections against any cross-pollenization

14   of information.

15          What we did is, first, as I say in my declaration, if

16   the case goes to trial and if the government actually calls

17   Ms. Isackson as a witness, which, frankly, I kind of doubt

18   because I think imputing her criminal consciousness onto

19   another defendant would be wildly improper, but let's say we do

20   go forward and let's say they do call her, first, as I stated

21   in my declaration, I will not cross-examine Ms. Isackson; and

22   the Latham attorneys obviously are more than capable of

23   cross-examining Ms. Isackson, who, as I said, knows nothing

24   about our client, and our client is obviously jointly

25   represented by myself and Latham.

1          In addition to that, we put rules in place so that we

2     didn't discuss the cases, even the public information related

3     to the cases.  And unlike in some of the cases that are

4     problematic, we talked to our computer vendor and segregated

5     the electronic files, and we've obviously segregated physical

6     files, so that I cannot access any files relating to

7     Mr. Gelhaar's client, and Mr. Gelhaar cannot access any files

8     relating to my client, and that goes for paralegals and other

9     attorneys who are working on the case.  So we've put in a

10    robust firewall.  And I know the government keeps coming back

11    to the point that we are a relatively small law firm, but

12    obviously the very cases cited by the government say that

13    that's a consideration but not controlling on this.

14         In addition, as you pointed out by the Massachusetts

15    Rules of Professional Conduct, we have secured a written waiver

16    from Ms. Isackson, and she has waived my involvement in the

17    case.  So Mr. Giannulli is ready to waive and has waived.  We

18    put in robust protections within the office.  I don't see what

19    evidence, admissible evidence Ms. Isackson would actually have

20    to offer against these defendants, and Ms. Isackson herself has

21    waived any potential conflict.

22         So since I think the government, by the cases they

23    cite, would agree that this is a waivable conflict, and both

24    clients have waived, and we've put in these robust protections,

25    I don't think, frankly, that the Court should disqualify our

1   law firm, and instead give Mr. Giannulli the attorneys of his

2   choice, which I think, when you read all the cases, is really

3   the default position.

4         So that's what we've done.  I think it's clearly

5   waivable.  The government agrees, and I think the Court -- I

6   say this respectfully, obviously -- that the Court should

7   accept the waivers and allow us to continue in the case.

8         Thank you.

9         THE COURT:  Okay.  Yes?

10        MR. TRACH:  So, your Honor, I just want to address a

11   couple of the things that the government said as it relates

12   to -- I think the government said that the evidence may be more

13   challenging than some of the other joint husband and wife

14   representations.  And, you know, first off, I think the first

15   thing that was said was that there is evidence that payments

16   were made to either USC employees, either directly or

17   indirectly.  There's zero evidence in this case of that.

18   There's not even an allegation in this case of that, your

19   Honor.  The evidence in this case is that there were checks

20   that were made out to USC Athletics and to a fund to build a

21   building at USC by our clients, and those checks were made and

22   sent to USC and cashed by USC in this case.  And then there

23   were payments that were made to the Key Worldwide Foundation,

24   which was a 401(c)(3) set up by Mr. Singer that gave donations

25   out to schools, legitimate donations to schools across the

1    country.  That's all that my clients are alleged to do, and

2    that's all that the evidence shows was done.  So the idea that

3    there is evidence that our clients paid money to individual

4    employees at USC, there's no evidence of that.

5          And, really, at the end of the day, our clients, their

6    defense which we've discussed before, at least in part, is a

7    question of what it is that they knew about whatever Singer may

8    or may not have been doing with a scheme or with money at the

9    Key Worldwide Foundation or what he was doing with respect to

10   these employees, and I think, on that, my clients do have a

11   united front.

12         The incident that the government talked about with

13   respect to a guidance counselor, first off, that incident

14   happened after the girls were both already admitted into USC,

15   and it was a conversation between Mr. Giannulli and a guidance

16   counselor at their high school.  Nobody who has been charged in

17   this case or who is alleged to have been involved in this case

18   was a part of that conversation.  So the idea that that has

19   become some important event that differentiates our clients and

20   matters for the purpose of the joint representation issue, I

21   just think that can't be the case.

22         And, moreover, all of these issues have been discussed

23   at length with both of our clients.  Unlike a lot of the other

24   people who have joint representation issues, both of our

25   clients have completely non-conflicted separate counsel who

1    they have engaged and who they have talked to about the risks

2    inherent in joint representation, and who are still engaged and

3    able -- at any time, each of our clients can individually talk

4    to non-Latham counsel with no conflicts whatsoever about

5    issues, and they are still retained, they are still part of a

6    team, and they're available to do that.

7           I think, with all of those protections, your Honor,

8    this is clearly a waivable conflict.  The waivers of other

9    husbands and wives who have been charged in this case have been

10   accepted before.  They have been fully apprised of the risks.

11   They have talked about the risks with independent counsel with

12   no conflicts whatsoever; and armed with all that information,

13   they have decided that they want Latham to represent them

14   jointly, and I think your Honor should accept their choice of

15   counsel and allow the continued joint representation.

16          THE COURT:  Okay, thank you.

17          Yes, sir?

18          MR. BERKOWITZ:  I have nothing to add to my partner's

19   comments, your Honor.  We have discussed all of these with

20   Mr. Giannulli and Ms. Loughlin, and I echo Mr. Trach's

21   comments.

22          THE COURT:  Okay.  All right, so as we go forward in

23   the hearing, if at any time you don't understand anything or

24   you have a question, you can ask me.  Or, if you want, we'll

25   take a break and you can consult with your counsel.  Or if you

1    feel that something has come up during the hearing that you

2    want to ask a question about but you feel that it might

3    compromise your defense, or if for any other reason you want to

4    do this, we can have an ex parte hearing, which means that it

5    would just be your counsel and me.  We would exclude the

6    government and the public, and we would have a hearing on the

7    record, but the record would be sealed.  And if at any time you

8    feel that you would like to have such a hearing, I'm also happy

9    to do that.  And if you wanted to take a short break at any

10   time and talk to your lawyers about that, that's fine too.  And

11   we can also always continue the proceeding to another day,

12   although I'm sure you probably don't want to do that, but we

13   could continue it and resume it at another time if you wish.

14          So I'm going to ask you to stand up, and I'm going to

15   ask Ms. Belmont to swear you in, and then you can be seated

16   again.  Thank you.

17          THE CLERK:  Raise your right hand.

18          (Defendants Giannulli and Loughlin duly sworn.)

19          THE COURT:  Okay, thank you.  So I'm just going to go

20   over the risks involved in joint representation briefly, and

21   then we'll do the colloquy, okay.

22          So, first of all, there's a potential conflict

23   because, as has been discussed, Latham & Watkins represents

24   both of you; and even though you're married and it might seem

25   normal to have the same counsel, I'm glad that you have

1    separate counsel as well because I think two people should have

2    separate counsel typically.  You need to have the undivided

3    loyalty of counsel.  Your roles in the offense might be

4    different.  You might have different defenses that come up.

5    You might have different sentencing issues, and there are very

6    serious risks inherent in being represented by an attorney who

7    represents another person in the same case.

8            Some examples of the risks include, your counsel may

9    not be able to conduct an independent investigation of the

10   facts on your behalf because that might mean he's investigating

11   the other person, or that he or she is looking for evidence

12   that might undermine something the other person told them

13   that's helpful to that person's defense.  You may want to

14   testify, if you go to trial, but your lawyer might not want you

15   to, since your testimony might hurt the other person.  Your

16   counsel may not be able to present evidence that's favorable to

17   you if it's harmful to the other person, or your counsel may

18   not be able to cross-examine witnesses fully if one line of

19   questioning might help or hurt the other person.  The

20   attorney-client privilege may prevent counsel from telling you

21   something that the other person told him or her that either

22   helps or hurts your case.  The government may want to offer

23   immunity or recommend a lesser sentence to one person for

24   cooperating; and if one of you gets an offer, your counsel may

25   not be able to fairly advise you whether to take it because it

1    could potentially harm the other person.  The government may

2    let a person plead guilty to lesser charges than the other

3    person but may require the first person to testify, and counsel

4    who represents more than one defendant might recommend the

5    first person not do that in order to protect the other person.

6          The best defense for a person often is the argument

7    that other people are guilty but that person is not, and a

8    lawyer who represents more than one defendant may not be able

9    to effectively make such an argument.  If sentencing becomes an

10   issue, then dual representation may prohibit a lawyer from

11   engaging in negotiations with the government as to full

12   disclosure by one defendant against the other, and it can also

13   prohibit the lawyer from arguing the relative culpability.  So

14   often at sentencing lawyers will attempt to rank all the

15   defendants in a case in order of culpability and say, "Here's

16   where my client falls in there," and if you have multiple

17   clients, it's very hard to do that without hurting one of your

18   clients.

19         And, as I mentioned earlier, another pitfall of having

20   counsel who represents more than one person is that even if

21   your attorneys were to stop representing one of you in the

22   future, their ongoing ethical responsibilities could still

23   hamper the defense of the person who stays.

24         So with regard to, Mr. Giannulli, your representation

25   by Donnelly, Conroy & Gelhaar, the firm that also represents

1   Davina Isackson, this is typically considered to be the most

2   serious potential conflict; and, if you read the cases, this is

3   a situation in which judges most often remove lawyers from

4   cases if they're representing a person who is cooperating

5   against another person.

6          So the defense lawyers in this entire case seem to be

7   arguing -- your lawyer is not the first -- that just because a

8   cooperator doesn't know the other defendant and doesn't have

9   firsthand knowledge of that defendant's alleged crime, they

10  can't really be a witness against that person.  But you should

11  know that the government has a different view of this.  And you

12  are charged in a conspiracy, and in a conspiracy, you don't

13  have to know the other people in the conspiracy.

14         Now, there's a dispute about whether you're even in

15  the same conspiracy, but that hasn't been decided yet.  That is

16  still to be decided, and it may even be that it is not decided

17  until at the trial.  So in that case, the government may use

18  Ms. Isackson to establish that there was this conspiracy, of

19  which she was a part and you were a part, to commit the same

20  crime in the same way with the same people.  And so she may be

21  testifying not exactly about precisely what you did, but she

22  would be a witness against you at trial.  And the fact that the

23  lawyers in this eleven-person firm have erected a firewall and

24  have taken what seems to be pretty good steps to protect you

25  and Ms. Isackson from tainting each other's cases, that's

1    great.  No one can tell you now whether that's foolproof, and

2    whether in fact lawyers who are in business together and

3    working together on many things -- and they're partners,

4    right? -- they're working closely together -- will actually be

5    able to go at each other and attack each other's clients in a

6    way that is really beneficial to you.  So that's a risk that

7    you're taking.  And I certainly, as the government said, I'm

8    not impugning the integrity or the intentions of any of your

9    lawyers, but it is a serious risk.  And I'm glad they've taken

10   the steps that they have, but you may well find yourself

11   disadvantaged somewhere down the road, not deliberately by your

12   lawyers but just by the fact there is this risky situation that

13   is in place.

14           And with regard to Peter Sartorio who's already pled

15   guilty, I agree with the government.  I don't think that's a

16   huge risk, although, again, you don't know what will happen

17   down the road.  For example, there is at least the legal

18   principle that after someone pleads guilty and is sentenced,

19   they don't have a Fifth Amendment privilege anymore, and they

20   could be called as a witness.  So I don't know if this person

21   is cooperating or will want to cooperate, but there's always

22   the potential that something could come up, and this person

23   could come back to hurt you in some way.  So that's also a

24   risk.

25           And for both of you, Latham & Watkins formerly

1   represented USC.  And the government says they don't consider

2   this to be a huge conflict, but I can tell you that there are

3   things brewing in the case where it may well be that USC is

4   opposed to some of the defendants in the case, and you may want

5   to ask your lawyers about that.  They do still have a duty of

6   loyalty toward USC, even though USC is no longer their client.

7   And, I mean, I don't know what all the ins and outs of that are

8   with regard to your defense, but that's something you really

9   need to discuss with your attorneys.  You know, USC is alleged

10  to be the victim of the scheme here.

11          So would you like to take a short break and just speak

12  to your lawyers?

13          DEFENDANT GIANNULLI:  No, thank you.

14          DEFENDANT LOUGHLIN:  No.  I'm fine.

15          THE COURT:  Okay, all right.  So I'm going to ask you

16  each -- you can remain seated, and I'll just ask you questions,

17  and then allow you both to answer them, and we'll just go

18  through them now.  And then after I leave the bench, you can

19  sign a waiver.  You can take your time.  If you don't wish to

20  sign it on the spot, your lawyers will provide it, and you can

21  sign it later.  Okay?

22          So have either of you taken any drugs, medicine, a

23  substance of any kind or alcoholic beverage, or do you have any

24  mental health issues that might prevent you from understanding

25  what is happening here?

1          DEFENDANT GIANNULLI:  No, no.

2          DEFENDANT LOUGHLIN:  No.

3          THE COURT:  And is there any reason you'd like to take

4     a break or continue the hearing?

5          DEFENDANT LOUGHLIN:  We can continue.

6          DEFENDANT GIANNULLI:  Continue, please.

7          MR. BERKOWITZ:  Your Honor, I think they assume what

8     you're asking is, do you want to continue to go on or --

9          THE COURT:  Yes, we'll continue to go on.  So pardon

10    me.  "Continue" has a special meaning to all the lawyers.

11          Okay, do you understand that you have an absolute

12    right to retain separate counsel?

13          DEFENDANT LOUGHLIN:  Can you say that again.

14          THE COURT:  Do you understand that you have an

15    absolute right to retain counsel who is not conflicted in the

16    case?

17          DEFENDANT LOUGHLIN:  Yes.

18          DEFENDANT GIANNULLI:  Yes.

19          THE COURT:  And would you like to consult with counsel

20    before you make a decision today, either your present counsel

21    or a different counsel?

22          DEFENDANT LOUGHLIN:  No.

23          DEFENDANT GIANNULLI:  No.

24          THE COURT:  And do you feel that you understand the

25    risks involved in dual representation?

```
 1              DEFENDANT LOUGHLIN:  Yes.
 2              DEFENDANT GIANNULLI:  Yes.
 3              THE COURT:  And have you discussed this matter with
 4    your lawyers?
 5              DEFENDANT LOUGHLIN:  Yes.
 6              DEFENDANT GIANNULLI:  Yes.
 7              THE COURT:  And would you like to have a private
 8    conversation with me and your counsel about these issues?
 9              DEFENDANT LOUGHLIN:  No.
10              DEFENDANT GIANNULLI:  No.
11              THE COURT:  So in view of these risks and in view of
12    the right to have an attorney who only represents you, do you
13    still wish to be represented by present counsel?
14              DEFENDANT LOUGHLIN:  Yes.
15              DEFENDANT GIANNULLI:  Yes.
16              THE COURT:  Okay.  So do counsel have any
17    reservations?  And I think everyone has said they've explained
18    to their clients the potential for conflicts, so any
19    reservations or anything else you want me to ask?
20              MR. TRACH:  No, your Honor.
21              MR. ROSEN:  Nothing from the government.
22              THE COURT:  Okay, all right.  So that concludes the
23    hearing.  And now there is a written waiver form, and
24    Ms. Belmont will give that to you.
25              Anything else from anyone?
```

1          MR. ROSEN:  Just to be clear, are you, your Honor, as

2     at previous hearings, are you reserving on the issues that

3     we've discussed, or are we --

4          THE COURT:  Okay, I am happy to allow the waiver, but

5     I'm going to take under advisement the Isackson issue.  I just

6     want to further read the cases.  I'm inclined to allow the

7     waiver with regard to Ms. Isackson, but I'm just going to

8     review that, and I'll issue an order in a few days.  Okay?

9          MR. ROSEN:  Thank you.

10          THE COURT:  All right, thank you.

11          THE CLERK:  Court is in recess.

12          (Adjourned, 3:42 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
   CITY OF BOSTON                )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 28 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Criminal No. 19-10080-NMG,

11 United States of America v. Mossimo Giannulli and Lori

12 Loughlin, and thereafter by me reduced to typewriting and is a

13 true and accurate record of the proceedings.

14         Dated this 29th day of August, 2019.

15

16

17

18

19

          /s/ Lee A. Marzilli
20  _____
          LEE A. MARZILLI, CRR
21        OFFICIAL COURT REPORTER

22

23

24

25