# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

    v.

MOSSIMO GIANNULLI and LORI
LOUGHLIN,

      Defendants.

Case No. 19-cr-10080

**DEFENDANTS MOSSIMO GIANNULLI AND LORI LOUGHLIN'S MOTION TO
COMPEL PRODUCTION OF MATERIAL AND EXCULPATORY EVIDENCE**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

ARGUMENT ......................................................................................................................5

    I.    THE GOVERNMENT MUST DISCLOSE EXCULPATORY INFORMATION...................................................................................................5

    II.    THE GOVERNMENT IS SYSTEMATICALLY VIOLATING ITS DISCLOSURE OBLIGATIONS .............................................................8

        A.    Singer's Statements About The Payments...................................8

        B.    USC's Knowledge Of The Payments .......................................16

    III.    THIS COURT SHOULD ACT NOW TO PROTECT DEFENDANTS' RIGHT TO A FAIR TRIAL .................................................................19

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Berger v. United States*,
   295 U.S. 78 (1935)............................................................................................5

*Brady v. Maryland*,
   373 U.S. 83 (1963)....................................................................................1, 5, 6

*Conley v. United States*,
   415 F.3d 183 (1st Cir. 2005)..........................................................................5, 16

*Kyles v. Whitley*,
   514 U.S. 419 (1995)........................................................................................5, 6

*United States v. Acevedo-Hernandez*,
   898 F.3d 150 (1st Cir. 2018)...........................................................................2, 8

*United States v. Agurs*,
   427 U.S. 97 (1976)..............................................................................................6

*United States v. Berroa*,
   856 F.3d 141 (1st Cir. 2017)............................................................................2, 8

*United States v. Bizzack*,
   19-cr-10222 (D. Mass. Oct. 30, 2019).................................................................8

*United States v. Gracie*,
   731 F.3d 1 (1st Cir. 2013)....................................................................................8

*United States v. Ingraldi*,
   793 F.2d 408 (1st Cir. 1986)................................................................................6

*United States v. Jones*,
   620 F. Supp. 2d 163 (D. Mass. 2009)..................................................................6

*United States v. LaRouche Campaign*,
   695 F. Supp. 1265 (D. Mass. 1988).....................................................................6

*United States v. O'Brien*,
   No. 12-cr-40026, 2013 WL 1057929 (D. Mass. Mar. 13, 2013).............................7

*United States v. Osorio*,
   929 F.2d 753 (1st Cir. 1991)................................................................................6

*United States v. Pesaturo*,
   519 F. Supp. 2d 177 (D. Mass. 2007) ...........................................................................7, 19

*United States v. Prochilo*,
   629 F.3d 264 (1st Cir. 2011)........................................................................................5, 19

## RULES

Fed. R. Crim. P. 16 ...........................................................................................................7

Fed. R. Crim. P. 16(a)(1)(E) ........................................................................................7, 19

Local Rule 7.1(d) .................................................................................................................1

Local Rule 83.2.1 ........................................................................................................19, 20

Local Rule 116..................................................................................................................11

Local Rule 116.2........................................................................................13, 14, 19, 20

Local Rule 116.2(a) ..............................................................................................7, 13, 16

Local Rule 116.2(b) .............................................................................................................7

## OTHER AUTHORITIES

*Actress Lori Loughlin Likely to Face 'Higher Sentence' in College Admissions
   Scandal, US Attorney Says*, WCVB5 (Oct. 8, 2019),
   https://www.wcvb.com/article/actress-lori-loughlin-likely-to-face-higher-
   sentence-in-college-admissions-scandal-us-attorney-says/29402556 ....................................20

Brian Costa, *At USC, Admissions Cheating Scandal Runs Deeper*, Wall St. J. (Mar.
   13, 2019), https://www.wsj.com/articles/at-usc-admissions-cheating-scandal-
   runs-deeper-11552505533 .............................................................................................17

*Ex-USC AD Haden Investigated in Admissions Scandal*, Reuters (June 5, 2019),
   https://www.reuters.com/article/us-football-ncaa-usc-haden-admissions/ex-
   usc-ad-haden-investig ated-in-admissions-scandal-idUSKCN1T704E...................................17

Jennifer Levitz & Douglas Belkin, *When Admissions Adviser Rick Singer Called,
   This School Said, 'No, Thanks,'* Wall St. J. (Nov. 6, 2019),
   https://www.wsj.com/articles/when-admissions-adviser-rick-singer-called-
   this-school-said-no-thanks-11573036202 .........................................................................18

Kaidi Yuan & Ashley Zhang, *Indicted USC Administrator's Side Business
   Spotlights the University's Oversight*, USC Annenberg Media (Dec. 5, 2019),
   http://www.uscannenbergmedia.com/2019/12/05/indicted-usc-administrators-
   side-business-spotlights-the-universitys-oversight ..............................................................17

Kaidi Yuan & Ashley Zhang, *More USC Staff Accepted Bribes And Helped Admissions Scam, Feds Say*, LAist (Dec. 4, 2019), https://laist.com/2019/12/04/more_usc_staff_accepted_bribes_and_helped_ad missions_scam_feds_say.php .......................................................................................18, 19

Report of the Judicial Members of the Commission Established to Review and Recommend Revisions of the Local Rules of the United States District Court for the District of Massachusetts Concerning Criminal Cases at 8 (Oct. 28, 1998) ..........................................................................................................................6

U.S. Dep't of Justice, U.S. Attorneys' Manual § 9-5.001(B)(1) (2010), https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings ........................................................................................................................6

U.S. Dep't of Justice, U.S. Attorneys' Manual § 9-5.001(C)(1) (2010).......................................14

## INTRODUCTION

Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), this Court's Local Rules, and the Federal Rules of Criminal Procedure, Defendants Mossimo Giannulli and Lori Loughlin move the Court to order the Government to disclose all information, including FBI Form 302 Reports of witness statements and underlying interview notes, concerning William "Rick" Singer's representations to his clients regarding payments to the University of Southern California, as well as all information about USC's knowledge of Singer's operation.

This Court's intervention is urgently needed.  Thus far, the Government has refused to produce material and exculpatory evidence required by the Due Process Clause, the Federal Rules of Criminal Procedure, and the Rules of this Court.  More fundamentally, the Government is applying a flawed disclosure standard that systematically deprives Giannulli and Loughlin of information necessary to prepare their case and ensure a fair trial.  The Government's theory in this case is that Giannulli and Loughlin knowingly bribed a rogue USC administrator in order to secure their daughters' admission to the university.  But the Government appears to be concealing exculpatory evidence that helps show that both Defendants believed *all* of the payments they made would go to USC itself—for legitimate, university-approved purposes—or to other legitimate charitable causes.  The Government's failure to disclose this information is unacceptable, and this Court should put a stop to it.

To assist the Court in resolving this important issue, oral argument is requested pursuant to Local Rule 7.1(d).[1]

---

[1] Counsel for Defendants Diane Blake, Todd Blake, Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh, and Robert Zangrillo have authorized undersigned counsel to indicate that they fully join in the arguments and relief requested in this Motion.

## BACKGROUND

The Government has charged Giannulli and Loughlin with conspiracy to commit mail and wire fraud, honest-services fraud, money laundering, and federal-programs bribery.  *See* Third Superseding Indictment, ECF No. 610 ¶¶ 313-18.  The Government must therefore prove, among other things, that Giannulli and Loughlin *intended* to defraud USC.  *See United States v. Berroa*, 856 F.3d 141, 154, 157 (1st Cir. 2017); *United States v. Acevedo-Hernandez*, 898 F.3d 150, 161-62 (1st Cir. 2018).  For two of the charges—honest-services fraud and federal-programs bribery—the Government must prove that Giannulli and Loughlin knew their payments to the USC Athletics Department and Singer's Key Worldwide Foundation (KWF) would actually be used to bribe Donna Heinel, a USC official.  At trial, Giannulli and Loughlin will help establish their innocence by showing that they understood both sets of payments to be legitimate donations and did not understand or intend that either set of payments would be used to directly or indirectly bribe Heinel.  The Government's view, meanwhile, is that Singer informed his clients, including Giannulli and Loughlin, that their payments to USC and KWF would actually be bribes to Heinel.  Given these competing theories of the case, any statements by Singer as to precisely what he told his clients about how their funds would be used are critically important.  Also highly relevant is what *USC* knew about Singer's alleged college-admissions operation.  If, for example, USC knew of Singer's operation and accepted donations to the university from Singer's clients as legitimate, then not only was there no bribery at USC, but also no fraud conspiracy at all.  Despite all this, the Government has repeatedly denied that such evidence is material and has refused to disclose it to Defendants.

On May 30, 2019, the Government informed Defendants that it was "aware of no information or materials" that constitute "exculpatory evidence."  May 30, 2019 Letter from

Andrew E. Lelling at 7, attached as Ex. A.[2]  At the initial status conference on June 3, 2019, defense counsel flagged their concerns about the Government's view of its *Brady* obligations—specifically as it related to Singer's representations to clients and USC's knowledge.  In particular, defense counsel explained that "[i]f Rick Singer was telling other parents that the money that they were giving to Key Worldwide was going to go to the athletic programs, we think that's exculpatory." Initial Status Conf. Tr., ECF No. 396 at 10:16-18.  When the Government disagreed with this view, defense counsel emphasized the "chasm[]" between the parties' understanding of the Government's *Brady* obligations, noting that "[i]f money went to a school, whatever the discussions, it's not a bribe, at least not a bribe within the ambit of the Government's allegations in this case."  *Id.* at 13:22-25.  And in response to this colloquy, the Court "urge[d] the Government" to turn over information if Defendants provided "any arguable reason" why it was exculpatory. *Id.* at 14:13-16.

Against that backdrop, Defendants asked the Government to produce all records and witness statements containing exculpatory evidence regarding Singer's representations to his clients, as well as evidence regarding the universities' knowledge of Singer's operation.  *See* Sept. 27, 2019 Letter from Defs' Counsel, attached as Ex. B.  But rather than respond to Defendants' specific requests, the Government dismissed the entire letter as a "fishing expedition" that was seeking *immaterial* and *inculpatory* evidence.  Oct. 31, 2019 Letter from Andrew E. Lelling at 1-2, attached as Ex. C.  According to the Government, "[t]o the extent that Singer made representations to actual or potential clients who are not defendants in this case, such representations are, on their face, irrelevant."  *Id.* at 2.  The Government said that the same was true for information about events that occurred "without the defendants' knowledge," as well as

---

[2] Exhibit A is partially redacted to omit certain information not relevant to this Motion.

for information "concerning where the bribe payments were directed or how they would be spent." *Id.*

Defendants responded by asking the Government to clarify *which* specific discovery requests, in the Government's view, sought evidence that was not exculpatory, and *which* requests sought evidence that the Government did not possess.  *See* Nov. 14, 2019 Letter from Defs' Counsel, attached as Ex. D.  Defendants also proposed to meet and confer about these issues.  *Id.* But the Government declined to clarify, dismissed the entire letter as "overbroad," and refused to meet and confer.  *See* Nov. 27, 2019 Letter from Andrew E. Lelling, attached as Ex. E.  The Government noted, however, that it had "re-reviewed" its FBI 302 Reports and had decided to produce written summaries of evidence to individual Defendants—though it continued to maintain that none of the information was material or exculpatory for *Brady* purposes.  *Id.*  Under separate cover, the Government provided individual Defendants with new summaries of Singer's statements during his FBI interviews—including that he had told certain clients that their "money would be directed to a USC program."  *See* Abdelaziz Reply in Supp. of Mot. to Compel, ECF No. 678 at 4 (quoting Nov. 27, 2019 Letter from Andrew E. Lelling to Brian Kelly); *see also* Nov. 27, 2019 Letter from Andrew E. Lelling to Sean Berkowitz, attached as Ex. F (providing a one-bullet-point summary of information about Singer's statements to the FBI regarding Giannulli and Loughlin).

Meanwhile, on November 13, 2019, Defendant Gamal Abdelaziz filed a motion to compel production of *Brady* material.  *See* Abdelaziz Mot. to Compel, ECF No. 648.  Abdelaziz's motion detailed how he had separately asked the Government to produce exculpatory evidence regarding specific allegations in the Government's March 11, 2019 Affidavit in Support of the Criminal Complaint (ECF No. 3-3).  *See id.*  Specifically, Abdelaziz asked the Government to produce

evidence about its assertion that Singer had not begun making bribe payments to Heinel in her personal capacity until *after* Abdelaziz had already made his payments to KWF. *See id.* The Government had rejected that request too, asserting that "where the money paid by [Abdelaziz] ended up" was neither material nor exculpatory. Ex. A to Abdelaziz Mot. to Compel, ECF No. 648-1 at 2. At the same time, however, the Government maintained that any evidence of direct payments to Heinel would be considered *inculpatory*. *Id.* at n.2.

## ARGUMENT

## I.     THE GOVERNMENT MUST DISCLOSE EXCULPATORY INFORMATION

The purpose of a criminal trial is to "ascertain the *truth* about criminal accusations." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (emphasis added). The Government's overriding responsibility when prosecuting alleged crimes is "not that it shall win [the] case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). Because "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair," the Government is required to disclose to criminal defendants any material exculpatory evidence that might help establish their innocence. *Brady*, 373 U.S. at 87.

The Government's disclosure obligations are governed by three sources of law. *First*, the Due Process Clause of the United States Constitution requires the Government "to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment." *United States v. Prochilo*, 629 F.3d 264, 266 (1st Cir. 2011) (citing *Brady*, 373 U.S. at 87). Under *Brady*, evidence is material if it has "a reasonable probability" of affecting the trial's outcome. *Conley v. United States*, 415 F.3d 183, 188 (1st Cir. 2005). But "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence." *Kyles*, 514 U.S. at 434. Rather, the question is whether—without the evidence—the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*

The Supreme Court has made clear that if a prosecutor is uncertain whether a particular piece of information is materially exculpatory, he should err on the side of providing the evidence. *Id.* at 439 (citing *United States v. Agurs*, 427 U.S. 97, 108 (1976)).  The Department of Justice provides similar guidance, urging prosecutors to "take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence."  U.S. Dep't of Justice, U.S. Attorneys' Manual § 9-5.001(B)(1) (2010), https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings.  And it is likewise clear that the Government's obligation to disclose *Brady* material "include[s] any such material appearing in [FBI Form] 302s."  *United States v. LaRouche Campaign*, 695 F. Supp. 1265, 1268 (D. Mass. 1988).

*Second*, the Government must comply with this Court's Local Rules, which provide "a road map for prosecutors" to satisfy their *Brady* obligations.  *United States v. Jones*, 620 F. Supp. 2d 163, 169 (D. Mass. 2009).  The provisions relevant here—Local Rules 116.1-116.10—were promulgated in 1998 due to the Government's "enduring difficulty" in complying with *Brady*.  *Id.* at 168-70.  As one court later recounted, prosecutors in the District had repeatedly fallen short by engaging in "astounding negligence," "sloppy practice," "inadvertent and deliberate [*Brady*] violations," and other related "[p]rosecutorial misconduct."  *Id.* at 168-69; *see also United States v. Osorio*, 929 F.2d 753, 760, 763 (1st Cir. 1991); *United States v. Ingraldi*, 793 F.2d 408, 413 (1st Cir. 1986).  This Court promulgated the relevant rules to address the fact that "cases too often get to trial without legally required discovery having been provided," thereby "present[ing] judges with challenging issues to be resolved promptly" and "threaten[ing] both the fairness of the trial and the finality of any conviction."  Report of the Judicial Members of the Commission Established to Review and Recommend Revisions of the Local Rules of the United States District Court for the District of Massachusetts Concerning Criminal Cases at 8 (Oct. 28, 1998).

Local Rule 116.2(a) defines "exculpatory information" as "information that is material and favorable" to the defendant, which "includes, but is not necessarily limited to, information that tends to" (1) "cast doubt on defendant's guilt as to any essential element in any count in the indictment"; (2) undermine the "admissibility" of certain Government evidence, as well as the "credibility" or "accuracy" of that evidence; or (3) "diminish the degree of the defendant's culpability" for sentencing purposes.   Unless the Government invokes a formal declination procedure, it must produce such exculpatory information to the Defendant in accordance with the schedule in the Local Rules.   *See* L.R. 116.2(b).

*Third*, Federal Rule of Criminal Procedure 16 provides in relevant part that, "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy . . . papers, documents, data, photographs, [or] tangible objects . . . if the item is within the government's possession, custody, or control" and (1) "the item is *material* to preparing the defense" or (2) "the government intends to use the item in its case-in-chief at trial."   Fed. R. Crim. P. 16(a)(1)(E) (emphasis added).   The standard for materiality under Rule 16 is broader than the standard under *Brady*.   Unlike *Brady*, "Rule 16 does not limit disclosure to information that is exculpatory." *United States v. O'Brien*, No. 12-cr-40026, 2013 WL 1057929, at *9 (D. Mass. Mar. 13, 2013); *United States v. Pesaturo*, 519 F. Supp. 2d 177, 191 (D. Mass. 2007) (requiring disclosure of 302 Reports containing inculpatory information).

The Government's full compliance with its disclosure obligations is absolutely essential to ensure that criminal trials are fair and uncover the truth.   But such disclosures are especially important in cases like this one, where the Government is charging a single, sprawling conspiracy involving parents across the country who did not know each other or work together to commit the alleged crimes.   Because the Government contends that co-conspirators may be held liable for

other foreseeable crimes that were committed to advance the conspiracy, all of the information

that is material and exculpatory for any individual Defendant may be equally so for the others.

## II.   THE GOVERNMENT IS SYSTEMATICALLY VIOLATING ITS DISCLOSURE OBLIGATIONS

### A.   Singer's Statements About The Payments

To convict Giannulli and Loughlin of conspiracy to commit honest-services fraud or

federal-programs bribery, the Government must prove they *knew* about Singer's alleged bribery

of USC employees.  *See Berroa*, 856 F.3d at 154, 157; *Acevedo-Hernandez*, 898 F.3d at 161-62.

Bribery generally requires evidence of "a quid pro quo, the exchange of something of value for

influence over some official conduct of the recipient."  *United States v. Gracie*, 731 F.3d 1, 3 (1st

Cir. 2013).

Here, the allegation that Defendants paid money to USC or KWF to advance their

children's prospects of admission is not itself proof of bribery (even if Singer later used KWF

funds to make donations to USC).  It is common knowledge that universities—*as part of their

legitimate admissions process*—regularly solicit donations from the families of prospective

students, and that such donations can have a material effect on admissions decisions.  As this Court

recently noted, "I don't think you have much of an uphill battle convincing a jury that if you give

donations to a school, you would improve your chances of getting in."  Zangrillo Hr'g Tr., ECF

No. 673 at 21:12-14.  Indeed, the Court rejected USC's claim that "we don't admit people because

they make donations" as simply "not credible" on its face.  *Id.* at 22:1-2.  The Government has

itself acknowledged that this widespread practice of making donations in connection with pending

university applications is not unlawful.  *See* Bizzack Sent'g Tr. at 23:12-18, *United States v.

Bizzack*, 19-cr-10222 (D. Mass. Oct. 30, 2019), attached as Ex. G (agreeing that when "people

whose children are awaiting admission" make "large payments to [educational] institutions," such

open payments are "not bribes," and further agreeing that it would not be a "criminal violation" for USC to "decide to take money, say $100,000 or $200,000" in exchange for an admissions slot).

For these reasons, *even if* Giannulli and Loughlin believed that KWF was using their payments to make these sorts of legitimate donations to USC—and not to bribe Heinel in her personal capacity—they lacked the requisite *mens rea* for bribery. Singer's statements to Giannulli and Loughlin about precisely how Singer would direct their KWF donations—and whether they would be used to benefit USC or Heinel or underprivileged children—thus bear directly on their guilt or innocence.

The 302 Reports and notes from the Government's interviews with Singer almost certainly contain exculpatory information on this point. According to the Indictment, Singer only began sending KWF funds to Heinel in her personal capacity in July 2018, *see* Third Superseding Indictment, ECF No. 610 ¶ 110, which is long after Giannulli and Loughlin allegedly made payments to KWF in April 2017 and February 2018, *id.* ¶¶ 135-36, 140, 147-48. Defendants intend to present evidence at trial that Singer told them KWF was a bona fide charitable organization, and that KWF in fact appeared to be a legitimate charitable organization. KWF was recognized by the IRS as a 501(c)(3) organization, and it made legitimate charitable donations during the relevant time period. Moreover, *even if* Giannulli and Loughlin had believed that some of their KWF donations would be rerouted to USC, Singer's statements on this issue would still be exculpatory if he told them that those donations would go to USC for its use in legitimate university activities, as opposed to being given to Heinel personally. And indeed, there is evidence that Singer was telling at least some of his clients exactly that. *See* Abdelaziz Reply in Supp. of Mot. to Compel, ECF No. 678 at 4 (citing Nov. 27, 2019 Letter from Andrew E. Lelling to Brian Kelly).

Common sense indicates that FBI interviewers asked Singer what he told his clients about their payments to USC and KWF. Were they told that their direct donations to university departments were bribes? Were they told that Singer would reroute their KWF donations, and if so, did he tell them those rerouted donations were legitimate? Or were they told that their money would be used to bribe individual USC employees? Although Singer's answers to those questions are critical to establishing Giannulli and Loughlin's intent with respect to the payments, the Government has not revealed how Singer responded. Indeed, the fact that the Government has never alleged that Singer told Giannulli and Loughlin that their KWF payments were going to Heinel personally is a strong reason to believe he told them the opposite—that the payments were legitimate. And none of the telephone recordings the Government has made public or shared with defense counsel indicate that Giannulli or Loughlin's payments were being directed to Heinel in her personal capacity.

In sum: It is almost certain that the FBI asked Singer what he told his clients about how KWF would use their donations; Singer's response to that question is certainly material; and there is strong reason to believe it is exculpatory as well.

Nonetheless, when Defendants sought the 302 Reports to review Singer's statements, the Government denied the request, claiming that such information was irrelevant and immaterial. For example, the Government completely rejected a request for evidence showing "that Rick Singer wanted Clients to make Payments through [KWF] . . . because this enabled him to divert a portion of the Payments, without the Client's knowledge, . . . to an athletic coach personally." Ex. C at 2 (addressing Request 15 in Ex. B). The Government asserted that "such information is neither relevant nor material to the defendants' knowledge or intent at the time they are alleged to have committed the charged crimes." *Id.* That is simply wrong: Singer's effort to conceal from

Defendants that KWF was using their donations to pay bribes to university insiders in their *personal* capacities strongly undermines the Government's assertion that Defendants knew the payments were illegitimate.

The Government also rejected Defendants' requests for exculpatory material related to Singer's statements to clients who are not defendants, saying that those statements are "on their face, irrelevant to this case." *Id.* But of course, Singer's representations to non-defendant clients are relevant for numerous reasons, such as (1) whether he generally told them that their payments were *donations* or *bribes*, and (2) whether he told them that their payments would go to USC or to Heinel in her personal capacity. The Government admitted as much when arguing that a client-turned-cooperating witness could provide relevant testimony as "a similarly situated person" to Defendants. Giannulli & Loughlin Rule 44(c) Tr., ECF No. 543 at 13 (Government arguing that a former Singer client who was not a defendant in this case could provide relevant testimony by "describ[ing] what Mr. Singer told them about the side door").

Similarly, the Government rejected "several requests seek[ing] information concerning where the bribe payments were directed or how they would be spent." Ex. C at 2 (addressing Requests 1-3, 7, 11-15, 17). In doing so, the Government again declared that this information is "neither relevant nor material to whether the defendants understood the payments to be bribes or kickbacks." *Id.*

The Government's position thus appears to be that if Singer specifically told Defendants that *all* of their payments to KWF would be passed on to USC and used for legitimate purposes—and that *none* of those payments would be diverted to Heinel for her personal use—that information would be immaterial, non-exculpatory, irrelevant, and thus not only outside the scope of *Brady* and Local Rule 116, but also (presumably) inadmissible at trial. That is absurd.

*Of course* it matters what Giannulli, Loughlin, and the other Defendants knew about where their donations would go.  As noted, in making their case to the jury, Giannulli and Loughlin intend to present evidence that they reasonably believed KWF was a bona fide charitable organization, and that their payments to KWF would support programs geared toward helping underprivileged children.  But *even if* they had believed Singer would use some of those funds to make legitimate donations to USC, that undermines the Government's ability to establish the requisite *mens rea* for bribery.  Conversely—as the Government itself has expressly stated—if Giannulli and Loughlin believed Singer would use the funds to bribe Heinel, it would be "inculpatory" and strengthen the Government's case.  Ex. A to Abdelaziz Mot. to Compel, ECF No. 648-1 at 2 n.2. Either way, what Giannulli and Loughlin were told about the funds they paid to KWF is highly relevant and material.

The Government concludes otherwise based on its view that even if Defendants knew KWF was channeling their donations to a specific university department in exchange for special treatment in the admissions process, they nonetheless might have understood those payments to be bribes.  *See, e.g.*, Ex. C at 2; *see also* Gov't Opp'n to Abdelaziz Mot. to Compel, ECF 670 at 11 ("[W]hether Abdelaziz's payment was ultimately funneled at Heinel's direction to a USC fund over which she exercised discretion, or to her own personal account, is irrelevant to the question whether the payment was a bribe.").  That dubious theory is legally flawed, but at best it presents a factual question that must ultimately be resolved by the jury.  And in making their case to the jury, Giannulli and Loughlin would highlight exculpatory evidence showing they believed the

payments to KWF and USC were legitimate donations, not payments to Heinel personally.  Their evidence on this point is certainly not "irrelevant."[3]

The Government appears to be operating on the premise that evidence is exculpatory under *Brady* and Local Rule 116.2 only if it *conclusively* negates criminal liability as a matter of law. That is not the test.  *See* L.R. 116.2(a) (defining exculpatory information to include any information that "tends to cast doubt on defendant's guilt as to any essential element in any count in the indictment").  Nor may the Government deny that evidence is material and exculpatory simply because it believes other evidence supporting liability is *more* compelling.  As the U.S. Attorneys' Manual makes clear, "[a] prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, *regardless of whether the prosecutor believes such information will make the difference*

---

[3] And the Government knows it.  Earlier in the case, the Government recognized that certain Defendants would assert this theory at trial, and that information that the KWF funds were paid to USC—and not to Heinel—would potentially be exculpatory.  Indeed, the Government affirmatively made this point *as a reason to deny certain Defendants their counsel of choice*.  As the Government explained at the Rule 44(c) hearing for Defendant Douglas Hodge,

> Essentially what happened was Ms. Henriquez paid $400,000 to the [KWF] charity account.  Now, the allegations are that part of that money was then funneled on to [Georgetown tennis coach Gordie] Ernst.  Mr. Hodge, on the other hand, their payments were made directly to Mr. Ernst via check in the total amount of approximately, from my review of the evidence, $325,000 that were mailed directly by him to Gordie Ernst in exchange for designating his daughter and son as tennis recruits.  So it raises the issues here.  *Of course, you know, Mrs. Henriquez will use as a defense, "I paid money to the Key Worldwide charity.  There was nothing wrong with that.  I thought the payments were a charitable donations."  She'll, most likely, contrast herself with people like Mr. Hodge, who paid directly to Mr. Ernst, and say, That guy paid a bribe. I didn't.*  There's a potential for significant finger-pointing amongst defendants in this regard, all of whom are joined in the same conspiracy and, given the overlapping facts, will most likely be tried together.

Hodge Rule 44(c) Tr., ECF No. 514 at 29:9-30:3 (emphasis added).  The Government offers no explanation for its striking about-face with respect to the relevance of this argument.

*between conviction and acquittal of the defendant for a charged crime*."  U.S. Dep't of Justice, U.S. Attorneys' Manual § 9-5.001(C)(1) (2010) (emphasis added).

Any doubt about the relevance or materiality of the undisclosed information—or the Government's fundamentally flawed understanding of *Brady* and Local Rule 116.2—is readily dispelled by the recent sentencing hearing of Defendant Jeffrey Bizzack, conducted on October 30, 2019.  There, Judge Woodlock repeatedly challenged the evidentiary basis for the bribery allegations in Bizzack's plea agreement by raising the exact same issues that were raised in Defendants' discovery requests.  *See generally* Ex. G at 13-39.  Among other things, the Court wanted to know (1) the amount that Heinel *personally* earned from the admissions scheme, (2) the details of what Singer told Bizzack about where his payments to KWF would go, and (3) the specific evidence showing that Bizzack believed his KWF payment "was money going to Ms. Heinel as a faithless employee *as opposed to the institution [USC] itself*."  *Id.* at 13-14, 20-25, 27-28, 30-31, 34 (emphasis added).   Moreover, the Court expressed extreme skepticism of the Government's theory that "payments directly to USC" necessarily amounted to bribery.  *Id.* at 15:18-16:11.  It accused the Government of "begging the [bribery] question," highlighted the absence of any evidence that Bizzack knew his payments would be used for bribery, and even hinted that Bizzack had been pressured into pleading guilty despite the absence of such evidence. *Id.* at 15-16, 25-26, 33-35; *see also id.* at 16:3-4 ("[T]his is a case in search of a bribe.").

Yet even after the Bizzack sentencing hearing, the Government has continued to apply its flawed understanding of *Brady* by denying the relevance of the exact same sorts of questions asked by Judge Woodlock.  *See* Ex. C at 2; *see generally* Gov't Opp'n to Abdelaziz Mot. to Compel, ECF 670 at 11.  The Government's intransigence is indefensible.

To be sure, on November 27, 2019, the Government provided Giannulli and Loughlin with a one-sentence bullet point purporting to summarize relevant aspects of Singer's statements to the FBI, and sent similar letters to other Defendants.  *See* Ex. F at 1 (noting simply that "Singer told Giannulli and Loughlin that, in exchange for getting Isabella admitted to the University of Southern California ('USC') as a recruited coxswain, they would need to write a $50,000 check to Donna Heinel at USC and pay an additional $200,000 through the KWF"); Ex. E at 2-3.  But the Government's sanitized account—which is plainly incomplete, given the extent of Singer's purported cooperation—provides no quotations, no context, and no way for defense counsel to assess the information and its import.  The summary has virtually no use as exculpatory or impeachment evidence at trial.  Defendants' access to the full reports is particularly critical because they do not have access to Singer himself, who is under Government control.[4]

More fundamentally, in light of the Government's deeply flawed *Brady* analysis throughout this proceeding, it is impossible to have any confidence in the accuracy and completeness of the summaries.  Indeed, in its November 27 letter, the Government continued to deny the exculpatory nature of its disclosure—and did not even claim to have disclosed a summary of all relevant facts.  Nor did the Government provide this information of its own accord; it was not until after Abdelaziz filed his motion to compel seeking relief from the Court that the Government deigned to provide its vague and cursory summary.  *See* Abdelaziz Reply in Supp. of Mot. to Compel, ECF No. 678 at 4.

---

[4] Moreover, the Government's vague response is affirmatively misleading because the $50,000 check at issue identified the only payee as USC, *not* Heinel.  If Singer actually told the Government the check was written "to Donna Heinel," that statement is false and plainly exculpatory insofar as it impugns the "credibility" and "accuracy" of Singer's account more generally.  But there is no way to know exactly what Singer said without access to the 302 Reports and the underlying FBI interview notes.

In sum, despite Defendants' best efforts, the Government has repeatedly refused to produce the clear-cut *Brady* material in its possession.  That violates Giannulli and Loughlin's right to a fair trial and defies this Court's instruction to turn over information if there is "any arguable reason" it may be exculpatory.  Initial Status Conf. Tr., ECF No. 396 at 14.

### B.    USC's Knowledge Of The Payments

The Government has also categorically rejected Defendants' requests for information about USC's knowledge of the alleged unlawful conduct, stating that such information is "neither relevant nor material to whether the defendants understood the payments to be bribes or kickbacks."  Ex. C at 2 (addressing Questions 15-32).  Here, too, the Government is mistaken.

Singer's payments, USC's knowledge of those payments, and what USC knew about Singer—and when—are all relevant to whether any conspiracy existed at all.  Again, the Government has admitted as much to the Court.  *See* Ex. G at 23-24 (The Court: "[O]ne of the problems, of course, is that people, particularly people whose children are awaiting admission, sometimes make large payments to institutions."  The Government: "That's correct."  The Court: "They're not bribes if they're not matters of concealment, are they?"  The Government: "Correct, Your Honor.").  Thus, like Singer's statements about his clients' knowledge, what Singer said about USC's knowledge—indeed, all evidence of USC's knowledge—is material because it has "a reasonable probability" of affecting the trial's outcome.  *Conley*, 415 F.3d at 188.  Evidence of USC's knowledge would also be exculpatory because it would "tend[] to cast doubt" on Giannulli and Loughlin's guilt.  L.R. 116.2(a).

Here, there is good reason to believe that numerous USC officials were aware of Singer's operation and that the Government is withholding materially exculpatory evidence on this point. As detailed by student journalists at USC's Annenberg Media Center, Heinel "ran a thriving [college admissions] side business that was tightly entwined with her duties at USC and involved

more athletics department personnel than has been publicly known." *See* Kaidi Yuan & Ashley Zhang, *Indicted USC Administrator's Side Business Spotlights the University's Oversight*, USC Annenberg Media (Dec. 5, 2019), http://www.uscannenbergmedia.com/2019/12/05/indicted-usc-administrators-side-business-spotlights-the-universitys-oversight; *see also* Brian Costa, *At USC, Admissions Cheating Scandal Runs Deeper*, Wall St. J. (Mar. 13, 2019), https://www.wsj.com/articles/at-usc-admissions-cheating-scandal-runs-deeper-11552505533 (reporting that Singer's operation was "far more systematic" at USC than other universities and became "a form of institutionalized fundraising for athletics").   Indeed, numerous media outlets have reported that Singer was introduced to Heinel by USC's own Athletic Director, Pat Haden.  *See, e.g.*, *Ex-USC AD Haden Investigated in Admissions Scandal*, Reuters (June 5, 2019), https://www.reuters.com/article/us-football-ncaa-usc-haden-admissions/ex-usc-ad-haden-investigated-in-admissions-scandal-idUSKCN1T704E.

Moreover, Heinel herself has stated, through her attorney, that "there was an aspect of USC admission that was directly linked to donations," and that she "performed her job as she was instructed to do so by Pat Haden, her predecessors in the position and others, and always in accordance with the expectations of both the athletic department and the USC administration." *Statement by Nina Marino, Lawyer for Donna Heinel* (Aug. 4, 2019), https://assets.documentcloud.org/documents/6382483/Statement-by-Nina-Marino.pdf.   Additional evidence corroborates this version of events, such as the "gift receipts" that USC provided for at least some of Singer's clients. *See* Aff. in Supp. of the Criminal Compl., ECF No. 3-3 ¶ 302; *see also* Exs. 1-18 to Zangrillo Resp. in Opp'n to USC Mot. to Quash, ECF Nos. 546-1 to 546-18 (showing extensive coordination between Heinel and USC Dean of Admissions regarding large payments to USC for admission of "VIP" and "special interest" candidates).  And this account is consistent with reports of how Singer

interacted with some other universities—where he was upfront that he sought to exchange donations for admissions. *See* Jennifer Levitz & Douglas Belkin, *When Admissions Adviser Rick Singer Called, This School Said, 'No, Thanks*,' Wall St. J. (Nov. 6, 2019), https://www.wsj.com/articles/when-admissions-adviser-rick-singer-called-this-school-said-no-thanks-11573036202.

In addition to the four USC officials already indicted, the Government has alleged that Singer bribed "others at USC" as well.  Superseding Indictment, *United States v. Ernst*, 19-cr-10081 (D. Mass. Oct. 22, 2019), ECF No. 272 ¶ 52 ("Singer similarly bribed VAVIC, Janke, Khosroshahin, HEINEL and others at USC to designate students as recruited athletes."); *see also* Bizzack Waiver Hr'g Tr., *United States v. Bizzack*, 19-cr-10222 (D. Mass. Oct. 30, 2019), ECF No. 21 at 15:23-16:4 (stating that "Heinel's assistants within the athletic office" supported her scheme).  The Government has even told reporters that other USC employees were also aware of Singer's operation.  *See* Kaidi Yuan & Ashley Zhang, *More USC Staff Accepted Bribes And Helped Admissions Scam, Feds Say*, LAist (Dec. 4, 2019), https://laist.com/2019/12/04/more_usc_staff_accepted_bribes_and_helped_admissions_scam_feds_say.php ("Liz McCarthy, a spokesperson for the U.S. Attorney's office in Boston, which is prosecuting the case, confirmed via email that 'assistants within the athletics office' does not refer to the three USC coaches who were arrested and no longer work at USC.").

But the Government has been much less forthcoming with Defendants than with the press.  As noted, the Government initially provided no information to Defendants about USC's knowledge of Singer's operation.  More recently, the Government has provided summaries of witness statements on this issue—including one from the Dean of Enrollment at a California private high school who told FBI interviewers that "USC does 'shady stuff' every year, especially in development."  Nov. 27, 2019 Letter from Andrew E. Lelling to David Meier at 2.  Remarkably,

the Government insisted that this information was *not* exculpatory—once again betraying its fundamental misunderstanding of *Brady* and Local Rule 116.2. *Id.* at 1. Finally, to the extent the Government has evidence of USC's knowledge that would tend to *inculpate* Giannulli and Loughlin—such as documents that suggest USC was *unaware* of Singer's scheme—that evidence is discoverable as well under the Federal Rules. *See* Fed. R. Crim. P. 16(a)(1)(E); *Pesaturo*, 519 F. Supp. 2d at 189.

## III.   THIS COURT SHOULD ACT NOW TO PROTECT DEFENDANTS' RIGHT TO A FAIR TRIAL

The Government generally bears the primary responsibility for upholding *Brady*'s disclosure requirements. *See Prochilo*, 629 F.3d at 268. In this particular case, however, the Government's fundamental misunderstanding of its obligations raises serious concerns about its ability to do so. Here, the Government's *Brady* errors have not been isolated slip-ups or oversights. Rather, they have systematically deprived Giannulli and Loughlin not only of the specific exculpatory evidence noted above, but also presumably of other exculpatory evidence misclassified as "irrelevant" and "immaterial" under the Government's flawed disclosure theory. The Government's failures directly threaten Giannulli and Loughlin's constitutional rights to a fair trial and due process of law.

Nor have these abuses arisen in a vacuum. As other Defendants have established, the Government has also failed to disclose exculpatory evidence regarding interceptions from various Title III orders and consensual recordings and text messages sent or received by Singer. *See* Various Defs' Mot. for Produc., ECF No. 681; Giannulli & Loughlin's Mot. to Join Various Defs' Mot. for Produc., ECF No. 689. And the Government has also violated Local Rule 83.2.1, which

prohibits prosecutors from making "extrajudicial statements" that interfere with a defendant's right to a "fair trial" and the "due administration of justice."[5]

To address the *Brady* and Local Rule 116.2 issues set forth above, the Court should require the Government to respond to *all* of Defendants' September 27 requests.  *See* Ex. B.  In particular, the Government should disclose the full 302 Reports from its interviews with Singer, along with the underlying interview notes.  The Court should also require disclosure of all information in the Government's possession that bears on USC's knowledge of Singer's operation.  Requiring these broad disclosures is essential to preserving the integrity of the trial and ensuring that Giannulli and Loughlin have a fair opportunity to prove their innocence.

More generally, this Court should address—and affirmatively reject—the Government's crabbed theory of *Brady* and Local Rule 116.2.  And it should further require the Government to reassess the information in its possession under the correct standard.

## CONCLUSION

The Court should bring the Government into compliance with *Brady* and Local Rule 116.2 by ordering the relief proposed above.

---

[5] *See, e.g.*, *Actress Lori Loughlin Likely to Face 'Higher Sentence' in College Admissions Scandal, US Attorney Says*, WCVB5 (Oct. 8, 2019), https://www.wcvb.com/article/actress-lori-loughlin-likely-to-face-higher-sentence-in-college-admissions-scandal-us-attorney-says/2940255 6 (noting numerous extrajudicial statements by the United States Attorney about this case, including that the Government would "be asking for a substantial[]" sentence for Loughlin if she does not plead guilty); *see also* Ex. G 45:10-46:8 (Judge Woodlock questioning Government counsel in a related case about the Government's compliance with Rule 83.2.1 and statements about the "public dissemination, that is, a discussion of the possibilities of pleas of guilty to the offense charged or the possibility, for example, of enhanced sentences or enhanced charges").

Dated:  December 13, 2019

Respectfully submitted,

/s/ Sean M. Berkowitz
Sean M. Berkowitz (*admitted pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Phone: 312.777.7700
Fax: 312.993.9767
sean.berkowitz@lw.com

William J. Trach (BBO #661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Phone: 617.948.6000
william.trach@lw.com

Perry J. Viscounty (*admitted pro hac vice*)
LATHAM & WATKINS LLP
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626
Phone: 714.540.1235
perry.viscounty@lw.com

Roman Martinez (*admitted pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Phone: 202.637.2200
roman.martinez@lw.com

*Counsel for Mossimo Giannulli and Lori Loughlin*

George W. Vien (BBO #547411)
Joshua N. Ruby (BBO #679113)
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street
Suite 1600
Boston, MA 02110
Phone: 617.720.2880
Fax: 617.720.3554
gwv@dcglaw.com
jnr@dcglaw.com

Mark E. Beck (*admitted pro hac vice*)
Mark Beck Law, A Professional Corporation
350 West Colorado Boulevard
Suite 200
Pasadena, CA 91105
Phone: 213.596.7828
mbeck@markbecklaw.com

*Counsel for Mossimo Giannulli*

David C. Scheper (*admitted pro hac vice*)
SCHEPER KIM & HARRIS LLP
601 West Fifth Street
12th Floor
Los Angeles, CA 90071
Phone: 213.613.4655
Fax: 213.613.4656
dscheper@scheperkim.com

*Counsel for Lori Loughlin*

## LOCAL RULE 7.1(a)(2) CERTIFICATION

Undersigned counsel certifies that, on December 11, 2019, he conferred with counsel for the Government in an attempt to resolve or narrow the issues raised in this Motion. The Government opposes this Motion.

*/s/ Sean M. Berkowitz*
Sean M. Berkowitz

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document was filed with the Clerk of the United States District Court for the District of Massachusetts via the CM/ECF system, which will notify all participants in the case who are registered CM/ECF users; these are identified on the Notice of Electronic Filing.  Paper copies will be sent on December 13, 2019, to those identified as non-registered participants.

<u>*/s/ Sean M. Berkowitz*</u>
Sean M. Berkowitz