# Exhibit B

September 27, 2019

Eric S. Rosen, Justin D. O'Connell, Leslie A. Wright, and Kristen A. Kearney
Assistant United States Attorneys
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

*United States v. Sidoo et al.*, **No. 19-cr-10080**

Dear Counsel,

The government has taken the position that it possesses no exculpatory evidence or information within the meaning of Local Rule 116.2(b)(1).  *See* May 30, 2019 letter from Eric S. Rosen.  Apparently relying on that position, the government has failed to disclose any FBI form 302 memoranda, and has not disclosed any information originating from witness interviews or grand jury testimony.  However, the categories of evidence and information described in this letter— whether contained in contemporaneous documents (e.g., emails, text messages, Skype messages or other instant messages, or audio recordings) or learned from witnesses (e.g., interviews, depositions, or grand jury testimony)—are exculpatory under Local Rule 116.2(a)(1), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Brady*'s progeny.  We therefore ask that you produce these categories of evidence and information forthwith, as Local Rules 116.2(b)(1) and 116.1(c)(1) required their production 28 days from our clients' May 2019 arraignments.

Our requests refer to the time period prior to March 2019.  They use the following definitions (in which "includes" and "including" denote inclusion without limitation):

- "Advised" includes stated, suggested, recommended, told, gave information, offered, or made a representation, directly or indirectly.

- "Clients" includes Rick Singer's actual client, potential clients to whom he sought to provide services, and persons he claims to have been his clients; it includes the student applicants and any family members or guardians with whom Singer interacted or claimed to have interacted.

- "Colleges" includes all colleges, graduate schools, and universities relevant to this matter, including all colleges, graduate schools, and universities to which Clients applied, and all colleges, graduate schools, and universities with whom Rick Singer communicated or claimed to have communicated about student admissions.

- "Educational institutions" includes Colleges, high schools, and public school districts.

- "Evidence" includes documents, recordings, or information in any form.

- "The Key" includes The Edge (d/b/a The Key), the Key Worldwide Foundation, and all related organizations.

- "Payments" includes all transfers of money, however described and for whatever purpose.

- "Rick Singer" includes all persons affiliated or working, directly or indirectly, with Rick Singer or The Key.

- "Personnel" of a College excludes any individual who, at the time of the relevant acts or events, was receiving funds for personal use from Rick Singer; but otherwise includes staff of the athletics department, the admissions office, the advancement office, and the president's office.

The categories of Evidence we request (divided among topical headings for convenience only) are the following:

*Evidence Regarding Rick Singer's Representations to Clients*

1. All Evidence that Rick Singer advised Clients that Payments from Clients to The Key would be (a) transferred, directly or indirectly, to Educational Institutions; (b) used, directly or indirectly, to fund academic, athletic, or other school-related programs; or (c) used solely for charitable purposes.

2. All Evidence that Rick Singer advised Clients that Payments from Clients to a College athletic coach, whether directly or via The Key, would ultimately benefit (a) the athletic team or program with which the coach was affiliated; or (b) another athletic team or program at the College.

3. All Evidence that Rick Singer advised Clients that the term "side door" referred to preferential admissions treatment for prospective students whose families had, either directly or indirectly, made or agreed to make a payment to a program of the College.

4. All Evidence that Rick Singer (a) advised Clients that any College or College staff knew about, approved of, or authorized any "side door" arrangement; or (b) otherwise gave Clients incorrect information about the scope or nature of his relationships with Colleges or College staff.

5. All Evidence that, in communications with Clients, Rick Singer (a) characterized Payments to any coach, athletic program, or College as lawful, permissible, legitimate, or "above board"; (b) otherwise described such Payments in any way tending to indicate that the Payments would be made in good faith or would not violate the law; or (c) did not describe Payments to Colleges as "bribes" or using other language suggesting impropriety.

6. All Evidence that Rick Singer advised Clients that Colleges afforded athletic coaches the discretion to (a) utilize preferential admission "slots" based on factors other than athletic skill; or (b) allocate preferential admission "slots" to prospective students who would not necessarily participate in NCAA competition.

7. With regard to all Payments that the Government categorizes as "bribes," all Evidence that (a) the relevant Clients intended the Payment to be transferred to a College; (b) the relevant Clients were told that the Payment would be transferred to the College; or (c) the Payment actually was transferred to the College.

8. All Evidence that Rick Singer introduced any misrepresentations into the admissions materials of any applicant (including any "common app" or athletic resume) without the Client's knowledge or without the applicant's knowledge; including all Evidence that Rick Singer had control over the final submission of the admissions materials of any applicant (including any "common app" or athletic resume).

9. All evidence that Rick Singer, Mark Riddell, or others altered ACT scores, SAT scores, or any other test scores without the Clients' knowledge or without the applicants' knowledge.

10. All evidence that Rick Singer or his employees misrepresented themselves as Clients in communications with the College Board or the Educational Testing Service.

11. All statements Singer made to anyone regarding his representations to Clients (a) about what any Payments were for, or where any Payments would go; (b) about the Colleges' awareness or lack of awareness regarding the purpose of the Payments; or (c) about any incorrect information in the admissions materials of any applicant (including any "common app" or athletic resume).

12. All Evidence that Rick Singer discouraged Clients from speaking to College employees about Payments that the Client or Rick Singer had made to the Colleges or to any College programs.

13. All Evidence that Rick Singer diverted any portion of Payments from Clients, without the Clients' knowledge, (a) for himself or for The Key; or (b) to pay money to a College employee personally, rather than to the College or one of its programs.

14. All Evidence that Rick Singer advised Clients that they should route money to help fund academic, athletic, or other school programs at Educational Institutions through The Key, as opposed to delivering the money directly to the Educational Institutions.

15. All Evidence that Rick Singer wanted Clients to make Payments through The Key, rather than directly to Colleges or College programs, because this enabled him to divert a portion of the Payments, without the Client's knowledge, to himself, to The Key, or to an athletic coach personally.

*Evidence Regarding Colleges' Knowledge of and Attitudes Toward the Alleged Conduct*

16. All Evidence that any College's Personnel understood or agreed that whether a prospective student-athlete would receive preferential admissions treatment would not necessarily be determined solely based on the prospective student-athlete's athletic skill.

17. All Evidence that any College's Personnel were aware that prospective students whose families had made Payments, or had agreed to make Payments, to any of the College's athletic programs, either directly or indirectly, had been promised or afforded (a) slots on College athletic teams; or (b) any other form of preferential admissions treatment.

18. All Evidence that any College coach or other employee was (a) encouraged to recruit prospective students whose families could or likely would make donations to the College or its sports programs (whether directly or through a third party), either as potential student-athletes or as team managers and support staff; or (b) rewarded or praised for doing so.

19. All Evidence that, at any College, the acceptance rate for prospective students whose families could or likely would make donations to the College was higher than the overall acceptance rate.

20. All Evidence of communications between Rick Singer and the administration, admissions department, or advancement office at any College.

21. All Evidence of communications between any College's athletic department staff and that College's advancement office or admissions office concerning the potential for donations by an applicant's or student's family.

22. All Evidence relating to the fundraising-related practices, procedures, or cultures at any College.

23. All Evidence of any College soliciting donations from the parents of any applicant or student-athlete.

24. All Evidence that admissions staff at any College were aware that the admissions materials of any applicant (including any "common app" or athletic resume) contained a misrepresentation.

*Additional Categories of Evidence*

25. All Evidence concerning any inquiries or investigations by or on behalf of a College, including compliance or internal audit reports, concerning Rick Singer's activities, including (a) an unredacted copy of UCLA's July 2014 report of a compliance investigation relating to student-athlete admissions; (b) an unredacted copy of Georgetown University's internal investigation into Gordon Ernst's recruitment practices; and (c) any investigation report prepared in connection with Rick Singer's activities by or on behalf of USC.

26. All Evidence concerning any inquiries or investigations by or on behalf of a College, including compliance or internal audit reports, concerning (a) interactions between the College's athletics department and its advancement office; (b) interactions between the College's admissions office and its advancement office; or (c) any individuals that have entered into cooperation agreements with the government.

27. All statements Singer made to financial advisors, employers, or other referral sources to persuade them to refer Clients to him.

28. All Evidence concerning benefits or things of value Singer gave to or received from financial advisors, employees, or other of his referral sources as part of his referral relationship with them.

29. All statements Singer made to Clients, defendants, or alleged conspirators in which he is alleged to have warned them of the Government investigation in violation of his obligations to the Government.

30. All statements the Government made to Singer as to what he should say to Clients, defendants or alleged coconspirators in his conversations with them, and any criticisms or comments the Government made to him about such conversations.

31. For every prospective government witness, including every individual identified in the government's "no-contact" letter of July 1, 2019: a written description of all promises, rewards, and inducements given to the witness; a copy of any promise, reward, or inducement reduced to writing; a copy of the witness's criminal record; and a written description of any criminal cases pending against the witness.

32. All Evidence concerning communications between Rick Singer and Donna Heinel that occurred outside the presence of Clients (see, e.g., ECF No. 3-3, ¶ 187, No. 1:19-mj-6087).

\* \* \* \* \*

Each of the requests is continuing in nature. We request prompt notice in the event that any responsive evidence or information comes to the government's attention at any time.

If the government declines to provide any category of evidence and information that this letter requests, please (within 14 days) state the basis for your position in writing. If the government takes the position that it has already produced evidence or information that this letter requests, please (within 14 days) so confirm in writing, identify the Bates ranges corresponding to each request, and agree to produce as soon as practicable any additional responsive evidence or information that may come within your possession in the future.

Sincerely,

Counsel to the defendants