**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> MOSSIMO GIANNULLI and LORI LOUGHLIN, <br><br> Defendants. | Case No. 19-cr-10080 |

**DEFENDANTS MOSSIMO GIANNULLI AND LORI LOUGHLIN'S REPLY IN SUPPORT OF THEIR MOTION TO COMPEL PRODUCTION OF <u>MATERIAL AND EXCULPATORY EVIDENCE</u>**

**<u>ORAL ARGUMENT REQUESTED</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................................1

ARGUMENT ...........................................................................................................................5

    I.     THE GOVERNMENT CONTINUES TO FUNDAMENTALLY MISUNDERSTAND ITS DISCLOSURE OBLIGATIONS...................................5

    II.    SINGER'S FULL STATEMENTS ABOUT THE PAYMENTS SHOULD BE DISCLOSED ......................................................................................9

    III.   USC'S KNOWLEDGE OF ADMISSIONS-RELATED DONATIONS SHOULD BE DISCLOSED ..............................................................................13

CONCLUSION........................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Berger v. United States*,
 295 U.S. 78 (1935)..................................................................................9

*United States v. Acevedo-Hernandez*,
 898 F.3d 150 (1st Cir. 2018)....................................................................9

*United States v. Ayala-Vazquez*,
 751 F.3d 1 (1st Cir. 2014)........................................................................9

*United States v. Berroa*,
 856 F.3d 141 (1st Cir. 2017)....................................................................9

## RULES

L.R. 83.2.1 ...................................................................................................2

L.R. 116.2 ..................................................................................................18

L.R. 116.2(a)(1) ...........................................................................................9

L.R. 116.2(b)(1) ...........................................................................................2

## REGULATIONS

28 C.F.R. § 50.2(b) ......................................................................................2

## OTHER AUTHORITIES

*Actress Lori Loughlin Likely to Face 'Higher Sentence' in College Admissions*
 *Scandal, US Attorney Says*, WCVB5 (Oct. 8, 2019),
 https://www.wcvb.com/article/actress-lori-loughlin-likely-to-face-higher-
 sentence-in-college-admissions-scandal-us-attorney-says/29402556 ......2

U.S. Dep't of Justice, U.S. Attorneys' Manual § 1-7.500, .600, .610, .700 (2018),
 https://www.justice.gov/jm/jm-1-7000-media-relations ............................2

U.S. Dep't of Justice, U.S. Attorneys' Manual § 9-5.001(C)(1) (2020).......18

U.S. Dep't of Justice, U.S. Attorneys' Manual § 9-5.002 (2017).................13

# INTRODUCTION

Defendants' motion to compel raised serious questions about whether the Government is withholding crucial exculpatory evidence, namely "evidence that helps show that [Giannulli and Loughlin] believed *all* of the payments they made would go to USC itself—for legitimate, university-approved purposes—or to other legitimate charitable causes." Defs' Mot. to Compel ("Mot."), ECF No. 693 at 1. That evidence would directly undermine the Government's theory that Defendants knew their payments would be used to bribe a rogue USC official. For months now, the Government has claimed that it has no such evidence—or that, to the extent it does, the evidence is not relevant, material, or exculpatory. The Government even doubled down on that intransigence in its January 14, 2020 response brief, denying that it is "withholding any exculpatory evidence" and asserting that it "has scrupulously adhered to its discovery obligations." Gov't's Consolidated Opp'n to Defs' Mots. to Compel ("Gov't Br."), ECF No. 736 at 1-2. But then, on January 28—on the evening this reply brief was originally due—the Government suddenly made new disclosures showing that it has in fact been withholding exculpatory evidence. Among other things, the Government's supplemental disclosure states that:

- "Rick Singer has advised the government, in sum and in substance, that . . . [t]he families that do the side door . . . typically do not know that [former USC official Donna] Heinel is involved until the time of the first payment[.]"

- "Singer stated that Giannulli and Loughlin thought their payment of $50,000 went directly to USC's program[.]"

- "[Giannulli and Loughlin] thought their $200,000 payment went to [the Key Worldwide Foundation, Singer's 501(c)(3) charitable organization]," with some of the funds then "going to a USC program."[1]

---

[1] Jan. 28, 2020 Letter from Andrew E. Lelling to Defs' Counsel at 3-5, attached as Ex. 1. Although the letter is dated January 27, it was not sent to Defendants until the evening of January 28.

For two overarching reasons, these new disclosures confirm that the Court should compel the Government to produce the full FBI 302 Reports and interview notes of Singer's statements, as well as all information about USC's knowledge of Singer and his operation.

*First*, the disclosures establish that for months the Government has been improperly withholding core *Brady* material—material *explicitly requested* by Defendants. The Government had the duty to disclose this information no later than May 30, 2019—247 days ago. *See* L.R. 116.2(b)(1); Arraignment Tr., ECF No. 373 at 23:25-24:1. Instead, the Government hid the information and launched a months-long campaign to pressure Defendants into pleading guilty. During that time, the Government falsely and repeatedly stated that it had turned over all *Brady* and Rule 16 material.[2] While hiding this evidence, it also attempted to apply undue pressure on the defendants by bringing new charges against those who refused to plead guilty—even going on television to threaten those who do not succumb to this pressure with "a substantial[]" sentence— all in blatant violation of this Court's Rules and DOJ policies.[3]

---

[2] *See, e.g.*, May 30, 2019 Letter from Andrew E. Lelling, ECF No. 693-1 at 7 ("the Government is aware of no information or materials relating to this case of the types described in Local Rule 116.2(B)(1)"); Sept. 17, 2019 Letter from Andrew E. Lelling to Brian T. Kelly, ECF No. 648-1 at 1 ("The government is familiar with its *Brady* obligations, and has complied with them, and will continue to do so as this case progresses."); Oct. 31, 2019 Letter from Andrew E. Lelling, ECF No. 693-3 at 1 (similar); Nov. 27, 2019 Letter from Andrew E. Lelling, ECF No. 693-5 at 1 ("we do not believe that any of the information contained [in the FBI 302 Reports] constitutes *Brady* material"); Nov. 27, 2019 Letter from Andrew E. Lelling to Sean Berkowitz, ECF No. 693-6 at 1 (similar); Abdelaziz Reply in Supp. of Mot. to Compel, ECF No. 678 at 4 (quoting Nov. 27, 2019 Letter from Andrew E. Lelling to Brian T. Kelly similarly professing compliance with *Brady* and disclaiming that anything in the FBI 302 Reports qualified as *Brady* material); *see also* Gov't Br. at 2 (similar).

[3] *See Actress Lori Loughlin Likely to Face 'Higher Sentence' in College Admissions Scandal, US Attorney Says*, WCVB5 (Oct. 8, 2019), https://www.wcvb.com/article/actress-lori-loughlin-likely-to-face-higher-sentence-in-college-admissions-scandal-us-attorney-says/29402556; *see also* L.R. 83.2.1 (prohibiting prosecutors from making "extrajudicial statements" that interfere with a defendant's right to a "fair trial" and the "due administration of justice"); 28 C.F.R. § 50.2(b) (DOJ's statement of policy articulating same principles); U.S. Dep't of Justice, U.S.

There is no good-faith basis on which the Government could have withheld this information. The Government offers no explanation for its conduct—and indeed, does not even concede that the newly disclosed materials are subject to *Brady*.[4] The Government's track record of denials and deception confirms that it cannot be trusted to uphold its *Brady* obligations and has forfeited any of the deference that prosecutors usually receive when making such disclosures. The only way to ensure that Defendants receive the materials to which they are entitled is for this Court to order full disclosure.

*Second*, the Government's belated disclosures confirm the fundamental implausibility of its case—especially when considered alongside other concessions buried in the Government's response brief. As things now stand, the Government clearly acknowledges that Giannulli and Loughlin's alleged "bribe payments" did not go to any USC official personally, but rather were given as donations *to USC itself*. *See* Gov't Br. at 21 n.14; Ex 1 at 4. That is, the payments that supposedly bribed Heinel never actually went to her; they were donations that went into university coffers for legitimate, university-approved uses. There is no evidence Defendants somehow knew these payments to USC were personal bribes designed to compensate Heinel for betraying her employer.

The Government also acknowledges that "others at USC"—beyond Heinel—knew about Singer and were "plainly aware of the fact of his purported donations." Gov't Br. 27 (emphasis

---

Attorneys' Manual § 1-7.500, .600, .610, .700 (2018), https://www.justice.gov/jm/jm-1-7000-media-relations (similar).

[4] The Government does not deny that FBI investigators asked Singer "what he told his clients about their payments to USC and KWF" from the beginning of the investigation (Mot. at 10), nor does it claim that the information revealed in the supplemental disclosures was acquired after Defendants' filed their motion. Its letter simply states that the supplemental disclosure is "based on our continued review of FBI 302 interview reports." Ex. 1 at 1. In its forthcoming sur-reply, the Government should explain both (1) *when* the newly disclosed information was obtained, and (2) *why* it was not disclosed until the eleventh hour.

omitted).  More generally, the Government concedes that USC has an institutional practice of tightly intertwining admissions and fundraising.  It could hardly argue otherwise, given the trove of internal documents showing that USC actively tracks and supports admissions-related donations, especially within the athletics department.  The Government's own brief cites emails titled "USC Admissions" sent by a USC *development* official to Giannulli, offering to "flag" his daughter's application, set up a "customized tour of campus for the family," and asking to discuss "the impact of [Giannulli's] philanthropy" at USC.  *Id.* at 5-6; Ex. F to Gov't Br., ECF No. 736-1 at 15-17.  The Government further notes that USC Athletics Director, Pat Haden, reportedly said that he thought Giannulli was "good for a million plus" in connection with his daughter's admission.  Gov't Br. at 6 (quoting Ex. I to Gov't Br., ECF No. 736-1 at 28).

Finally, the Government acknowledges that USC's practice of soliciting donations in exchange for facilitating admissions provides a "legitimate approach" for parents and college applicants.  *Id.* at 5 (quotation marks omitted); *see also id.* at 37-38.  Thus, under the Government's view, it is entirely appropriate for parents to make donations to USC to help secure the admission of their children.

Putting all this together, the Government's theory is apparently that *even though* USC affirmatively accepts donations in exchange for admissions, and *even though* that approach is "legitimate," and *even though* Giannulli and Loughlin's donations actually went to USC and not into the pockets of a rogue employee, Giannulli and Loughlin are still somehow guilty of paying bribes to defraud USC.  That argument flunks common sense.

Defendants' opening brief described the Government's legal theory as "dubious."  Mot. at 12.  But the more information that comes out, the more it looks outright absurd.  It is thus all the more important that the Government cease withholding critical evidence in violation of its clear-

cut *Brady* obligations.  As its eleventh-hour disclosures illustrate, the Government cannot be trusted to make *Brady* determinations on its own.  This Court should put a stop to the Government's unconstitutional game of evidentiary hide-and-seek once and for all.[5]

## ARGUMENT

## I.    THE GOVERNMENT CONTINUES TO FUNDAMENTALLY MISUNDERSTAND ITS DISCLOSURE OBLIGATIONS

The Government's disclosure failures in this case have not been isolated slip-ups or oversights.  Nor have they been limited to colorable disagreements over how the relevant legal standards apply to particular evidence.  Rather, the Government has made clear that it is applying a flawed legal standard to all of its disclosure decisions.  That structural error casts doubt on the Government's repeated assurance that it has "scrupulously adhered to its discovery obligations." Gov't Br. at 1.  Because the Government is applying *the wrong standard*, neither Defendants nor the Court can have any confidence that the Government has produced all of the evidence required by *Brady*, the Federal Rules of Criminal Procedure, and this Court's Local Rules.  And nothing about the Government's last-minute disclosures changes any of this.

Defense counsel raised concerns about "the chasms between the Government's understanding of *Brady* and the defense['s]" at the initial status conference on June 3, 2019.  Initial Status Conf. Tr., ECF No. 396 at 13:21-22.  In response, the Court "urge[d] the Government" to

---

[5] As they did with respect to the original motion, Defendants Diane Blake, Todd Blake, Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh, and Robert Zangrillo join in this Reply.  The Government opposes Defendants' motion, in part, on the basis that certain evidence has already been disclosed to Defendants Loughlin and Giannulli.  *See e.g.*, Gov't Br. at 21 (nothing that the Government has already turned over "Singer's statements to government investigators about what he told the Giannullis concerning their money" and "all of Singer's e-mails with the Giannullis").  But, in doing so, the Government ignores that the motion was joined by eight additional Defendants and seeks the production of exculpatory evidence as to *all* Defendants.

turn over information if Defendants provided "any arguable reason" why it was exculpatory. *Id.* at 10:16-18, 13:22-25, 14:13-16. The Government then proceeded to ignore that instruction. *See* Mot. at 8-20. And in its response brief, the Government continues to deny the relevance and exculpatory nature of quintessential *Brady* material—evidence about Defendants' state of mind, what they knew about the alleged bribes, and USC's knowledge about the alleged scheme. The Government's confused and shifting rationales further show that it misunderstands its disclosure obligations and, as a result, is using unsound judgment in deciding what materials to turn over.

For one thing, the response is littered with numerous mischaracterizations and puzzling assertions, some of which are simply false.[6] For example, the Government either misunderstands or chooses to mischaracterize Defendants' straightforward argument: Giannulli and Loughlin believed their payments were legitimate donations, and USC welcomed them as such. Instead of addressing whether it possesses material and exculpatory information that would support *that argument*, the Government repeatedly attacks a strawman by claiming that Defendants' "principal contention is that, absent an understanding that their money was going to university employees *personally* . . . they cannot be guilty of federal programs bribery or honest services fraud." Gov't Br. at 3. Although Defendants are rightly skeptical of the Government's innovative theory involving "bribe payments" that are paid to the purported victim, that has not been Defendants' "principal contention." Rather, Defendants' *Brady* requests rest on a premise echoed by Judge Woodlock: What Defendants and USC thought about the donations is relevant to whether

---

[6] The Government's brief oddly claims that the disagreement over whether "the evidence that [Defendants] seek is exculpatory . . . . is not the basis for the instant discovery dispute." Gov't Br. at 3. That claim is odd because the exculpatory nature of the withheld evidence is exactly (and obviously) the nature of the dispute: The fundamental reason Defendants need access to the full FBI 302 Reports (and the underlying interview notes) is because the Government is systematically reviewing for exculpatory evidence under the wrong legal standard. *See* Mot. at 19-20.

Defendants had the requisite criminal intent and to whether USC was defrauded at all. *See United States v. Bizzack* Sent'g Tr. at 13-39, ECF No. 693-7 at 13-39. If the Government cannot understand that defense theory, how can it be trusted to identify and produce exculpatory evidence that would support it?

Next, although the Government abandons several of its prior justifications for denying Defendants' requests, its response continues to "dispute[]" that what Singer told parents about their payments could be "exculpatory" information. Gov't Br. at 21. The Government does not develop that argument because it cannot do so with a straight face. What Singer told his clients about their payments is obviously relevant to assessing whether Defendants had any intent to defraud USC.

And the reality is that Singer *did* in fact tell some clients that their admissions-related donations were legitimate—a fact that corroborates Defendants' lack of fraudulent intent. Consider one of the Government's own exhibits, an email in which Singer assures a concerned parent that his "side door" approach to admissions was "not improper" but rather a way that "all schools fund their special programs or needs." Ex. SSS to Gov't Br., ECF No. 736-1 at 361-63. That is quintessential *Brady* material because it is at odds with the Government's theory that Singer's clients knew they were engaging in criminal conduct. Remarkably, the Government *continues* to insist that this evidence is "neither favorable . . . nor material" and thus not subject to *Brady*. Gov't Br. at 22, 24.

Ultimately, the Government's response does not try to justify its indefensible positions, and instead resorts to simply listing the material it has already produced. *See id.* at 21-26 & 26 n.17. But that is no response at all. Regardless of how much information the Government has disclosed, *Brady* still requires the production of *all* material and exculpatory information in the

Government's possession. The Government's non-responsiveness shows that it knows as much, but it has no good answers to Defendants' questions.[7]

Up until the Government's last-minute disclosures, the only information about Singer's interviews that the Government shared with Giannulli and Loughlin was a single bullet-point summary noting that Singer had advised the Government that he told Giannulli and Loughlin "they would need to write a $50,000 check to Donna Heinel at USC and pay an additional $200,000 through the KWF," and that "Loughlin was in charge." Nov. 27, 2019 Letter from Andrew E. Lelling to Sean Berkowitz, ECF No. 693-6 at 1. But the latest disclosures show that material and exculpatory statements by Singer—core *Brady* material—were improperly omitted from the November 27 letter.

Consider the belated disclosures: "Singer stated that Giannulli and Loughlin thought their payment of $50,000 went directly to USC's program[.]" "[Giannulli and Loughlin] thought their $200,000 payment went to [the Key Worldwide Foundation]." "Singer did not recall exactly what he said to Giannulli and Loughlin regarding the money . . . [but] did recall telling [them] that the first $50,000 for each girl went to USC. It was Singer's belief that the Gianullis knew that part of the $200,000 sent to KWF was going to a USC program." Ex. 1 at 4. It should be obvious to any fair-minded observer that evidence that Giannulli and Loughlin thought their money was going to USC and KWF—as opposed to Heinel's pockets—is material and exculpatory. But the Government's November 27 letter completely omitted Singer's statements on this point. Not only

---

[7] The Government's response is concerning for yet another reason. When listing the categories of evidence that it has "produced" to Giannulli and Loughlin, the Government includes, as the fifth category, statements that it has made during the plea colloquies with other parents who have pled guilty. *See* Gov't Br. at 24. In other words, the Government is operating under the troubling view that it can satisfy its *Brady* obligations to Giannulli and Loughlin by mentioning exculpatory evidence in a hearing for another defendant rather than by actually producing that evidence to Giannulli and Loughlin. That is not the law.

that, but the new disclosures reveal inaccuracies in the initial disclosure. Contrary to the Government's November 27 letter reporting that Singer told the Government "Loughlin was in charge," Nov. 27, 2019 Letter from Andrew E. Lelling to Sean Berkowitz, ECF No. 693-6 at 1, the belated disclosures say that Singer told the Government "Giannulli was 'running the show.'" Ex. 1 at 4.

These discrepancies squarely contradict the Government's assertion in its brief (at 25) that the November 27 letter "accurately set forth the relevant information from the FBI 302 report of the interview." If the Government actually believes that statement to be true—even in light of the new disclosures—then it is only because it is operating under a fundamental misconception of what *Brady* requires. Given all this, the Government simply cannot be trusted to fulfill its *Brady* obligations going forward.

The Government's job is not to secure convictions but rather to do justice. *See Berger v. United States*, 295 U.S. 78, 88 (1935). But the Government's deeply flawed disclosure standard— and its casual disregard for Defendants' rights—does the exact opposite. The Court should act now to correct the Government's errors and to protect Defendants' rights.

## II. SINGER'S FULL STATEMENTS ABOUT THE PAYMENTS SHOULD BE DISCLOSED

To convict Giannulli and Loughlin of *any* of the crimes they are charged with, the Government must prove that they had the specific intent to defraud USC. *See, e.g.*, *United States v. Acevedo-Hernandez*, 898 F.3d 150, 161-62 (1st Cir. 2018); *United States v. Berroa*, 856 F.3d 141, 154, 157 (1st Cir. 2017); *United States v. Ayala-Vazquez*, 751 F.3d 1, 14-15 (1st Cir. 2014). Thus, any evidence that suggests Defendants thought their payments were legitimate—and went *to USC*—is clearly exculpatory. *See* L.R. 116.2(a)(1) (defining "exculpatory information" to include evidence that tends to "cast doubt on defendant's guilt as to any essential element in any

count in the indictment"). The belated disclosures confirm that the Government has withheld such evidence in the past. This Court should ensure that no additional evidence is being withheld by requiring the Government to turn over to Defendants both (1) the FBI 302 Reports from its interviews of Singer, and (2) the underlying notes from those interviews.

Defendants previously pointed out that because the Government must prove that Defendants *intended* to defraud USC, FBI interviewers undoubtedly asked Singer what he told Giannulli and Loughlin about the nature of their payments. *See* Mot. at 9-11. Did he tell them that their donations were legitimate, as he told some other clients? *See, e.g.*, Ex. SSS to Gov't Br., ECF No. 736-1 at 361-63 (email from Singer assuring a client that the "side door" approach to admissions was "not improper" but rather a way that "all schools fund their special programs or needs."). Or did he tell them that their payments were bribes?

So far, it has been impossible for Defendants to determine what Singer has told the Government on these fundamental points because the Government has refused to provide the FBI 302 Reports and notes from its interviews with Singer. Up until its belated disclosures, all the Government had provided was a carefully crafted one-sentence summary of Singer's statements to the FBI regarding Giannulli and Loughlin. *See* Nov. 27, 2019 Letter from Andrew E. Lelling to Sean Berkowitz, ECF No. 693-6 at 1 (noting simply that "Singer told Giannulli and Loughlin that, in exchange for getting Isabella admitted to [USC] as a recruited coxswain, they would need to write a $50,000 check to Donna Heinel at USC and pay an additional $200,000 through the KWF"). The Government's belated disclosures provide substantially more (and sometimes contradictory) information. But they still fall short of what is required.

*First*, the Government has *still* not disclosed precisely how Singer answered interviewers' questions about whether he had told Giannulli and Loughlin that their payments would be used to

personally bribe USC officials such that they would betray their duties to USC. Defendants raised this issue at length in their opening brief, *see* Mot. at 9-16, but the Government's response completely ignores the question as it relates to Giannulli and Loughlin. The belated disclosures, on the other hand, provide only a vague summary of Singer's response: "Singer did not recall exactly what he said to Giannulli and Loughlin regarding the money." Ex. 1 at 4. That summary is conveniently vague on the exact issue where the details are crucial. If Singer "did not recall exactly" whether he had told Giannulli and Loughlin that their payments were bribes, Defendants still need to know exactly what he did recall on that issue. The Government's summary does not answer that question.

Moreover, the Government's belated summary suggests that FBI interviewers asked Singer to speculate about Defendants' state of mind: "It was Singer's *belief* that the Gianullis knew that part of the $200,000 sent to KWF was going to a USC program." "The Giannullis *understood* the money was part of the deal and it had to be paid in order to get the girls into USC." *Id.* at 4-5 (emphasis added). As an initial matter, it seems doubtful that interviewers asked Singer to speculate about Defendants' state of mind without asking for the factual bases for his beliefs, yet the Government has not shared that underlying evidence. Further, if interviewers were asking Singer to speculate about Defendants' state of mind on those questions, they also presumably asked him to speculate about whether he thought Giannulli and Loughlin knew their payments were actually bribes. But on that key issue, the Government has provided no disclosures.

Notably, the Government's response does *not* ignore what other defendants knew about the legitimacy of *their* payments. *See* Gov't Br. at 29-30 (claiming that Singer told agents that Defendant McGlashan knew someone else would take the ACT for his son); *id.* at 35 ("The government has also reviewed its reports of interviews with Singer for any statement suggesting

that he advised Wilson that this scheme was legitimate.  There is none.").  But the Government has provided no such response to Giannulli and Loughlin.  Why not?  If Singer had told Giannulli and Loughlin that the payments were bribes, the Government surely would have said so by now.  But it has not.  The question is simple:  What did Singer say about the extent to which Giannulli and Loughlin knew that their donations were really personal bribes intended to induce Heinel to betray her duties to USC?

*Second*, the Government has offered no justification for providing a prosecutor's sanitized characterization of the 302 Reports rather than the actual Reports and accompanying notes from the interviewers themselves.  Its only response has been to deride Defendants' request as "silly." *Id.* at 25 n.15.  But the Government's *Brady* violations are no joking matter.  The Government has now established that its written summaries are no substitute for the actual 302 Reports by confirming—through its last-minute disclosure—that the November 27 bullet point summary was incomplete and inaccurate.  *See supra* at 8-9.

Moreover, the November 27 bullet point appears to have inaccurately portrayed Singer's statements in other material ways.  For example, the bullet point reports Singer as having said that he told Giannulli and Loughlin to write the $50,000 check "*to Donna Heinel* at USC."  Nov. 27, 2019 Letter from Andrew E. Lelling to Sean Berkowitz, ECF No. 693-6 at 1 (emphasis added). Defendants contested that characterization as "affirmatively misleading" because the check was not made payable to Heinel, but rather to USC.  Mot. at 15 n.4.  Because USC was the payee, not Heinel, the Government's written summary shows that either Singer lied to FBI interviewers or the Government inaccurately summarized Singer's statement.

The Government's response brief makes no effort to explain this discrepancy.  Instead, it simply asserts that "[t]he statement is not misleading," and that to the extent the statement impugns

the accuracy of Singer's account, Defendants "now have it." Gov't Br. at 6 n.6. That response misses the point: Defendants need the 302 Reports because the Government's vague one-sentence summary does not even answer whether Singer's statement to the Government was false or the Government's summary was simply imprecise. *Cf.* U.S. Dep't of Justice, U.S. Attorneys' Manual § 9-5.002 (2017) (noting that "prosecutors should take great care to ensure that the *full scope* of pertinent information is provided to the defendant" if the evidence is provided by letter and not in its original form (emphasis added)). And the Government's supplemental disclosures only confirm the inaccuracy of the November 27 bullet point: It notes Singer's statements that Defendants thought their $50,000 payments "went directly to USC's program" and their $250,000 payments "went to KWF," with part of those then "going to a USC program." Ex. 1 at 4. The details matter, and the only way for Defendants to learn them is to review the 302 Reports and the underlying notes themselves.

In sum, the Government has largely refused to address Defendants' requests for exculpatory evidence regarding Singer's statements to his clients. And to the extent the Government has addressed these requests, its responses confirm that it is still applying a fundamentally flawed disclosure standard.

## III.    USC'S KNOWLEDGE OF ADMISSIONS-RELATED DONATIONS SHOULD BE DISCLOSED

As Defendants have argued, USC's knowledge about Singer's operation is relevant both to whether the University was defrauded at all and to whether Defendants intended to commit any such fraud. *See* Mot. at 16-19. When Defendants sought exculpatory information about USC's knowledge, however, the Government categorically rejected the request on the basis that "events that occurred without the defendants' knowledge" are "neither relevant nor material to the defendants' knowledge or intent." Oct. 31, 2019 Letter from Andrew E. Lelling, ECF No. 693-3

at 2 (rejecting Defendants' requests 15-32). The Government no longer defends that extreme position. It now acknowledges that it must produce any evidence that "USC admissions condoned . . . tacitly or otherwise" its employees' business arrangements with Singer. Gov't Br. at 37.

That concession is a good start, but it is artificially limited to "USC admissions." Elsewhere, the Government suggests that the relevant group is broader, but still limits it to officials who knew about Singer's operation within "USC admissions or development offices, or anyone senior to Heinel in the athletics department." *Id.* at 4; *see also id.* at 27. But given the ways in which USC's knowledge is material and potentially exculpatory, those limitations do not make sense. What any USC official knew about Singer—whether in the admissions office, the Marshall Business School, the President's office, or anywhere else—is material and potentially exculpatory for at least two reasons. First, if certain officials in these offices knew of and tacitly condoned Singer's operation, that could establish that USC was not defrauded at all. Second, officials' knowledge of Singer and the donations that he facilitated for the University, combined with USC's practice of linking admissions and donations, corroborates that Defendants believed their donations were legitimate. *Cf.* USC Gift Receipts, attached as Ex. 2.

The latter point has become particularly salient as more and more evidence emerges that USC has a widespread practice of actively soliciting admissions-related donations from wealthy parents, as happened to Giannulli. *See* Gov't Br. at 5-6 & Ex. F to Gov't Br., ECF No. 736-1 at 15-17 (email from USC development official offering to "flag" Giannulli's daughter's application for admission). As internal documents reveal, officials across the University—including Dean of Admission Tim Brunold—aggressively recruited applicants from wealthy and well-connected families. *See* Exs. 1 & 3 to Zangrillo's Opp'n to USC Mot. to Quash, ECF Nos. 546-1 & 546-3. University officials compiled such applicants onto a "special interest" or "VIP" list, making

notations about their parents' past donations and pledges of future donations, such as "potential donor," "250,000 signed pledge," and "25-50,000-no ask as of yet." *Id.* Notably, the column listing the "sport" of the applicants was often left blank, and sometimes included entries such as "Donor," "Development," or "Scholarship Club." Ex. 1 to Zangrillo's Opp'n to USC Mot. to Quash, ECF No. 546-1 at 2.

The Government's belated disclosures confirm its awareness of USC's knowledge about these practices. The disclosures include witness statements about USC's practices of linking donations to admissions, including that "Sarah Trudell, USC Central Advancement, has advised the government . . . that the purpose of tagging an applicant as a 'VIP' was to keep a list of future donors, be responsive to relationships, and *share with admissions that these people were important*"; that "The VIP list was shared with Kirk Brennan and Tim Brunold [(USC admissions officials)]"; and that "Trudell reported that her office was 'similar to a concierge service,' and sometimes people reached out in hopes of positive outcomes for admission." Ex. 1 at 5 (emphasis added). Each of these statements relates to USC's institutional practices and shows how USC intermingled its fundraising efforts with admissions. But the unanswered questions about what USC officials knew about Singer's operation and Heinel's alleged involvement are even more significant—and the snippets of summarized information in the Government's belated disclosures are entirely silent on that point.

Indeed, recent revelations about the University of California, Los Angeles (UCLA) confirm that it is unlikely—given the extent of Singer's connections to USC—that more officials were not aware of Singer's work. Like USC, UCLA also has a longstanding practice of using admissions to bolster fundraising. *See* Mem. in Supp. of Mot. for R. 17(c) Subpoenas, *United States v. Salcedo*, No. 19-cr-10081 (D. Mass. Jan. 23, 2020), ECF No. 373. And as detailed in internal

UCLA documents—including a 2014 report by the Compliance Office—UCLA officials have knowingly admitted non-athletes through their athletics program in exchange for large donations. *See id.* at 8-23. Not only that, but UCLA officials knew Singer himself was involved in facilitating such admissions, and UCLA maintained a relationship with Singer even after its Compliance Office detailed Singer's methods. *Id.* at 21. Yet despite all this, the Government has charged parents and a coach for "defrauding" UCLA by means of a scheme analogous to the one at issue here. *See* Superseding Indictment, *United States v. Salcedo*, No. 19-cr-10081 (D. Mass. Oct. 22, 2019), ECF No. 272 (coach); Superseding Indictment, *United States v. Sui*, No. 19-cr-10082 (D. Mass. Sept. 24, 2019), ECF No. 14 (parent); *cf.* Information, *United States v. Isackson*, No. 19-cr-10115 (D. Mass. Apr. 8, 2019), ECF No. 313 (parents).

Defendants have not yet been able to learn exactly how widespread the knowledge about Singer and his donations was at USC. Although it was widely known that USC linked admissions and donations, the University has not openly explained how the process works. In fact, USC's Dean of Admission has even denied that the University links admissions and donations at all—a claim that this Court has rightly rejected as "not credible," Mot. at 8 (citing Nov. 26, 2019 Hr'g Tr., ECF No. 673 at 22:1-2), and is at odds with numerous internal USC documents as well as the Government's belated disclosures.[8]

---

[8] The discovery documents that Defendants have received thus far show that Heinel regularly apprised the Dean of Admission of such donations at the time when the Dean made admission decisions. *See, e.g.*, Ex. 4 to Zangrillo's Opp'n to USC Mot. to Quash, ECF No. 546-4 (2014 email from Heinel to Dean of Admission listing "VIP" students with notes including "Galen Center donor," "long time donors," and "Dean interview"); Ex. 5 to Zangrillo's Opp'n to USC Mot. to Quash, ECF No. 546-5 at 2 (2015 VIP list including notes "potential donor," "$3 mil to Men's Golf-Thailand, has met w/ Tim," "$250,000," "1 mil pledge," "$15 mil," "Max Nikias [then-President of USC]," "Previously donated $25k to Heritage Hall," and "Donated $15k," among others); Ex. 6 to Zangrillo's Opp'n to USC Mot. to Quash, ECF No. 546-6 at 2 (2016 VIP list including note "pledged 1 million, interview w/Tim"). And Heinel's attorney confirms that Heinel was "perform[ing] her job as she was instructed to do so by Pat Haden, her predecessors in the

Given this context, Defendants asked the Government to produce all material and exculpatory evidence regarding USC's knowledge about Singer and his operation. The Government's answer in its response brief initially seems straightforward: The Government appears to claim that it has no evidence that any other USC officials knew about Singer's operation. *See* Gov't Br. at 27. But then the Government goes on:

> *To be sure, others at USC understood that Singer existed, and were plainly aware of the fact of his purported donations and those of the defendants*, insofar as they provided the 'gift receipts' that the government produced and that the Giannullis cite in their brief. But the government has not interviewed any current or former USC employee who knew that the payments were a *quid pro quo* for the admission of the Giannullis' children . . . .

*Id.* (emphasis altered) (citation omitted).

In other words, the Government *does* have evidence that others at USC knew about Singer and the donations he orchestrated for USC. The Government believes that evidence is irrelevant, however, because those individuals did not understand Singer's donations to be *quid pro quo* for admissions—that is, they did not understand the donations to be bribes. But the Government has it exactly backwards. Evidence that others at USC *knew about Singer's donations* and *did not consider them to be bribes* is textbook *Brady* material. That evidence corroborates that (1) USC likely knew and approved of Singer facilitating admissions-related donations, and (2) Giannulli and Loughlin—like others at USC who knew about Singer—had reason to believe their payments were not bribes. *Cf.* Ex. 2 (USC gift receipts for Giannulli and Loughlin's contributions to USC's "Women Athletic Board Fund").

---

position and others, and always in accordance with the expectations of both the athletic department and the USC administration." Nina Marino, Statement (Aug. 4, 2019), https://assets.documentcloud.org/documents/6382483/Statement-by-Nina-Marino.pdf.

To reach its contrary conclusion, the Government appears to be operating under the mistaken view that information only counts as *Brady* material if it conclusively disproves the charges against Defendants. The Government apparently sees no obligation to disclose circumstantial evidence. That is not the correct standard. *See* L.R. 116.2; U.S. Dep't of Justice, U.S. Attorneys' Manual § 9-5.001(C)(1) (2020). *Brady* does not only apply to homerun evidence; it also applies to singles and doubles. The Government's analysis here shows once again that it does not recognize *Brady* material when it sees it, and therefore cannot be trusted to make disclosure decisions on its own.

## CONCLUSION

The Government continues to misapply the disclosure standards mandated by the Constitution, the Federal Rules of Criminal Procedure, and this Court's Local Rules. To bring the Government into compliance with the law, and to protect Defendants' rights, the Court should order the Government to take effective remedial action. *First*, the Government should respond to all of Defendants' September 27 requests. *See* Sept. 27, 2019 Letter from Defs' Counsel, ECF No. 693-3 at 2-5. *Second*, the Government should produce the full 302 Reports—and the interview notes—from its interviews with Singer. *Third*, the Government should disclose all information in its possession regarding USC's knowledge of Singer's operation. *Finally*, the Government should reassess all other evidence in its possession under the correct legal standards.

Dated:  January 31, 2020

Respectfully submitted,

/s/ Sean M. Berkowitz
Sean M. Berkowitz (*admitted pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Phone: 312.777.7700
Fax: 312.993.9767
sean.berkowitz@lw.com

William J. Trach (BBO #661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Phone: 617.948.6000
william.trach@lw.com

Perry J. Viscounty (*admitted pro hac vice*)
LATHAM & WATKINS LLP
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626
Phone: 714.540.1235
perry.viscounty@lw.com

Roman Martinez (*admitted pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Phone: 202.637.2200
roman.martinez@lw.com

*Counsel for Mossimo Giannulli and Lori Loughlin*

George W. Vien (BBO #547411)
Joshua N. Ruby (BBO #679113)
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street
Suite 1600
Boston, MA 02110
Phone: 617.720.2880
Fax: 617.720.3554
gwv@dcglaw.com
jnr@dcglaw.com

Mark E. Beck (*admitted pro hac vice*)
Mark Beck Law, A Professional Corporation
350 West Colorado Boulevard
Suite 200
Pasadena, CA 91105
Phone: 213.596.7828
mbeck@markbecklaw.com

*Counsel for Mossimo Giannulli*

David C. Scheper (*admitted pro hac vice*)
SCHEPER KIM & HARRIS LLP
601 West Fifth Street
12th Floor
Los Angeles, CA 90071
Phone: 213.613.4655
Fax: 213.613.4656
dscheper@scheperkim.com

*Counsel for Lori Loughlin*

## CERTIFICATE OF SERVICE

I certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and that paper copies will be sent on January 31, 2020, to those identified as non-registered participants.

*/s/ Sean M. Berkowitz*
Sean M. Berkowitz