# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MOSSIMO GIANNULLI and LORI LOUGHLIN,<br><br>Defendants. | Case No. 19-cr-10080<br><br>Leave to File Granted on 2/27/20 |

### DEFENDANTS MOSSIMO GIANNULLI AND LORI LOUGHLIN'S SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO COMPEL PRODUCTION OF MATERIAL AND EXCULPATORY EVIDENCE

Ever since this prosecution began, Defendants have been trying to persuade the Government to fulfill its disclosure obligations under the Due Process Clause, this Court's Local Rules, and the Federal Rules of Criminal Procedure. At every turn, the Government has steadfastly maintained that it has fully complied with its obligations and is withholding no material exculpatory information. Defendants' pending motion to compel explains why the Government's assertions are inadequate, and why the Court should order the production of the full 302 Reports and interview notes of Singer's statements. *See* Defs' Mot. to Compel ("Mot."), ECF No. 693. Common sense dictates that this evidence includes Singer's statements about what he told his clients about their alleged payments to USC—including whether he told them that the payments would go to USC itself (for legitimate, university-approved purposes) or other legitimate charitable causes, or that they would be used to bribe a rogue USC official. *Id.* at 1. Such evidence directly speaks to Defendants' state of mind and is quintessential *Brady* material.

We submit this supplemental filing to advise the Court of an important new development directly bearing on the Government's ongoing *Brady* violations. Yesterday, the Government provided a brand-new disclosure of obviously exculpatory information that has been in its

possession since at least October 28, 2018. That information consists of Rick Singer's written notes contemporaneously memorializing his discussions with FBI investigators about recorded phone calls that they directed him to make to his clients in order to induce inculpatory statements to be used against those clients in subsequent criminal prosecutions. Singer's notes say that FBI agents repeatedly yelled at him, instructed him to lie, and directed him not to mention on the recorded calls that he had previously told the clients that their payments would be "donation[s]" that would go "to the [university] program not the coach." Oct. 2, 2018 Singer Notes, attached as Exhibit A. Singer's notes also indicate that one of the FBI agents pressured him to "agree . . . with her that everyone [b]ribed" the schools, and that the agents wanted to "entrap" Defendant Gordon Caplan and "nail" him "at all costs."[1] *Id.*

Defendants are still reviewing the Government's disclosure, which they will provide to the Court in full under seal. But the most problematic aspect of this disclosure consists of notes that Singer created on his iPhone in early October 2018, memorializing his interactions with FBI agents on October 2, 2018:

> Loud and abrasive call with agents. **They continue to ask me to tell a fib and not restate what I told my clients as to where there money was going -to the program not the coach and that it was a donation and they want it to be a payment.**
>
> I asked for a script if they want me to ask questions and retrieve responses that are not accurate to the way I should be asking the questions. **Essentially they are asking me to bend the truth** which is what they asked me not to do when working with the agents and Eric Rosen.
>
> **Liz [presumably an FBI agent] raised her voice to me like she did in the hotel room about agreeing with her that everyone Bribed the schools. This time about asking each person to agree to a lie I was telling them.**
>
> Spoke to **[REDACTED]** which is a referral from Gordon Caplon [sic]. They want to **nail Gordon at all costs**. **[REDACTED]** told

---

[1] Mr. Caplan pleaded guilty and was sentenced last year.

2

> me his daughter is a good runner 19 minute 3 mile good enough for recruited walk on or walk on to Wash U and Cornell. Explained the side door but very late and I probably could not do it at this stage.
>
> The agents told me to get him to take another school I had a relationship **just to entrap him** despite him never asking for any other school.
>
> When I told them Gordon texted me that **[REDACTED]** did not get extended time and the reasons why they still wanted me to ask him for a payment to take the SAT through WHCP even when he was not approved **just to nail him**. I said that is ludicrous as he will not entertain because she was not approved.

*Id.* (redactions and emphasis added).

The Government's cover letter indicates that "members of the prosecution team" became aware of these notes on or about October 28, 2018—nearly 16 months ago—when they "saw all or part" of the paragraphs quoted above. Feb. 26, 2020 Letter from Andrew E. Lelling at 1, attached as Exhibit B. The letter claims that (1) the Government "believed the notes were privileged and did not review them further"; (2) the Government "initiated a privilege review process" in August 2019; and (3) Singer's counsel "agreed to waive privilege over the notes" this week. *Id.*

The Government's belated disclosure confirms—yet again—its ongoing *Brady* violations, and the need for this Court's urgent intervention to protect Defendants' constitutional rights.

***First***, the disclosure includes materially exculpatory information that the Government has been concealing from Defendants, at the same time that it has been promising them—and this Court—that all such materials have been handed over.

The notes are patently material and exculpatory. To obtain a conviction here, the Government must prove that Defendants had the specific intent to defraud USC, and that their payments were bribes as opposed to legitimate donations. Obviously, if Singer—an experienced and (at the time) respected college-admissions counselor—told Defendants that their payments

3

were legitimate and would fund a university program, such information would be exculpatory because it "cast[s] doubt on defendant's guilt as to an[] essential element in a[] count in the indictment." L.R. 116.2(a)(1). Specifically, such evidence would directly disprove that Defendants possessed the specific intent to bribe anyone. *See, e.g.*, *United States v. Sawyer*, 85 F.3d 713, 730 (1st Cir. 1996).

This is precisely the kind of exculpatory—and indeed, exonerating—information that Defendants have been seeking with their *Brady* motion. As that motion explained,

> **Common sense indicates that FBI interviewers asked Singer what he told his clients about their payments to USC and KWF. Were they told that their direct donations to university departments were bribes?** Were they told that Singer would reroute their KWF donations, and if so, did he tell them those rerouted donations were legitimate? Or were they told that their money would be used to bribe individual USC employees? **Although Singer's answers to those questions are critical to establishing Giannulli and Loughlin's intent with respect to the payments, the Government has not revealed how Singer responded. Indeed, the fact that the Government has never alleged that Singer told Giannulli and Loughlin that their KWF payments were going to Heinel personally is a strong reason to believe he told them the opposite—that the payments were legitimate."**

Mot. at 10 (emphasis added).

The Government's response to Defendants' arguments was unequivocal: "The reality is that the government has scrupulously adhered to its discovery obligations in this case, and gone well beyond those requirements[.]"[2] The Government argued that, "notwithstanding the defendants' hyperbolic and unsupported claims, the government is not withholding any exculpatory evidence." *Id.* at 2. And the Government asserted that, "to the extent the Giannullis wish to argue that they acted in good faith because they believed their payments would go to a

---

[2] Gov't's Consolidated Opp'n to Defs' Mots. to Compel ("Gov't Br."), ECF No. 736 at 1.

4

USC fund Heinel controlled—instead of into Heinel's pocket—*the government has produced the relevant evidence to them*." *Id.* at 21-22 n.14 (emphasis added).

Defendants' reply explained that "[w]hat Singer told his clients about their payments is obviously relevant to assessing whether Defendants had any intent to defraud USC," and noted that the Government has been conveniently vague in answering a simple question: "What did Singer say about the extent to which Giannulli and Loughlin knew that their donations were really personal bribes intended to induce Heinel to betray her duties to USC?" Defs' Reply in Supp. of Their Mot. to Compel ("Defs' Reply"), ECF No. 807 at 11-12.

The Government's sur-reply then made light of these arguments: "The government has broad powers, but they do not include mental telepathy or time travel. The government cannot disclose witness statements before the witnesses make them." Gov't's Consolidated Sur-Reply to Defs' Mots. to Compel, ECF No. 834 at 2.

The Government's latest round of supplemental disclosures establishes that the Government was simply not being truthful with Defendants or the Court in the above filings. As early as October 2, 2018, Singer told agents working on the case the exact information we have been seeking in discovery, and those agents attempted to bully him into lying and saying something different. *See* Ex. A. This belated discovery, which should have been produced no later than 28 days after arraignment, is devastating to the Government's case and demonstrates that the Government has been improperly withholding core exculpatory information, employing a "win at all costs" effort rather than following their obligation to do justice.

**Second**, the Government has failed to justify its refusal to turn over this material "within 28 days of arraignment." L.R. 116.1(c)(1). On October 28, 2018—approximately *seven months* before Defendants' arraignment—"members of the team saw all or part of the first four paragraphs

5

under the entry for October 2, 2018," Ex. B—which are the most exculpatory parts of Singer's October 2 notes. The Government's professed reason for not turning the notes over sooner is because it "believed the notes were privileged and did not review them further." *Id.* But that explanation is woefully inadequate. *Nothing* in those first four paragraphs even remotely suggests that a privilege applies to the contents; all the notes contain is Singer's summary of his interactions with FBI agents and what they made him do. *See* Ex. A. Nothing in the notes includes legal advice, statements to or by Singer's counsel, or anything remotely related to such things.

Moreover, the Government's claim that it "did not review [the notes] further" upon learning about them, Ex. B., is incredible on its face. According to the Government, on learning that the supposed mastermind at the center of a vast conspiracy involving dozens of university officials and public figures keeps notes of his daily interactions on his phone, it responded by *not* reviewing those notes for evidence.[3] So while it was actively investigating and building its case, the Government claims that it simply ignored an obvious source of potential evidence. That explanation does not hold up. And the Government's assertion that "[i]n August 2019, . . . [it] initiated a privilege review process," *id.*—without explaining why it waited so long, or whether that review process determined that the notes were privileged—does not justify the belated disclosure of these core *Brady* materials either. Indeed, the Government asserts that it produced the notes now because "[t]his week, Singer's counsel agreed to waive privilege over the notes," *id.*—but that justification fails because the notes are not privileged, and the Government does not even claim that they are.

---

[3] As the full notes (or at least those produced yesterday) illustrate, they date back to at least February 2012. *See* SINGER-PHONE-000802.

6

Finally, the Government's bogus claim that it "believed" these notes were privileged at the time it learned of them is a red herring, as the Government had an obligation to relay the substance of these conversations it had with Singer independent of the fact that he recorded notes of those conversations. The Government's stated position for its failure to produce these documents further is every defense counsel's worst nightmare: that cooperating witnesses relay exculpatory information to the Government in their conversations, but the Government does not turn that exculpatory information over unless someone writes it down. Indeed, the Government's entire justification for failing to turn over the FBI 302s or notes from its meetings with Singer is that it has no obligation to produce the actual notes or memoranda from conversations with Singer in which *Brady* information was shared, it solely has an obligation to describe the substance of what he said. While we disagree as to the extent of the Government's production obligation, that principle obligated the Government to produce the substance of what Singer told the agents on October 2, 2018, and there is, and can be, no excuse for the Government's failure to do so.

\* \* \*

Yesterday's disclosures confirm the need for this Court to take action against the Government's egregious prosecutorial misconduct. Specifically, the Court should grant Defendants' pending *Brady* motion and require disclosure of the 302s and underlying interview notes (as well as the other relief requested, *see* Mot. at 20). Furthermore, the Court should order an evidentiary hearing at which the Defendants can examine witnesses to create a record regarding, at a minimum: (1) how and when the Government learned of Singer's phone notes; (2) how and why it chose not to disclose this information to Defendants sooner; (3) what other categories of evidence the Government is withholding on the basis of a supposed privilege; and (4) how

7

yesterday's disclosures square with the Government's prior assertions that it was not withholding exculpatory information.

Dated: February 27, 2020                          Respectfully submitted,

<u>/s/ Sean M. Berkowitz</u>

| | |
|---|---|
| Perry J. Viscounty (*admitted pro hac vice*) | Sean M. Berkowitz (*admitted pro hac vice*) |
| LATHAM & WATKINS LLP | LATHAM & WATKINS LLP |
| 650 Town Center Drive | 330 North Wabash Avenue |
| 20th Floor | Suite 2800 |
| Costa Mesa, CA 92626 | Chicago, IL 60611 |
| Phone: 714.540.1235 | Phone: 312.777.7700 |
| perry.viscounty@lw.com | Fax: 312.993.9767 |
| | sean.berkowitz@lw.com |
| Roman Martinez (*admitted pro hac vice*) | |
| LATHAM & WATKINS LLP | William J. Trach (BBO #661401) |
| 555 Eleventh Street, NW | LATHAM & WATKINS LLP |
| Suite 1000 | 200 Clarendon Street |
| Washington, DC 20004 | Boston, MA 02116 |
| Phone: 202.637.2200 | Phone: 617.948.6000 |
| roman.martinez@lw.com | william.trach@lw.com |

*Counsel for Mossimo Giannulli and Lori Loughlin*

| | |
|---|---|
| George W. Vien (BBO #547411) | David C. Scheper (*admitted pro hac vice*) |
| Joshua N. Ruby (BBO #679113) | SCHEPER KIM & HARRIS LLP |
| DONNELLY, CONROY & GELHAAR, LLP | 601 West Fifth Street |
| 260 Franklin Street | 12th Floor |
| Suite 1600 | Los Angeles, CA 90071 |
| Boston, MA 02110 | Phone: 213.613.4655 |
| Phone: 617.720.2880 | Fax: 213.613.4656 |
| Fax: 617.720.3554 | dscheper@scheperkim.com |
| gwv@dcglaw.com | |
| jnr@dcglaw.com | *Counsel for Lori Loughlin* |

Mark E. Beck (*admitted pro hac vice*)
Mark Beck Law, A Professional Corporation
350 West Colorado Boulevard
Suite 200
Pasadena, CA 91105
Phone: 213.596.7828
mbeck@markbecklaw.com

*Counsel for Mossimo Giannulli*

## **CERTIFICATE OF SERVICE**

I certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and that paper copies will be sent on February 27, 2020, to those identified as non-registered participants.

*/s/ Sean M. Berkowitz*
Sean M. Berkowitz
