UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| DAVID SIDOO, *et. al.*, | ) | **Leave to File Sur-Reply** |
| | ) | **Granted on April 14, 2020** |
| | ) | |
| Defendants | ) | |

**GOVERNMENT'S SUR-REPLY IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS INDICTMENT OR, IN THE ALTERNATIVE, FOR SUPPRESSION OF
<u>EVIDENCE AND FOR DISCOVERY AND AN EVIDENTIARY HEARING (DKT. 971)</u>**

## INTRODUCTION

The government did not commit misconduct in this case.  It did not violate *Brady*.  It did not fabricate evidence.  It did not entrap any defendant.  And it did not suborn the commission of a crime.

Attached are declarations from three members of the government's investigative and prosecution team:  Elizabeth Keating, a special agent with the Internal Revenue Service – Criminal Investigation; Laura Smith, a special agent with the Federal Bureau of Investigation; and Assistant United States Attorney Eric S. Rosen.  *See* Exs. A-C.  Also attached is an FBI-302 report of an interview with cooperating witness Rick Singer.[1]  *See* Ex. D.  The declarations and the 302 report explain the context of Singer's October 2 note and what prompted him to write it.  The declarations also affirm, under penalty of perjury, that the government did not fabricate evidence, seek to entrap any defendant, or suborn the commission of a crime.  The evidence described in the government's opening brief corroborates the declarations, illustrating the defendants' intent to commit fraud *and* bribery based on their statements and conduct *before* Singer began cooperating.  The consensual calls Singer made three weeks *after* his October 2 note are consistent with that earlier evidence.

The government did not use Singer to suborn the commission of a crime.  The government used him to gather additional evidence of a crime the defendants had *already* committed when they agreed to pay money in exchange for their children's admission to college as fake athletic recruits.  For this reason, and the reasons set forth below and in the government's opening brief, the defendants' motion should be denied without a hearing.

---

[1] Unless otherwise noted, the factual assertions in this brief are supported by the attached declarations and 302.

## ADDITIONAL FACTUAL BACKGROUND

Singer was approached by federal agents in a Boston hotel room on September 21, 2018. The approach followed a six-month investigation into his college admissions fraud scheme. Over the course of that investigation, the government gathered extensive evidence that Singer had turned his college counseling business, and an associated charity, into a front for fraud. For parents who sought an illicit edge for their children, Singer offered an array of services. He could guarantee high scores on college entrance exams by cheating. He could guarantee good grades in classes by having his employees pose as the students and take the classes in their names. And he could guarantee admission to certain colleges by using falsified athletic resumes and "donations" to university athletic programs to induce coaches to recruit unqualified applicants to their teams.

By the time of the approach, the government had developed evidence against complicit coaches, university athletics administrators, test proctors, test administrators, and parents who had participated in the scheme. Those parents – including the defendants in this case – had *already committed* fraud, or they were in the midst of the crime. In addition, new clients were continuing to contact Singer about enlisting his services.

On September 21, Singer agreed to cooperate with the government's investigation. He was, initially, a reluctant cooperator. He did not fully accept responsibility for his crimes.[2] He continued to use the word "donation" to describe payments to university athletic programs in exchange for the coaches' agreement to recruit unqualified students based on fabricated credentials. During Singer's first meeting with agents on September 21, Special Agent Keating told him that it doesn't matter if a payment is called "donation," or is directed to an athletic

---

[2] Weeks later, Singer acknowledged that he obstructed the government's investigation during this time, tipping off several parents that he was "wired."

program instead of a coach's pocket:  exchanging money for a guaranteed admissions spot for an unqualified student based on fabricated athletic credentials is a crime.  Special Agent Keating does not recall raising her voice at Singer during this meeting, but believes she was more "animated" than usual due to Singer's refusal to accept responsibility for his crimes.[3]

Despite his reluctance, Singer engaged in a series of consensually recorded calls in the first days after the approach, including with several parents.  Those parents were either actively engaged in the fraud scheme at the time of the calls, or learning its details for the first time.  Only one of the calls was with a remaining defendant in this case.[4]

In those calls, the government directed Singer to be explicit that the scheme involved paying money, as a *quid pro quo*, to induce one or more university employees to facilitate the admission of the parents' children as purported athletic recruits.  In calls with parents to whom Singer had already said that their money would go to an athletic "program," Singer generally continued using that language.  But in calls with new clients, he generally said that the money went "to the coach."  This was not because there is a legal distinction between a "donation" to a "program" and a "payment" to a "coach."  There isn't, provided that the money is intended as a *quid pro quo*.  But the government wanted to make sure that anyone who decided to pursue the scheme at that point – when it was, effectively, a government sting operation – understood that

---

[3] Special Agent Smith recalls that Special Agent Keating raised her voice "somewhat." Singer recalls that the meeting was "boisterous" on both sides.

[4] That call, on September 29, 2018, was with defendant John Wilson, who had previously agreed with Singer to secure his son's admission to USC as a purported water polo recruit, and who contacted Singer again around the time of the government's approach about pursuing the "side door" a second time for his daughters.  The call, which focused on future illegal conduct, is described in the government's opening brief.  *See* Dkt. 1066 at 12-13.  Singer also had a brief, non-substantive call with Wilson on September 23, 2018, to cancel a scheduled meeting.

their money would be used to induce a university insider to commit fraud, and could not later claim they had been duped or entrapped.

For example, on October 2, 2018, Singer received a call from Parent A, who had been referred to him by another client, Gordon Caplan.[5] Because Singer had not previously discussed the scheme with Parent A, the government instructed him to say that the fraud involved sending money "to the coach." He told Parent A: "[Y]ou'd make a donation to, um, to the coach, um -- I mean, to the  program and the coach, essentially, because they need help." Ex. E at 7-8. He added: "[T]hey would flag her as a student athlete, which she is, uh, but she may not be at the level in which, um, she'd be a recruitable student athlete.  They would help her and support her, 'cause you're giving some support, um, to the pro-- to, to the coach." *Id.* at 8.  Later in the call, Singer said: "[T]here will be a donation to the coach . . . who is gonna provide the help of getting her in." *Id.* at 10.  Parent A asked: "When you say a donation to the coach, you're talkin' about a donation in connection with playing sort of the, the athletic card?" *Id.* at 11.  Singer replied: "Yeah, that's correct." *Id.*[6]

---

[5] Caplan had agreed with Singer to pursue the test-cheating fraud for his daughter and also discussed the "side door" with him, but ultimately chose not to pursue it.  Caplan pled guilty to conspiracy to commit mail fraud and honest services mail fraud and was sentenced by Judge Talwani to one month in prison. *See United States v. Caplan*, 19-cr-10117, Dkts. 380 & 517.

[6] Singer had a subsequent call with Parent A in which, at the government's instruction, he advised Parent A that he had secured a commitment from the Yale University soccer coach to admit Parent A's daughter as a soccer player in exchange for $1 million. Ex. F.  This was a ruse. As noted in the government's opening brief, by that point the Yale coach was cooperating with the government's investigation.  Singer said: "[A]ll the payments will be made to the coach and then the coach will figure out what he does with his money.  And at the end of the day, your daughter shows up first day of school, she's just a regular student and everything goes on like it normally goes on." *Id.* at 5.  Parent A asked: "[Y]ou said I make the payment to the coach.  Exactly who am I making a check out to, Rick?" *Id.*  Singer responded: "[T]o my foundation." *Id.*  Parent A later chose not to proceed with the scheme and was not charged.

*That same day, Singer wrote his October 2 note* concerning a "[l]oud and abrasive call with agents."  In the note, Singer wrote that the agents "continue to ask me to tell a fib and not restate what I told my clients as to where there money was going -to the program not the coach and that it was a donation and they want it to be a payment."  And he wrote that "Liz raised her voice to me like she did in the hotel room about agreeing with her that everyone Bribed the schools.  This time about asking each person to agree to a lie I was telling them."

The agents do not specifically recall a "loud and abrasive" call on that day, but they do remember tense calls with Singer during this period.  The agents were *not* telling Singer to entrap parents who had *already* engaged in the scheme by asking them to "agree to a lie."  They were telling him to be more explicit in describing the scheme to parents who still had the opportunity to back out – to make it obvious that the money would be a *quid pro quo* for fraud.  Singer was particularly resistant to using blunt language with parents who were in the midst of the fraud – as opposed to those who were just finding out about it, like Parent A – because he had already told them that their money would go to an athletic program, not a coach.  But in all of those late September and early October calls, Singer was discussing *future* or *ongoing* conduct, *not* something that had happened in the past.

What Singer's note does *not* reflect is the agents' instructions concerning interactions with the defendants before this Court, who had *already* engaged in his scheme *before* the government's approach.  The government did not direct Singer to call these defendants until *three weeks after the October 2 note was written*.  It is *those* calls, all of which concern *historical* conduct, that the defendants seek to suppress.  But Singer's note has nothing to do with them.

For those late October calls, the government instructed Singer to engage the parents in a discussion about their prior conduct using a ruse:  that the IRS was auditing his foundation, and –

for parents whose children had been admitted to USC – that he would not tell the IRS that the money they had sent to "Donna" at USC was in exchange for having their children recruited as fake athletes. At that time, the government had a good faith belief, based on the evidence in the case, that each parent knew and understood this. While not every parent might have known that the complicit USC insider's name was "Donna," most did; and the evidence showed that they all understood that their "donations" to USC and to Singer's charity were a *quid pro quo* to secure their children's admission as recruited athletes based on false credentials. The purpose of the "audit" calls was to give any parent who claimed not to have that understanding the opportunity to say so – and to elicit additional evidence of what their understanding was.

For example, as set forth in the government's opening brief, in 2016, Singer instructed Giannulli to "*send 50K payment* to the person below . . . Donna Heinel[,] Senior Womens Associate Athletic Director[,] c/o of USC Athletics[,] . . . Check should be made out to USC Athletics[.]" Dkt. 1066 at 5 (emphasis added). Singer then forwarded an email *from Heinel* to Giannulli and Loughlin, attaching a letter indicating that their daughter had been admitted to USC as a recruited athlete. *Id.*, Ex. R. The email had Heinel's name and title on it. The following year, Singer instructed Giannulli and Loughlin to send another check, payable to a USC fund, to Heinel, in connection with their younger daughter's admission as a fake recruit. *Id.* at 6. Thereafter, in the "audit" call on October 25, 2018, Singer told Giannulli: "I'm not gonna say anything [to the IRS] about your payments going to Donna Heinel at USC to get the girls into USC, through crew." *Id.* at 11. And in a call with Loughlin, Singer said: "[N]othing has been said about the girls, your donations helping the girls get into USC to do crew even though they didn't do crew." *Id.*

Likewise, in 2018, Singer forwarded an email *from Heinel* to Zangrillo confirming that Zangrillo's daughter had been accepted to USC "through athletics" even though, as Zangrillo

knew, she was not an athlete. *Id.* at 8. At Singer's direction, Zangrillo mailed Heinel a $50,000 check, payable to "USC Women's Athletics," and sent a second check to Singer's charity, KWF. *Id.* On the "audit" call, Singer said: "I won't say that the, uh, the moneys went to go pay Donna Heinel for USC to get [your daughter] in." *Id.* at 10.

Singer's statements on the "audit" calls were thus consistent with what the defendants already understood, and the defendants' responses corroborate that evidence. The government was not attempting to build a case that the parents understood Heinel to be personally pocketing money, and the government has never alleged that. The government *has* alleged – and the calls, checks and emails prove – that the defendants knew that one or more complicit insiders at USC were facilitating the admission of their children as recruited athletes in exchange for payments to a USC athletic program. Accordingly, while the government *did* direct Singer to use ruses as part of its investigation, it did *not* fabricate evidence, and it did *not* suborn the commission of a crime.

## ARGUMENT

### I.  THE GOVERNMENT DID NOT COMMIT MISCONDUCT

The government did not commit misconduct in this case. As the attached declarations affirm, under penalty of perjury, the investigative team did not instruct Singer to fabricate evidence, to entrap parents, or to elicit false admissions from anyone. Singer's 302 corroborates these declarations.

The reality is that Singer was a reluctant cooperator who wrote the October 2 note at a time when he had not fully accepted responsibility for his crime, and while he was obstructing the government's investigation. In his first interview with government agents, he used the word "donation" to describe the money he and his clients sent to athletic programs, even as he acknowledged that the payments were in exchange for recruiting unqualified students to athletic teams based on fabricated credentials. Special Agent Keating firmly reminded Singer that a

donation is a gift:  money in exchange for nothing.  Paying money in exchange for guaranteed admissions spots for unqualified athletes based on fabricated credentials is illegal.  The issue is not *where* the money was sent, or what the payments were called, but *why* it was sent and what the parents received in exchange.  Here, they received their children's guaranteed admission to elite universities as recruited athletes in sports they did not play (or did not play at that level).  Singer later acknowledged as much when he pled guilty.  But like many white collar defendants, he was slow to accept the full extent of his culpability – as he now admits.

Agents and prosecutors told Singer to be more explicit with parents who had not yet completed the fraud, and to tell parents who had not yet agreed to the scheme that it involved paying off coaches.  Like many white collar criminals, Singer was not typically so blunt.  He did not use words like "bribe" or "payoff," even though that is what the payments were.  Singer's note makes plain his frustration.  He was particularly resistant to telling parents who were in the middle of the fraud at the time of the government's approach that the money was a payment to a coach, because that was not what he had told them previously.  In Singer's language, it was a "fib."  But because this portion of the investigation was a sting – targeting ongoing and future conduct – the government wanted to ensure that the crime would be obvious to anyone involved in it.

Despite the defendants' attempts to make it so, Singer's note has *nothing to do* with the consensual calls he made weeks later to parents who had *already* engaged in the scheme before the government's approach.  The purpose of those calls was to corroborate what the evidence indicated those parents knew and understood about the fraud and bribery.  The script Singer used during those calls was consistent with that evidence.  Put another way, during the late-October "audit" calls, Singer repeated back to the defendants a summary of the crime they had committed and asked them if they agreed they had done it.  The calls were the equivalent of a wired-up

cooperator asking a drug dealer, to whom the cooperator has previously sold drugs: "Do you remember when I sold you those drugs?"  That is not suborning the commission of a crime.  It is corroborating evidence of it.  So too, here.  If the defendants in this case did *not* agree with Singer's summary of their crimes, the government anticipated that they would say so – instead of readily agreeing to mislead the IRS about the reason for their payments, as they all did.

In sum, the government did *not* suborn the commission of a crime.  The defendants in this case had *already* agreed to commit fraud and bribery.  The government used Singer to gather *additional* evidence of the crime they had already committed – and to ensure that individuals who had not yet crossed the line knew what they were getting into.[7]

Finally, the government did not investigate Singer's October 2 note after first learning of it on October 28 for several reasons.  <u>First</u>, the AUSAs responsible for the investigation were aware that Singer was a reluctant cooperator who was slow to accept responsibility for his crimes and initially refused to make consensual calls.  <u>Second</u>, they knew that, at the time Singer wrote the note, he was obstructing the government's investigation by tipping off potential targets.  <u>Third</u>, the AUSAs were either present when Singer made the consensual calls, or reviewed them afterwards, and they were familiar with the other evidence in the case.  They knew that the purpose of the calls in late September and early October was to be *more* explicit with individuals who still had the opportunity to back out of the fraud.  And they knew that the note had nothing to do with the "audit" calls Singer placed in late October, weeks after the note was written.  They also knew that what Singer said on those calls was consistent with what other evidence showed:  that the defendants understood they were making *quid pro quo* payments to a USC fund to induce a

---

[7] As set forth in the government's opening brief, the defendants' remaining claims of misconduct are meritless and do not warrant relief.

university insider to facilitate the fraudulent recruitment of their children.  <u>Finally</u>, the AUSAs knew that the purpose of the consensual calls was to make sure that the government *only* charged individuals who acted with knowledge and intent and who were, in fact, guilty.

## II.     THERE IS NO BASIS FOR AN EVIDENTIARY HEARING

There is no basis for an evidentiary hearing.  The government has unequivocally denied committing misconduct, and has provided declarations from two experienced federal agents and an AUSA, under penalty of perjury, addressing the contentions in Singer's October 2 note.  The government has also interviewed Singer about his note and produced an FBI 302 report of that interview.  The declarations are detailed, credible, and corroborated by the 302 report and other evidence, including the consensual calls Singer made and evidence of the defendants' criminal intent prior to Singer's cooperation.  The defendants have, accordingly, failed to meet their burden of establishing a disputed issue of material fact that would warrant a hearing.  *See United States v. Staula*, 80 F.3d 596, 603 (1st Cir. 1996).

## CONCLUSION

The government, like the Court, views the allegations of misconduct in this case as serious and disturbing.  The defendants' contention that the government "has engaged in a sustained, orchestrated effort to cheat the justice system" is repugnant and untrue.  For all of the reasons set forth above, and in its opening brief, the government respectfully submits that the defendants' motion should be denied without a hearing.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:      */s/ Stephen E. Frank*
Karin M. Bell
Stephen E. Frank
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

*/s/ Stephen E. Frank*
Stephen E. Frank
Assistant United States Attorney