FILED
IN CLERKS OFFICE
2020 MAY 18 AM 10:33
U.S. DISTRICT COURT
DISTRICT OF MASS.

**UNITED STATES DISTRICT COURT**

*FOR THE*

**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA, :

v. : Case No. 19-cr-10080

:

MOSSIMO GIANNULLI and LORI LOUGHLIN, : MOTION TO INTERVENE
Defendants.

and

Robert A. Heghmann, May 14, 2020
Intervenor.

## MOTION TO INTERVENE

The Federal Rules of Criminal Procedure provide no path to intervention in a criminal matter by a third-party. Interventions in criminal matters "have been granted in limited circumstances where 'a third party's constitutional or other federal rights are implicated by the resolution of a particular motion, request, or other issue during the course of a criminal case.'" United States v. Collyard, case no. 12cr0058, 2013 WL 1346202 at *2 (D. Minn. April 3, 2013)(quoting United States v. Carmichael, 342 F. Supp. 2d 1070, 1072 (M.D. Ala. 2004)). For instance courts have occasionally allowed the press to intervene in criminal cases to assert the press' First Amendment rights. See In re Associated Press, 162 F.3d 503, 506- 507 (7th Cir. 1998). Courts have also allowed intervention by third-parties seeking to prevent the wide dissemination of confidential or privileged information. United States v. RMI Co., 599 F.2d 1183 (3d Cir. 1979); United States v.

Crawford, 735 F.2d 174 (5th Cir. 1984); 4:15-cr-03128-JMG-CRZ Doc # 48 Filed: 11/02/16 Page 2 of 5 - Page ID # 3 United States v. Martoma, 962 F. Supp. 2d 602, 605-06 (S.D.N.Y. 2013). "A third-party's reasonable assertion of privilege with respect to documents to be produced in a criminal actions is sufficient grounds on which to grant the third-party's motion to intervene and to consider the merits of that party's application." Martoma, 962 F. Supp. 2d at 605-06. IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA UNITED STATES OF AMERICA, Plaintiff, vs. JEFFERY S. SIKES, Defendant. 4:15-CR-3128 Memorandum and Order DOC. #48

As is discussed more fully in the Memorandum in Support of the Motion to Intervene, Robert A. Heghmann (hereinafter "the Intervenor") relies on 28 U.S.C. Sec. 530B or the McDade Act for the exercise of jurisdiction by this Court. Further, the Plaintiff has standing under Rule 8.3 of the American Bar Association Model Rules of Professional Conduct. Rule 8.3 which provides that attorneys "shall" take action to preserve the integrity of the Courts. *In re Grievance Comm. of United States Dist. Ct.*, 847 F.2d 57, 62 (2d Cir. 1988) (observing that "most code provisions *obligate* an attorney to take affirmative measures to preserve the integrity of the judicial system") (emphasis added) That includes adhering to the A.B.A. Model Rules.

The Intervenor attempted to discharge this obligation by first filing a Complaint with the Board of Overseers of the Massachusetts Supreme Judicial Court. By letter dated February 4, 2020, the Bar Counsel on behalf of the Board of

Overseers told the Plaintiff to go pound sand. That is what brings the Intervenor to this Court.

**Prosecutorial Misconduct Lies at the Heart of this Motion to Intervene**

As a result of Prosecutorial Misconduct, the criminal justice system in the federal courts in the United States is in crisis. The conduct of the Prosecutors in this case (referred to as Team Lelling) is an excellent example of that misconduct, therefore, the Plaintiff intends to use the record in this Court to bring this crisis to the attention of the Supreme Court.

I have never met any of the Defendants in the criminal action including, but not limited to, Lori Loughlin, Mossimo Giannulli or their daughters. I have never met any of their Counsel. I have not received any compensation for this Motion to Intervene.

Although the points and authorities set forth in this Complaint may apply to more than two defendants in the criminal prosecution, because Lori Loughlin and her husband, Mossimo Giannulli are the highest profile remaining defendants the public record in this case is most complete with regard to them. Therefore, I used that record in preparing this Motion and the accompanying Memo of Law.

**STATEMENT OF ISSUE FOR THE U. S. SUPREME COURT**

Scholars note that "[a] significant gap exists between the performance the Constitution requires of a prosecutor and the higher

standard compelled by the rules of professional responsibility." The existence of this gap begs the question of whether a prosecutor should understand her disclosure obligation to go only as far as the standard the Supreme Court set forth in *Brady* or as far as the more liberal ethical obligations. Obviously, the answer to this question is of the utmost importance to prosecutors, as it creates the standard to which a prosecutor must adhere. (citation omitted) Lisa M. Kucias, *Prosecutors Duty to Disclose Exculpatory Evidence*, 69 Fordham L. Rev. 1205, 1217 (2000)(hereinafter "Kucias)

**ARGUMENT**

It is high time for the Supreme Court to take up this critically important question. There is a split between the Circuits on the role of Courts on monitoring prosecutorial compliance with obligations under the Canons of Ethics.

Courts have expressed differing views on what role a federal court plays in regulating attorney conduct. The Second and Fifth Circuits' decisions defining the role of the federal judiciary in regulating attorney conduct illustrate the contrasting philosophies. The Second Circuit has taken the position that "[t]he business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it.'" Under the Second Circuit's reasoning, ethical issues that surface during the course of litigation are better addressed by the "comprehensive disciplinary machinery of the state and federal bar,... or possibly by legislation.", In contrast, the Fifth Circuit has "squarely rejected this hands-off approach," instead holding that district courts are "obliged to take measures against unethical conduct occurring in connection with any proceeding before it.'" According to the Fifth Circuit "it is not clear that the vitality of state enforcement is relevant to the judicial duty of the federal courts to clean its own house.

As these two approaches aptly illustrate, the appellate decisions suggest that there is significant uncertainty about a federal judge's role in regulating attorney misconduct. (footnotes omitted) Judith A. McMorrow, Jackie A. Gardina & Salvatore Ricciardone, JUDICIAL ATTITUDES TOWARD CONFRONTING ATTORNEY MISCONDUCT: A VIEW FROM THE

REPORTED DECISIONS, Hofstra Law Review 32, (2004): 1425-1474 at 1440-41.

The result of this confusion on the part of federal judges as to their role in enforcing the ethical standards required of prosecutors is a growing crisis of confidence in the courts as reflected in articles published by of a growing cadre of commentators.

> Studies of prosecutorial misconduct in criminal proceedings, many of which are cited below in this section, agree that courts rarely discipline prosecutors for misconduct. One of the leading sources of information about prosecutorial misconduct is Pace University Law School Professor Bennett L. Gershman's text, *Professional Misconduct.*41 In the first and second editions of the book, which were published fifteen years apart,42 Gershman noted that prosecutorial misconduct was an increasing problem.43 Gershman, a former prosecutor with the Manhattan District Attorney's Office, has authored numerous articles as well as two editions of *Professional Misconduct* on prosecutorial and judicial ethics.44 He attributed the growing misconduct problem to prosecutors' growing powers, and to courts' failure to discipline prosecutors for professional wrongdoing.45
>
> The costs of prosecutorial misconduct—to the wrongfully convicted defendants, to the victims, and to taxpayers—are high. A Chicago Tribune study of 11,000 criminal cases between 1963 and 1999 uncovered 381 homicide convictions that were vacated because prosecutors hid exculpatory evidence or allowed witnesses to lie.46
>
> Prosecutorial misconduct appears to often go unpunished even after it is identified. A survey of alleged prosecutorial misconduct in more than 11,000 criminal proceedings found 2,000 cases where the appellate courts reduced sentences, dismissed charges, or vacated convictions.47 But the courts disciplined prosecutors only forty-four times in the cases reviewed.48 A 2010 USA Today study of Department of Justice ("DOJ") criminal prosecutions found 201 cases where federal prosecutors acted improperly, but in a review of bar records could only locate a single instance where a federal prosecutor was disbarred in the

last twelve years.49 And prosecutors are disciplined less frequently than private a attorneys.50

The entities charged with disciplining prosecutors for misconduct are poorly equipped to do so. Even though all states have adopted disciplinary rules that forbid prosecutors from suppressing exculpatory evidence or falsifying evidence, prosecutors who engage in this proscribed behavior are sanctioned infrequently—if at all.51 Bar associations discipline attorneys for misusing or abusing client funds but are not equipped to, or do not, review prosecutors' work.52 The DOJ's Office of Professional Responsibility ("OPR" or "Office"), tasked with overseeing federal prosecutors and other agents, began investigations in only 9 percent of the 4,000 complaints filed against officials in the last twenty years. Only 4 percent of those were determined to have merit, and the Office provided little disclosure about what punishments it applied.53 Thomas P. Sullivan and Maurice Possley, *The Chronic Failure to Discipline Prosecutors for Misconduct: Proposals for Reform*, 105 J. Crim. L. & Criminology (2015) at 890 to 894. .(for the benefit of the Court, footnotes 41 to 53 are reproduced in the Appendix.)

Prosecutors such as Team Lelling are further emboldened in their constitutional violations by the immunity they enjoy from civil liability for violation of the *Brady* Rule.

While the Supreme Court requires prosecutors to disclose certain evidence to the defense, consequences for withholding such evidence do not exist in the criminal justice system. In fact, the Supreme Court has granted prosecutors absolute immunity from civil liability for failure to disclose exculpatory evidence. Thus, prosecutors do not fear being sued for withholding evidence and the *Brady* Rule is consequently weakened. As one commentator stated, "[i]nsofar as federal law is concerned, we have no reason at all to believe, under these circumstances, that prosecutors will not continue to ignore their constitutional obligation under *Brady.*" (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); *see also* Bruce A. Green, *Policing Federal Prosecutors: Do Too Many Regulators Produce Too Little Enforcement?,* 8 St. Thomas L. Rev.

69, 79 n.54 (1995) [hereinafter Green, *Enforcement]* (stating that "prosecutors have absolute immunity for misconduct related to their prosecutorial function")). Kurcias. *supra*, at 1215.

The result of all this is that today, the Department of Justice through the Offices of the United States Attorney in cooperation with the Federal Bureau of Investigation, constitutes a clear and present danger to the lives and property of every person in the United States. Doubt me? Let's look at the activities of the DOJ in the Russian Collusion Investigation.

On December 19, 2019 Judge Rosemary Collyer, Presiding Judge of the FISA Court, was compelled to Issue and Order IN RE ACCURACY CONCERNS REGARDING FBI MATTERS SUBMITTED TO THE FISC, Docket No. Misc. 19-02.

> This order responds to reports that personnel of the Federal Bureau of Investigation (FBI) provided false information to the National Security Division (NSD) of the Department of Justice, and withheld material information from NSD which was detrimental to the FBI's case, in connection with four applications to the Foreign Intelligence Surveillance Court (FISC) for authority to conduct electronic surveillance of a U.S. citizen named Carter W. Page.1 When FBI personnel mislead NSD in the ways described above, they equally mislead the FISC.
>
> . . .
>
> On December 9, 2019, the government filed with the FISC public and classified versions of the OIG Report.6 The OIG Report describes in detail the preparation of the four applications for electronic surveillance of Mr. Page. It documents troubling instances in which FBI personnel provided information to NSD which was unsupported or contradicted by information in their possession. It also describes several instances in which FBI personnel withheld from NSD information in their possession which was detrimental to

their case for believing that Mr. Page was acting as an agent of a foreign power. 8

In addition, while the fourth electronic surveillance application for Mr. Page was being prepared, an attorney in the FBI's Office of General Counsel (OGC) engaged in conduct that apparently was intended to mislead the FBI agent who ultimately swore to the facts in that application about whether Mr. Page had been a source of another government agency. *See id.* At 252-56. The information about the OGC attorney's conduct in the OIG report is consistent with classified submissions made to the FISC by the government on October 25, 2019, and November 27, 2019. Because the conduct ofthe OGC attorney gave rise to serious concerns about the accuracy and completeness of the information provided to the FISC in any matter in which the OGC attorney was involved, the Court ordered the government on December 5, 2019, to, among other things, provide certain information addressing those concerns.

The FBI's handling of the Carter Page applications, as portrayed in the OIG report, was antithetical to the heightened duty of candor described above. The frequency with which representations made by FBI personnel turned out to be unsupported or contradicted by information in their possession, and with which they withheld information detrimental to their case, calls into question whether information contained in other FBI applications is reliable. The FISC expects the government to provide complete and accurate information in *every* filing with the Court. Without it, the FISC cannot properly ensure that the government conducts electronic surveillance for foreign intelligence purposes only when there is a sufficient factual basis.

THEREFORE, *the Court ORDERS that the government shall, no later than January 10,2020, inform the Court in a sworn written submission of what it has done, and plans to do, to ensure that the statement of facts in each FBI application accurately and completely reflects information possessed by the FBI that is material to any issue presented by the application.* In the event that the FBI at the time of that submission is not yet able to perform any of the planned steps described in the submission, it shall also include (a) a proposed timetable for implementing such measures and (b) an explanation of why, in the government's view, the information in FBI applications submitted in the interim should be regarded as reliable. (foot note omitted)(emphasis added)

In effect, the FISA Court to protect itself has issued a Permanent Injunction to the DOJ and the FBI. Take whatever steps you need to insure that this never happens again. The American People require the exact same Injunctive Relief. They need an Order perhaps issued by the Supreme Court that the DOJ enforce the A.B.A. Code of Professional Responsibility through every Office of the U.S. Attorney and the Federal Bureau of Investigation. The Plaintiff will seek that Permanent Injunction using the dismal record of this case.

Respectfully submitted,

Robert A. Heghmann

P.O. Box 6342

Virginia Beach, VA 23456

(603) 866 - 3089

Bob_Heghmann@Reagan.com

## LOCAL RULE 7.1(a)(2) CERTIFICATION

I certify that I communicated with counsel for the Government in an attempt to resolve or narrow the issues raised in this motion. The Government takes the position that it opposes this motion.

______________________________

**CERTIFICATION**

I hereby certify that on May 14, 2020, 2019 I caused a copy of the foregoing document to be served electronically on all Parties through the Court's CM/ECF system by mailing a copy to the Clerk of the Court for dissemination.

Robert A. Heghmann