# UNITED STATES DISTRICT COURT

*FOR THE*

## DISTRICT OF MASSACHUSETTS

---

**UNITED STATES OF AMERICA,:**

**v.**                                :          **Case No. 19-cr-10080**

                                      :

**MOSSIMO GIANNULLI and LORI**
**LOUGHLIN,**                          :
                 **Defendants.**         **MEMORANDUM**

---

                                      :

**Robert A. Heghmann,**                :          **May 14, 2020**
**Intervenor.**

                                      :

---

## MEMORANDUM IN SUPPORT OF THE MOTION TO INTERVENE AND MOTION FOR PERMANENT INJUNCTION

### PRELIMINARY STATEMENT

The Intervenor, Robert A. Heghmann, (hereinafter "Intevenor") hereby files his Motion to Intervene, Motion for Permanent Injunction and this Supporting Memorandum of Law using this Court's record of the persecution of Mosimmo Giannulli and Lori Loughlin as the principal points of reference. Although the points and authorities set forth in the Motions and Memorandum apply to more than Ms. Loughlin and Mr. Giannulli, because Ms. Loughlin is the highest profile defendant remaining in the Varsity Blues Investigation, the public record is most complete with regard to her and her husband. Therefore, I used that record in preparing the Motions and Memorandum.

## INTRODUCTION

Former Chief Justice Rehnquist authored the doctrine now known as "outrageous government misconduct" when, in *dicta*, he noted that courts someday might be presented a situation in which "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from obtain[ing] a conviction." *See United States v. Russell*, 411 U.S. 423, 431-32 (1973); *United States v. Santana*, 6 F.3d 1, 3 (1st Cir. 1993). In this Circuit, the court has mused that such cases could involve extreme physical or psychological abuse of a defendant, on the one hand, or cases where the government can fairly be said to have "created the crime or to have coerced the defendant's participation in it." *Santana*, 6 F.3d at 4 (internal quotations and citations omitted). Karin M. Bell and Stephen E. Frank, Assistant United States Attorneys, GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS INDICTMENT OR, IN THE ALTERNATIVE, FOR SUPPRESSION OF EVIDENCE AND FOR DISCOVERY AND AN EVIDENTIARY HEARING, Case 1:19-cr-00080-NMG Document 1065 Filed 04/08/20 at 26 – 27. (hereinafter Smith Memo")

This case is the embodiment of what Chief Justice Rehnquist warned about. In this wrongful persecution, the government first "created the crime" where none existed and then engaged in "psychological abuse of a defendant' in order to coerce defendants to not only plead guilty to crimes they did not commit but plead guilty to crimes that do not even exist. This Court has been willingly complacent in these violations of basic fundamental and civil rights.

The Judges of this Court have been treated to front row seats in the kick-off of Andrew Lelling's Campaign for the U.S. Senate. This case has enabled him to go from one of 600 non-descript U.S. Attorneys to the U.S. Attorney persecuting the highest profile case in the country. And not only is he fighting "crime", this case enables him to fulfill the role of a modern-day Robin Hood, persecuting the rich for the benefit of the poor. The fact that Lori Loughlin has committed no crime is a hindrance, but not an obstacle. The minute Lelling saw the names Lori Loughlin and Felicity Huffman, he knew he had political gold in his hands. If Lelling indicts Rick Singer, he makes page 12 in the Boston Globe. But if he indicts Lori Lochlin and Felicity Huffman, he makes the front page of every newspaper in the nation as well as the Hollywood Reporter (great for

campaign fund raising in Los Angeles) as well as all of the supermarket tabloids. This was too good an opportunity to pass up.

In order to make sure the Varsity Blues Investigation made page one and not page six, Team Lelling "leaked" information to the media that they would seek prison time for Felicity Huffman and Lori Loughlin. See AP story dated April 4, 2019 attached as Exhibit 1. To keep the story on Page One they periodically "leaked" new information about Loughlin's possible prison time. See People Magazine article dated October 23, 2019 attached as Exhibit 2. Thanks to the skillful manipulation of the media, Lori Loughlin appeared on the front page of at least five "super-market" tabloids – The National Enquirer (April 29, 2019) Inside Us (April 29, 2019), People Magazine ((April 29, 2019), People Magazine (November 11, 2019) and Inside US (December 9, 2019). Given the market penetration of these tabloids, everyone in the Nation knew about Andrew Lelling and his Merry Band of Persecutors (hereinafter "Team Lelling").

So what if Lori Loughlin and the other parents are innocent? Any U.S. Attorney worth his salt can get a Grand Jury to indict a ham sandwich. And by threatening Loughlin's children with persecution, he still thinks he can get Lori Loughlin and the remaining defendants to plead guilty, as others have, to crimes that she and her husband did not commit.

All the while the "Judges" of this Court, fueled by their own personal class bias, have been more than willing to sit by while Team Lelling shreds the A.B.A. Model Rules of Professional Conduct (which if the "Judges" really cared were adopted by the State of Massachusetts) and play "hide and seek" with the evidence that will prove the Defendants innocence. Not only that, the "Judges" gleefully sentenced innocent American Citizens to prison while publicly excoriating them for their "sins". Not since the hey-day of Salem have there been witch trials to rival the trials in this Court.

3

## THE DOJ VERSUS WE, THE PEOPLE

This is not the first time that the views of the Department of Justice (hereinafter "DOJ")

that it is not bound by either the state ethics rules or the American Bar Association's Model Rules

of Professional Conduct (hereinafter "the Model Rules") have been criticized by the federal courts

or by Congress. These disputes began some 30 years ago.

Rule 4.2 of the ABA Model Rules of Professional Conduct provides:

> In representing a client, a lawyer shall not communicate about the subject of the
> representation with a person the lawyer knows to be represented by another lawyer
> in the matter, unless the lawyer has the consent of the other lawyer *or is authorized*
> *by law to do so.* (emphasis added)

Virtually all 50 states and the District of Columbia had adopted an ethical rule

identical or similar to ABA Model Rule 4.2 or its predecessor. In response,

> In 1980, the DOJ Office of Legal Counsel distributed a memorandum
> (Ethical Restraints of the ABA Code of Prof'l Responsibility on Fed. Criminal
> Investigations, 4B Op. O.L.C. 576, 576 (1980) (hereinafter 1980 DOJ Memo].
> stating that federal prosecutors did not violate the no-contact rule by contacting
> witnesses and suspects, without their lawyers' knowledge, before formal
> adversarial proceedings began, if done in accordance with DOJ policy. In support
> of its position, the DOJ pointed out that the no-contact rule permits contact with
> represented parties if "authorized by law."
> The DOJ claimed that it had authority to adopt regulations that were a
> "reasonable and necessary means to effectuate" the U.S. Attorney's statutorily
> imposed duty to "prosecute . . . all offenses against the United States." According
> to the DOJ, this was one such regulation and authorized the otherwise-prohibited
> contacts. Hopi Costello, <u>Judicial Interpretation of State Ethics Rules Under the</u>
> <u>McDade Amendment: Do Federal or State Courts Get the Last Word</u>?, 84 Fordham
> L. Rev. 201. 289 (2015) (hereinafter "Costello").

There ensued considerable tension between the various states' no-contact rule and the

perceived needs of federal law enforcement officials. In the criminal context, at the urging of the

DOJ most courts held that the ethical restriction against contacts with represented persons did not

apply at the pre-indictment investigation stage before the Sixth Amendment right to counsel attaches. See, e.g., *United States v. Ryans*, 903 F.2d 731, 739 (10th Cir. 1990), cert. denied, 498 U.S. 855 (1990); *United States v. Kenny*, 645 F.2d 1323, 1339 (9th Cir. 1981), cert. denied, 452 U.S. 920 (1981). But the Second Circuit muddied this rule in *United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988), cert. denied, 498 U.S. 871 (1990), which held that federal prosecutors violated New York's no-contact rule even though the Sixth Amendment right to counsel had not yet attached.

DOJ reacted strongly to the *Hammad* decision. In 1989, then-Attorney General Richard Thornburgh issued a memorandum (Memorandum from Att'y Gen. Richard L. Thornburgh to all Justice Dep't Litigators, (June 8, 1989), *reprinted in In re* Doe, 801 F. Supp. 478, 489 (D.N.M. 1992) (hereinafter "Thornburgh Memo"). warning that the Justice Department would resist what it viewed as efforts by the criminal defense bar to achieve through local ethical rules "what cannot be achieved through the Constitution: a right to counsel at the investigative stage of a proceeding." See *In re Doe* at 489. The Thornburgh Memo concluded by stating that: contact with a represented individual in the course of authorized law enforcement activity does not violate DR 7-104 [the predecessor to Model Rule 4.2]. The Department will resist, on Supremacy Clause grounds, local attempts to curb legitimate federal law enforcement techniques.

Almost from the date of its issue, the Thornburgh Memo set off a firestorm of criticism," including from the courts. *United States v. Tapp*, 2008 WL 2371422, at 6 (S.D. Ga. June 4, 2008). One court declared: "The Department of Justice seeks to render the court powerless to enforce its own rules and to protect the integrity of the criminal justice system. This court will not allow the Attorney General to make a mockery of the court's constitutionally-granted judicial powers." *United States v. Lopez*, 765 F. Supp. 1433, 1463 (N.D. Cal. 1991), *vacated on other grounds*, 4

F.3d 1455 (9th Cir. 1993); *see also In re Doe at* 486 ("The idea of placing the discretion for a rule's interpretation and enforcement solely in the hands of those governed by it not only renders the rule meaningless, but the notion of such an idea coming from the country's highest law enforcement official displays an arrogant disregard for and irresponsibly undermines ethics in the legal profession.").

In the face of that criticism, DOJ held firm. In 1994, Attorney General Janet Reno issued a regulation formalizing the core of the Thornburgh Memo. (28 C.F.R. § 77.12 (1995) (hereinafter "the Reno Rule). The Reno Rule was "intended to preempt and supersede the application of state laws and rules and local federal court rules" prohibiting communication with represented parties, *id.*; pt. 77 (1995); 59 Fed. Reg. 10,086, 10,088 (Mar. 3, 1994)—even though that prohibition had been followed "from time immemorial by the Anglo- American bar" and had been codified in all 50 States and the District of Columbia, *Tapp*, 2008 WL 2371422, at *4.

DOJ's stance continued to draw criticism from state and federal organizations, including the Judicial Conference of the United States, the Conference of Chief Justices, the ABA, the Federal Bar Association, and state bar associations. For example, in 1994 the Conference of Chief Justices unanimously adopted a resolution respectfully urging "each of its members to continue to enforce the ethical rules upon all members of bars of the various states and jurisdictions." Conference of Chief Justices, *Resolution XII, Proposed Rule Relating to Communications with Represented Persons* (Aug. 4, 1994), *quoted in Tapp*, 2008 WL 2371422, at *7.

The Courts were once again critical of the DOJ policy.

> *See, e.g.*, United States v. McDonnell Douglas Corp., 132 F.3d 1252, 1257 (8th Cir. 1998) (rejecting the validity of the Reno Regulation); United States v. Lopez, 4 F.3d 1455, 1461 (9th Cir. 1993) (rejecting the claim that "general enabling statutes" legitimized the DOJ's definition of which contacts were authorized by law"); Costello at 210, n. 88.

This time Congress joined in the criticism.

> *See* H. Comm. on Gov't Operations, Fed. Prosecutorial Authority in a
> Changing Legal Environment: More Attention Required, H.R. REP. NO. 101-
> 986, at 32 (1990) ("We disagree with the Attorney General's attempts to exempt
> departmental attorneys from compliance with the ethical requirements adopted by
> the State bars to which they belong and in the rules of the Federal courts before
> which they appear."). Ibid., 210, n. 89

DOJ's attempts to "exempt departmental attorneys from compliance with the ethical requirements adopted by the State bars to which they belong and in the rules of the Federal courts before which they appear led Congress to consider corrective legislation. A bill proposed in 1996 by Representative Joseph McDade attracted broad support. Legislation was eventually enacted in 1998 with bipartisan congressional support.

That legislation—commonly known as the McDade Amendment, and titled "Ethical standards for attorneys for the Government"—provides in relevant part: "An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a).

## THE A.B.A. RESPONDS

The Ethics 2000 Commission was formed by the A.B.A. in 1997 to review the Model Rules of Professional Conduct. It submitted a report to the House of Delegates at the August 2001 Annual Meeting. The report was debated at the August 2001 Annual and February 2002 Midyear Meetings. The changes to the Model Rules as amended during the debate were final at the end of the February 2002 Midyear Meeting.

The A.B.A. Model Rules were actually intended to assist government attorneys. Given the plethora of local rules and regulations in the 50 states where U.S. Attorneys practice, the Ethics 2000 Commission's goal was to reduce the many rules and regulations to their lowest common

7

denominator. Thus, if the government attorneys complied with the Model Rules, they would be on safe ground under any state's local rules and regulations.

The success of the Ethics 2000 Commission and the Model Rules of Professional Conduct is that the Model Rules have been adopted in every state except California virtually without amendment.

### DOJ to We, The People – "Drop Dead!"

The protection afforded the People by the McDade Amendment lasted approximately 24 hours. On April 20, 1999 (the day after McDade became effective), DOJ published for comment an Interim Final Rule (the "Interim Rule") implementing the requirements of Section 530B. 64 Fed. Reg. 19273 (1999). The Interim Rule became effective immediately and superseded DOJ's previous regulations governing contacts with represented persons, but nevertheless contains several important limitations on the application of the Model Rules and state ethics rules applicable to federal prosecutors.

The Interim Rule covers all attorneys employed by DOJ who are authorized to conduct civil or criminal enforcement proceedings on behalf of the United States, as well as any specially appointed independent counsel. 28 CFR § 77.2(a). The Interim Rule expressly applies to investigative agents operating under DOJ direction. Id., § 77.4(f). The regulations admonish Department attorneys against "direct[ing] an investigative agent acting under the attorney's supervision to engage in conduct under circumstances that would violate the attorney's obligations under Section 530B." Id.

While paying lip service to the McDade Amendment, the Interim Rule actually guts Section 530B. Of the provisions gutting the McDade Amendment, the most important is Sec. 77.1 (b).

8

§ 77.1 - Purpose and authority.

(b) Section 530B requires Department attorneys to comply with state and local federal court rules of professional responsibility, **but should not be construed in any way to alter federal substantive, procedural, or evidentiary law.**

Is there anything left? Federal prosecutors can argue that almost every rule of ethics alters federal substantive, procedural or evidentiary law as this case demonstrates.

## THE DEATH OF DISCLOSURE

One of the principal targets of Sec. 77.1 is Model Rule 3.8 (d): Special Responsibilities of a Prosecutor:

> (d) make *timely disclosure* to the defense of *all evidence or information* known to the prosecutor that *tends to negate the guilt of the accused or mitigates the offense,* and, in connection with sentencing, disclose to the defense and to the tribunal all *unprivileged mitigating information* known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal; (emphasis added)

> As [ 3.8(d) ] makes clear, the disclosure must be: 1) "timely"; 2) include "all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense" or is mitigating as to sentence; and 3) the prosecutor must disclose the information unless there is a protective order.

> First, to be *timely*, the disclosure must be made at a time when the defense is able to use it. For example, disclosure right before or during trial is not timely in most instances. Second, the disclosure is broader than the *Brady* materiality standard. This means that the disclosure includes all exculpatory information whether or not it would be admissible at trial. Third, the prosecutor must make the disclosure unless the prosecutor has obtained a protective order. Peter A. Joy and Henry Hitchcock, Ethical Issues Related to Discovery and Protective Orders, Washington University School of Law in St. Louis (hereinafter "Ethical Issues")

> Rule 3.8(d) sometimes has been described as codifying the Supreme Court's landmark decision in *Brady v. Maryland,* which held that criminal defendants have a due process right to receive favorable information from the prosecution. This

9

inaccurate description may lead to the incorrect assumption that the rule requires no more from a prosecutor than compliance with the constitutional and other legal obligations of disclosure, which frequently are discussed by the courts in litigation. A.B.A. Formal Opinion 09-454 <u>Prosecutor's Duty to Disclose Evidence and Information Favorable to the Defense</u>, July 8, 2009, p. 1 (hereinafter "Formal Opinion")

Despite Section 530B, Sec. 77.1 is designed to avoid Sec. 3.8 completely. By eliminating Sec. 3.8, the Government is then free to play "hide and seek" under the *Brady* Rule.

The prosecutor's constitutional disclosure obligation is grounded in due process. The seminal case recognizing this duty is *Brady v. Maryland*, 373 U.S. 83 (1963). perhaps the most controversial aspect of current *Brady* doctrine is its highly restrictive materiality limitation. Under current *Brady* doctrine, prosecutors need to turn over only evidence deemed material, which is defined as evidence likely to change the outcome of the case. PETER A. JOY AND KEVIN C. McMUNIGAL, <u>The Ethics of Prosecutorial Disclosure,</u> Criminal Justice, Volume 30, Number 3, Fall 2015 at 41

Team Lelling does not come into this Court as free agents. Indeed, their power is derived from their status as agents of the DOJ in Washington, D.C. Presumably, therefore, they are subject to the Model Rules which have been adopted by the District of Columbia and interpreted by the courts therein. In that regard the opinion of the District Court in Washington D.C. in the case of *In re Kline* should, under Section 530B, be controlling their actions.

*In re Kline* is a disciplinary case arising from a felony assault prosecution involving a drive-by shooting. The primary issue at trial was the identity of the shooter. The victim was one of three eyewitnesses relied upon by the prosecution to identify the defendant as the shooter. When interviewed at the hospital shortly after the shooting, however, the victim had told police that he did not know who had shot him. Kline, the prosecutor, did not disclose this prior inconsistent statement. The jury at trial could not agree on a verdict and a mistrial was declared.

After the mistrial, Kline left the US attorney's office and the case was reassigned successively to two different prosecutors before a retrial took place at which the defendant was convicted. Prior to the retrial, both prosecutors who replaced Kline decided to disclose the victim's prior inconsistent statement. Once the statement came to light, disciplinary charges were brought against Kline.

The District of Columbia Board on Professional Responsibility concluded that Kline had violated the District of Columbia's version of Model Rule 3.8 and imposed a 30-

day suspension. The District of Columbia Court of Appeals affirmed the board's finding of a violation, but found that imposition of discipline was inappropriate due to uncertainty about the interpretation of Rule 3.8.

Kline's primary position was that a prosecutor's ethical duties under D.C. Rule 3.8 are "coextensive with the duties imposed under *Brady v. Maryland*." (*Kline*, 113 A.3d at 204.) A central question, then, for the *Kline* court was whether Rule 3.8 simply repeats and mirrors the *Brady* disclosure obligation or is broader than the duty created by the *Brady* line of cases. More particularly, it needed to decide whether D.C. Rule 3.8 contains the same materiality limitation found in *Brady* doctrine.

The court rejected Kline's argument. It found that D.C. Rule 3.8 is *not* limited by a materiality requirement similar to the one found in *Brady* doctrine and that it thus does impose a disclosure obligation different from and broader than the *Brady* disclosure obligation. In doing so, the court relied primarily on the language of D.C. Rule 3.8, which, like Model Rule 3.8 on which it was modeled, sets forth no materiality limitation. Interestingly, the comment to D.C. Rule 3.8—unlike the comment to Model Rule 3.8— does contain a sentence that could be read (and Kline argued should be read) as reflecting an intent to impose on D.C. Rule 3.8 a *Brady* materiality limitation. That language states: "The rule, however, is not intended either to restrict or to expand the obligations of prosecutors derived from the United States Constitution, federal or District of Columbia statutes, and court rules of procedure." The *Kline* court, though, refused to rely on this sentence from the comment to override the language of the rule itself.

Many, though not all, courts in interpreting statutes regularly rely on a version of what is sometimes called the "plain meaning" rule. Under this rule of interpretation, if the text of a rule is unambiguous (i.e., "plain"), it is improper for a court to rely on any evidence of legislative intent other than the text of the statute. The *Kline* court adopted just such an approach in interpreting D.C. Rule 3.8. It stated that "Kline's reliance on the comment to support his interpretation of the rule is unavailing because the text of the rule is always controlling when it comes to interpreting a rule." The court quoted the scope note from the D.C. Rules of Professional Conduct, which states that "the Comments are intended as guides to interpretation, but the text of each Rule is controlling." (*Kline*, 113 A.3d at 209.)

The legislative history of Model Rule 3.8(d), which was adopted in 1983, supports the view that the ethical disclosure duty should be interpreted more broadly than a prosecutor's constitutional disclosure obligation. There was no attempt to incorporate the materiality requirement from *Brady* into the rule, even though the ABA adopted the ethics rule long after *Brady* was decided. Instead, notes concerning a prosecutor's disclosure duty from the Kutak Commission, which drafted the Model Rules, explain that "the constitutional standards do not adequately control prosecutorial behavior, as they focus on fairness of the outcome rather than fairness to the defendant at the time of the conduct." (ABA Comm . on Evaluation of Prof'l Standards, Proposed Final Draft Model Rules of Professional Conduct 213 (1981).)

The Kutak Commission notes continue to state that *"paragraph (d) requires the disclosure of all information which may support a claim of innocence, mitigate the offense, or reduce the punishment." Id.* (emphasis added).) Due to this more expansive disclosure obligation, the Kutak Commission notes caution "that a prudent prosecutor should resolve doubts in favor of disclosure." Ibid. at 42

The *Kline* decision is consistent with the broader requirements of as prosecutor as opposed

to a normal attorney.

While all lawyers are governed by legal and ethical rules, prosecutors are subject to more stringent obligations. Unlike the private lawyer or defense attorney whose obligation is to be a zealous advocate on behalf of his client, the prosecutor is entrusted with the duty to "seek justice" in addition to fulfilling her role as an advocate. The prosecutor has this duty to seek justice because she is a representative, not of a single individual, but of the government and society as a whole.

As the representative of a sovereign, the prosecutor enjoys powers that other lawyers do not. For example, prosecutors have broad discretion in deciding whom to prosecute and what charges to bring. In addition, prosecutors have the benefit of a police force that investigates their cases and gathers evidence for them. This broad access puts defendants at a great disadvantage in preparing their cases. In the adversary system in which the prosecutor operates, the availability of these powers leads to great inequity between the prosecution and the defense in a criminal trial.

Thus, the heightened ethical obligations of the prosecutor are meant to ensure a fair process and minimize the disparity of resources between the prosecution and defense in the criminal justice system. The ethics rules written especially for prosecutors, therefore, impose additional obligations and responsibilities on them. The ABA mentions the prosecutor's unique duty to seek justice in the Canons, and in the Model Rules. Although the term "justice" is very ambiguous and the ethics rules provide very little guidance to prosecutors on its meaning, it is clear that prosecutors are expected to provide defendants with certain assistance in an attempt to alleviate the inherent imbalance between the two sides. *See* Charles W. Wolfram, Modern Legal Ethics 759 (1986). As Professor Bruce A. Green explains, the prosecutor works under heightened requirements because of her role as the representative of the sovereign. *See* Green, *Justice, supra* note 31, at 634. The sovereign, according to Green, has the responsibility to see that justice is done, which is more than just convicting the guilty. Justice requires a fair process. *See id.* at 642-43. As the lawyer for the sovereign, this responsibility is passed on to the prosecutor. *See id.* at 634. Prosecutors are therefore distinguished from other government lawyers and from private lawyers by "the identity of the client, the amount of authority delegated to the lawyer to act on behalf of the client and the nature of the client's interests and ends in the criminal context." *Id.* at 633; *Lisa M. Kurcias* NOTE, PROSECUTOR'S DUTY TO DISCLOSE EXCULPATORY EVIDENCE, 69 Fordham Law Review 1205, 1209 - 2011 (2015)

As is evident from this case, Team Lelling not only has no incentive to comply with *Brady* or Section 530B, it has a clear incentive to play "hide and seek".

> While the Supreme Court requires prosecutors to disclose certain evidence to the defense, consequences for withholding such evidence do not exist in the criminal justice system. In fact, the Supreme Court has granted prosecutors absolute immunity from civil liability for failure to disclose exculpatory evidence. Thus, prosecutors do not fear being sued for withholding evidence and the *Brady* Rule is consequently weakened. As one commentator stated, "[i]nsofar as federal law is concerned, we have no reason at all to believe, under these circumstances, that prosecutors will not continue to ignore their constitutional obligation under *Brady.*"' Consequently, encouragement for prosecutors to adhere to this requirement must be found elsewhere. Ideally, the ethics rules would supply this incentive. Ibid. at 1215

> Thus, when a prosecutor must determine whether to disclose potentially exculpatory evidence, she has no personal incentive to encourage her to disclose this evidence to the defense." Moreover, when the prosecution's case is weak, there may be a significant risk that disclosing the evidence will severely harm the case." A prosecutor may see obvious advantages to withholding such evidence when there is no serious risk of repercussion. Hence, it is easy to see why a prosecutor who believes in the guilt of the defendant would choose not to disclose exculpatory evidence. Even if the prosecutor's failure to disclose exculpatory evidence is discovered, the worst-case scenario for the prosecutor is that the conviction will be overturned on appeal and the defendant will be granted a new trial, which is an unlikely result." On the other hand, the prosecutor may fear that she will not win a conviction if she does disclose the evidence.'

> Furthermore, "[i]t is also likely that in most cases the prosecutor believes the defendant is guilty, and therefore might be motivated by the concern that, in one sense, justice will not be served by revealing evidence which will increase the probability that the defendant will go free."" Ibid at 1218 – 1219.

As is discussed below, the case against Lori Loughlin and other parent defendants, including one already sentence to prison, is not only weak, it is non-existent. Therefore, to assure getting Andrew Lelling elected to the United States Senate, Team Lelling must violate Model Rule 3.8 while paying lip service to Section 530B and hiding behind the limited disclosure requirements of *Brady* to deny the Defendants Due Process and the opportunity to mount an adequate defense.

One single issue brings this all into perspective as to how Team Lelling's rigid adherence to *Brady* denies the Defendants their due process right to information necessary for a defense. That

issue is access to whatever information the persecution has reflecting what USC corporate knew about what the Athletic Department was doing to raise money. This information is central to the entire case.

On December 13, 2019 the Defendants filed DEFENDANTS MOSSIMO GIANNULLI AND LORI LOUGHLIN'S MOTION TO COMPEL PRODUCTION OF MATERIAL AND EXCULPATORY EVIDENCE, Document 693. The Motion set forth the information the Defendants required.

> Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), this Court's Local Rules, and the Federal Rules of Criminal Procedure, Defendants Mossimo Giannulli and Lori Loughlin move the Court to order the Government to disclose all information, including FBI Form 302 Reports of witness statements and underlying interview notes, concerning William "Rick" Singer's representations to his clients regarding payments to the University of Southern California, *as well as all information about USC's knowledge of Singer's operation.*(emphasis added) Motion to Compel at 6.

On January 14, 2020 the Government filed its CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO COMPEL, Doc. 736. In response to Defendants' Demand for Information the Government first duly noted, "They thus seek, *inter alia*, evidence about   what "the university" knew about those funds." (citation omitted) Doc. 693 at 3. In footnote 4, the Government elaborated upon what the Defendants were seeking.

> *See, e.g.,* Dkt. 693 at 7 ("Also highly relevant is what USC knew about Singer's alleged college-admissions operation. If, for example, USC knew of Singer's operation and accepted donations to the university from Singer's clients as legitimate, then not only was there no bribery at USC, but also no fraud conspiracy at all."). Doc, 736 at 3, n. 4

The Government's response to this demand took several forms in its Response. The first statement was,

> The instant dispute is about the fact that the government has declined the defendants' demand to produce the full FBI 302s and notes of its interviews with potential witnesses—notably, Singer *and various employees of USC.* But those are materials to

which the defendants are simply not entitled *at this stage of the proceedings.*(emphasis added) Doc. 736 at 4.

So much for the Model Rule requirement that information is to be disclosed "timely". But this fairy tale gets much better. Later in its Response, the Government states:

> The Giannullis further contend that there is "good reason to believe that numerous USC officials were aware of Singer's operation and that the government is withholding materially exculpatory evidence on this point," Dkt. 693 at 16, and seek information about what USC knew about their payments, and about Singer, and when. The Giannullis' "good reason" appears to be based on little more than speculation and press clippings—including a self-serving interview by Heinel's lawyer after her arrest—and therefore does not satisfy *Prochilo*'s requirement that it be based on more than "mere speculation." 629 F.3d at 268. *Their contentions are, in any event, without merit.* (emphasis added) Doc. 736 at 26.

Team Lelling then digs its grave a little deeper with the following statement.

> Third, the government is not in possession of any evidence that anyone in the USC admissions office, any of Heinel's or the complicit coaches' supervisors in the athletic department, or anyone outside the athletic department was aware that Singer and his clients had agreed with Heinel and the complicit coaches to recruit students as purported athletes in exchange for payments to their USC programs. As part of its investigation, the government has interviewed several USC admissions officers, including members of the subcommittee for athletic admissions, none of whom provided exculpatory information. To be sure, others at USC understood that Singer existed, and were plainly aware of the fact of his purported donations and those of the defendants, insofar as they provided the "gift receipts" that the government produced and that the Giannullis cite in their brief, Dkt. 693 at 17. But the government has not interviewed *any* current or former USC employee who knew that the payments were a *quid pro quo* for the admission of the Giannullis' children or the children of other Singer clients, save for cooperating witnesses who have pled guilty to their involvement in the charged crimes. The defendants are not now entitled to the statements of those cooperating witnesses, which are inculpatory. In the event that the government discovers evidence indicating that admissions officers or other administrators senior to Heinel and the coaches were, in fact, aware of the scheme, the government will promptly disclose that information to the defense. Doc. 736 at 27.

Here's the problem with the Persecutor's statements. The Response was filed with the Court on 1/14/20 if the Clerk is to be believed (and I for one believe the Clerk). On that very same day, 1/14/2020, at 1:17 p.m., USC published its Statement, attached as Exhibit 3, that it had fired the C.F.O. in connection the college admissions scandal. Now, on March 12, 2019, the day the indictments were announced, USC released a statement attached as Exhibit 4 stating that they were

cooperating *fully* with the government's investigation. Further, two attorneys representing the interests of USC have filed appearances in this case. Presumably, they have been participating in these proceedings if only as observers. Surely, as representatives of USC, they have been cooperating "fully" with Team Lelling in persecuting Lori Loughlin.

It strains credibility beyond the breaking point to believe that on January 14, 2020 when Team Lelling filed its Response with the Court, that it had received no evidence from USC either directly or through USC's attorneys participating in these proceedings that at least one official at the very top of the USC hierarchy was aware of what was going on in the Athletic Department.

The statements made in the Response as to information the Government possesses concerning USC knowledge of the actions of the Athletic Depart constitute a fraud on the Court. They are a bald-faced lie! They are conclusive proof that Team Lelling is making this up as it goes along. Say anything and do anything to kick the can down the road. Buy time, so that they can continue to increase the pressure on Lori Loughlin to plead guilty to a crime she did not commit.

On February 18th and 19th, 2020, a little over a month after perpetrating a fraud on the Court in filing the Government's Response, Team Lelling used its friends in the media to increase the pressure on Lori Loughlin to plead guilty. Once again the pressure came from threats to persecute her children.

The campaign to use the children to force parents like Lori Loughlin to plead guilty to crimes they did not commit began immediately after the indictments were unsealed. The next day Target Letters were sent to the children of the parents who were indicted. Attached as Exhibit 5 is one report of these Target Letters (stating at page 2 that these Target Letters are designed to "bring recipients to the negotiating table more quickly than had they not received one"). Target Letters

are not public documents. Exhibit 5 would only be possible if Team Lelling "leaked" word about them to the media.

This time Team Lelling provided the media with copies of Olivia Jade's (the younger daughter) fake resume and encouraged news articles (one of which is attached as Exhibit 6) along the following lines.

- [A legal expert]   said it may be the federal prosecutors way of hinting to <u>Lori Loughlin</u> and <u>Mossimo Giannulli</u> — who are accused of paying $500,000 in bribes so their daughters <u>Olivia Jade</u> and <u>Isabella Rose</u> would be crew team recruits for the <u>University of Southern California</u> — that they may be building a case against their daughter.
- 
- "You know, she may face her own charges," [the legal expert] told me. "I mean, they released that document. Who knows what they're gonna do? To me, that was a clear and present danger signal coming from the prosecution that she may get charged. *And it's a message to her parents that if they want to protect her daughter, they better play ball."* (emphasis added)

For Team Leling, to "play ball" means confess to crimes they did not commit. This is what Team Lelling forced Jeffrey Bizzard to do. Bizzard did exactly what Lori Loughlin did, pay Singer the standard $200,000 fee and contribute $50,000 to the USC Athletic Department. And like Loughlin, Team Lelling threatened his son with persecution if Blizzard did not 'play ball". To save his son, Blizzard plead guilty to crimes he did not commit. As a news report attached as Exhibit 7 indicates, at his sentencing the first thing he said was that, "his son was blameless". After this gallant father fell on his sword to protect his son, Judge Woodlock excoriated him.

> [Judge Woodlock] called the parents' deeds in the scandal a crime of "sneaky conspicuous consumption -- the kind of thing rich people can do that poor people can't because they have the money to do it, to obtain a good that impresses their friends."

> "Do I think this is a serious crime? You bet I think this is serious crime," the judge said. Exhibit 7 at 1.

Clearly, Judge Woodlock has not read the 9th Amendment, or perhaps even the Constitution, otherwise he would know that Jeffrey Bizzard's "sneaky conspicuous consumption" when used to advance the education of his son is protected by the 9th Amendment. But apparently neither this Court nor Team Lelling care about the Constitution.

### Team Lelling has not only violated Sections 530B and Rule 3.8, it has violated the DOJ's own Manual

The DOJ Manual provides:

### 9-27.230 Initiating and Declining Charges – Substantial Federal Interest

**8. The Interests of Any Victims.** It is also important to consider the economic, physical, and psychological impact of the offense, and subsequent prosecution, on any victims. In this connection, it is appropriate for the prosecutor to take into account such matters as the seriousness of the harm inflicted and the victim's desire for prosecution. Prosecutors may solicit the victim's views on the filing of charges through a general conversation without reference to any particular defendant or charges. For more information regarding the Department's obligations to victims, see the Crime Victims' Rights Act, 18 U.S.C. § 3771, the Victims' Rights and Restitution Act, 34 U.S.C. § 20141, and the Attorney General Guidelines for Victim and Witness Assistance.

The only fair reading of the four (4) indictments in this case is that the victims were the colleges and universities who admitted students through athletic departments based upon false athletic credentials. If that is true, why were they not consulted prior to the institution of criminal proceedings? There was no rush on this investigation. March 12, 2019 was not a magic date for announcing the indictments. Nothing bad was going to happen to the "victims" if Team Lelling took a few days to consult with the colleges and universities to see what they wanted to do. So why not confer with the "victims"?

The reason is simple. Team Lelling was afraid the "victims" would say they preferred to handle this internally. In other words, they would address any problems administratively without public outcry or bad publicity. But if the "victims" declined prosecution, Team Lelling would be

denied their scalps and headlines and Andrew Lelling would lose the start of his Senate Campaign. And electing Andrew Lelling to the U.S. Senate, not justice, is what this case is all about.

To the extent the "victims" were ever actually victimized, they have been victimized by Team Lelling. The colleges and universities involved have been vilified in the main street press as some type of criminal enterprises. USC has been particularly hard hit. One internet article indicates that USC has lost millions in donations as a result of the college admissions scandal. See Exhibit 8 attached. But Team Lelling simply does not care. They have their scalps and their headlines and that is what this case is all about.

The DOJ Manual further provides:

### 9-27.260 Initiating and Declining Charges – Impermissible Considerations

In determining whether to commence or recommend prosecution or take other action against a person, the attorney for the government should not be influenced by:

…

The attorney's own personal feelings concerning the person, the person's associates, or the victim

Every statement issued by Team Lelling starting with the public announcement of the indictments on March 12, 2019, every Superseding Indictment, every filing with the Court, every sentencing recommendation exudes the venom Team Lelling feels for the parents who used their wealth to advance the education of their children. Unfortunately, the Judges of this Court have been infected with their venom.

The Indictments were announced at a March 12, 2019 Press Conference. Prior to the conference a copy of an Affidavit by Federal Bureau of Investigation (hereinafter "F.B.I.") Agent Laura Smith was made available to The Press. The Smith Affidavit at Par. 195 stated. "As set forth below, the GIANNULLIS agreed to a pay bribes totaling $500,000 in exchange for having their

two daughters designated as recruits to the USC crew team—despite the fact that they did not participate in crew—thereby facilitating their admission to USC."

What is clear is that the Affidavit of Smith was clearly intended to be incendiary and do maximum damage to the Defendants, especially Lori Loughlin. Using words like "bribe", the $500,000 figure (which was false) and using USC as opposed to ASU were designed for media consumption that would cause the public to hold the Giannullis in the worst possible light. Although the Second and Third Superseding Indictments tried to tone down the rhetoric, the long-term damage was done and to this day the wording in the Smith Affidavit is quoted in media articles.

The first speaker at the Press Conference was Joseph Bonavolonta, F.B.I. Agent in Charge, Massachusetts.

> Joseph Bonavolonta, the FBI special agent in charge, said some parents paid millions of dollars to ensure that their children gained admission to prestigious universities.
>
> "This is a case where they flaunted their wealth, sparing no expense, to cheat the system and set their children up for success with the best education money could buy — literally," Bonavolonta said.
>
> Some parents sent as much as $200,000 to $6.5 million for "guaranteed admission," he said.

A picture of an angry Bonavolonta announcing the indictments is attached as Exhibit 9. This statement was designed to cause public approbation of the Defendants in clear violation of Model Rule and the DOJ Manual. Not only that but it represents bad law. Parents have a Fundamental Right to spend as much money as they want to advance the education of their children. If Agent in Charge Bonavolonta has a problem with that, he can take it up with Mr. Madison the next time he sees him.

Then U.S. Attorney Lelling took the Podium:

Fifty people, including Hollywood stars Felicity Huffman and Lori Loughlin, were charged Tuesday in a scheme in which wealthy parents allegedly bribed college coaches and other insiders to get their children into some of the nation's most selective schools.

*Federal authorities called it the biggest college admissions scam ever prosecuted by the U.S. Justice Department, with the parents accused of paying an estimated $25 million in bribes.*

Prosecutors said that parents paid Singer big money from 2011 through last month to bribe coaches and administrators to falsely make their children look like star athletes to boost their chances of getting accepted. The consultant also hired ringers to take college entrance exams for students, and paid off insiders at testing centers to correct students' answers.

Some parents spent hundreds of thousands of dollars and some as much as $6.5 million to guarantee their children's admission, officials said.

*"For every student admitted through fraud, an honest and genuinely talented student was rejected," Lelling said.*

Authorities said coaches in such sports as soccer, sailing, tennis, water polo and volleyball took payoffs to put students on lists of recruited athletes, regardless of their ability or experience. Once they were accepted, many of these students didn't play the sports in which they supposedly excelled.

The applicants' athletic credentials were falsified with the help of staged photographs of them playing sports, or doctored photos in which their faces were pasted onto the bodies of genuine athletes, authorities said. (emphasia added)

Lelling was particularly focused on Lori Loughlin.

Loughlin, who was charged along with her husband, fashion designer Mossimo Giannulli, appeared in the ABC sitcom "Full House" in the 1980s and '90s

*Loughlin and her husband allegedly gave $500,000 to have their two daughters labeled as recruits to the USC crew team, even though neither participated in the sport. Their 19-year-old daughter Olivia Jade Giannulli, a social media star with a popular YouTube channel, is now at USC.* (emphasis added)

These statements by Lelling were not only scandalous but they were false. There is no way

that Lelling can support the claim that by admitting either of the Giannulli children to USC, some

other child was denied admission. The number of students admitted in 2017 was 9,025. The

number in 2018 was 8,306. With this flexibility in the number of students accepted, there is no way Lelling can definitively state that by accepting the Giannulli daughters some other student was denied admission. Further, their contribution of $100,000 to USC Athletics resulted in their children being given priority athletic admissions as Team Lelling well knows. Their priority admission had nothing to do with athletic prowess or false athletic credentials.

One pundit pointed out the real purpose of Lelling's outrageous comments at the Press Conference:

> The scandal is certain to inflame longstanding complaints that children of the wealthy and well-connected have the inside track in college admissions — sometimes through big, timely donations from their parents — and that privilege begets privilege. ALANNA DURKIN RICHER and COLLIN BINKLEY TV Celebrities and Coaches Charged in College Bribery Scheme, AP, March 13. 2019

The scandalous and outrageous comments contained in the Smith Affidavit and spewed out from the Podium by Bonavolonta and Lelling had their desired impact upon the Defendants including Lori Loughlin.

## THE NEED FOR SUPREME COURT REVIEW

> Scholars note that "[a] significant gap exists between the performance the Constitution requires of a prosecutor and the higher standard compelled by the rules of professional responsibility." The existence of this gap begs the question of whether a prosecutor should understand her disclosure Obligation to go only as far as the standard the Supreme Court set forth in *Brady* or as far as the more liberal ethical obligations. Obviously, the answer to this question is of the utmost importance to prosecutors, as it creates the standard to which a prosecutor must adhere. Kurcias, Note at 1217

This is the Issue which I hope to present to the Supreme Court and this is the perfect record to frame that issue. Here we have a team of rogue DOJ persecutors who in defiance of the McDade Amendment, the Model Rules and the DOJ Manual have indicted and sent to prison American

Citizens who have committed no crime simply because they can. This must come to an end! And since Courts such as this will not end it, then the jurisdiction of the Supreme Court over the judicial system must be invoked.

## STATEMENT OF MATERIAL FACTS

College Admissions Consulting is now a $400 Million a year business. There are approximately 8,000 College Admission Consultants working in the United States today. See Exhibit 10 attached.

CNBC estimates that 1 out of every 4 students attending private colleges and universities have used the services of a College Admission Consultant. Leading College Admissions Consultants charge between $650 and $980 per hour.

Rick Singer ("Singer") has been a College Admissions consultant for over 20 years. He literally wrote the book on college admissions consulting. His standard fee is between $200,000 and $400,000.

Singer based upon his 20+ years of experience has broken down the college admissions market into three segments, the Front Door, the Side Door and the Back Door.

The Front Door is for families with estates in the six-figure range. They can afford to pay elite college tuition but are not in a position to make significant donations to a college or university. Over 95% of the students applying to elite universities are trying to enter through the Front Door. Singer counsels the parents' children on how best to complete admission forms and show themselves in the best possible light. There is, however, no guarantee they will get into the college or university of their choice.

The Back Door is for families with estates in the nine-figure range. They can not only afford to pay elite college tuitions but they can write a check for $2 to $5 Million to build a building and assure their children guaranteed college admission. About 1% if the students applying to elite colleges are trying to enter through the Back Door. Singer does not cater to this segment.

The Side Door is for families with estates in the 7 to 8 figure range. These families can afford to pay the tuition at elite colleges and, in addition, make significant financial donations to colleges to assure their children priority admissions.

To service the families whose students qualified for admission through the Side Door, Singer created two sets of clients. The first set of clients were the families themselves. The combined wealth of the Giannulli Family has been estimated at between $35 and $88 million. The Giannulli Family had two daughters, Isabella and Olivia Jade, who were a senior and junior in high school, respectively, in 2017. They could afford both tuition and significant contributions to a college or university to secure a priority admission to the college of their choice.

Singer's second set of clients consisted of colleges, universities and, in some cases departments within a college or university, which were financially challenged and in constant need of infusions of cash donations. Singer selected these colleges and universities by studying their financial reports and studying their admission's requirements. One of these clients was the USC Athletic Department.

The practice of bartering admissions for financial contributions is so well established among colleges in California, including public colleges, that there is a term commonly used to describe these transactions, Admission by Exemption. If the price is right, colleges in California

will exempt student applicants from complying with the usual requirements for admission, hence Admission by Exemption or AbyE for short.

Team Lelling has chosen not to share the AbyE Guidelines for USC with the Court or the public so I have attached the University of California Guidelines for reference as Exhibit 11. Among the reasons for exempting an applicant from the usual admission requirements is #5. Applicants whose enrollment would enable campuses to establish new majors or academic programs. See Exhibit 11 at 3. This is enough wriggle room for all the Universities in the California system to offer priority admissions to applicants whose parents are in a position to make substantial contributions to the University or its programs.

Singer designed his Side Door program for colleges with AbyE admission guidelines and who had financial needs not met by tuitions or donations. As he advised Lori Loughlin and others, bargaining admissions priority in exchange for significant contributions was how universities and colleges paid for their academic and athletic programs. See Smith Affidavit at par. . This is what Mosimmo Giannulli referred to in an email that "he had to play the system". See Third Superseding Indictment at par. 139

The Varsity Blues indictments brought this admission policy out into the public and the media attempted to explore how often AbyE was used to raise money. See Exhibit 12 attached. What they found was that university officials would either not discuss the issue or that the records of who received priority admissions and why were so incomplete that no determination of how many students received priority by donations was possible.

In the wake of the Varsity Blues Investigation and indictments, the California General Assembly in January 2019 considered banning public universities in California from using

Admissions by Exemption to raise funds for the University. See Exhibit 13 attached. Once the California General Assembly took up the legislation, the opposition by colleges and universities was so great that the proposed legislation died in committee. See Exhibit 13 at 2 – 3. Therefore, Admission by Exemption, A/K/A Singer's "Side Door", must be presumed to be legal under California Law.

Since University officials are reluctant to discuss why AbyE is used to raise necessary donations, the best way to understand it is by examining what happens to colleges who do not barter priority admissions for donations. One of the colleges Singer attempted to recruit as a college client was Occidental College in Los Angeles. Occidental College then and now said no to bartering priority admissions for donations. While commendable, as a result Occidental is effectively self-liquidating as it is unable to maintain its facilities and programs based upon tuition and donations alone. See article on Singer and Occidental College attached as Exhibit 14. Exhibit 14 demonstrates why when the General Assembly considered banning using AbyE to raise money, universities flocked to Sacramento to kill the legislation. The ability to barter priority admissions for significant financial contributions is an important tool in financing college academic and athletic programs. Without that tool, as Occidental teaches us, the educational experience of students ultimately suffers.

Another tool in financing academic programs is success on the athletic fields. Attached as Exhibit 15 is an article highlighting the importance of success in athletics with colleges attracting alumni donations. Maintaining a high level, successful Division-1 Intercollege Sports program is critically important to maintain Elite College status.

Although this was true at USC, the decision makers at USC decided not to divert either tuition revenue or donations to the University (as opposed to donations to the Athletic Department

specifically) to the Athletic Department which was solely responsible for raising the revenues to support USC's extensive athletic program. Attached as Exhibit 16 is the USC Athletic Department Mission Statement which states clearly that the Athletics Department must maintain a high level of athletic success without "university subsidization".

It is understandable why Team Lelling did not advise the Court or the public of the USC Mission Statement. First, it explains why the Athletic Department and its directors such as Defendant Heinel were under such intense pressure to raise funds for the Athletic Department. Second, the Mission Statement undercuts one of the principal "proofs" that the Giannulli donations were in fact bribes. Team Lelling would have everyone believe that the fact that the donations were made directly to the Athletic Depart through Defendant Heinel as opposed to the University proves the donations were actually bribes because they were given to the Athletic Department to help advance Defendant Heinel's career. WRONG! The donations had to be given to the Athletic Department directly otherwise under the Mission Statement if the donations were given to the University directly, the University would not pass them through to the Athletic Department. Without the funds, the Athletic Department could not maintain the elite level of USC Sports. Therefore, Defendant Heinel and others in the Athletic Department who have been indicted by Team Lelling and some of whom have been sentenced to prison had the donations come directly to the Athletic Department. These were donations, not bribes.

As a result of the Mission Statement, the budget for USC's Athletic Department was chronically "under water", a fact well known in the collegiate community. Attached as Exhibit 17 is an article highlighting USC's well-known financial difficulties in connection with USC's search for a new Athletic Director. As the article points out, USC was searching for its 4th Athletic Director in 10 years. This is unheard of in the world of elite college athletics. Athletic Director is

perhaps the best position at a major University. Many Athletic Directors stay for 10, 20 sometimes 30 years. USC's turnover indicates the intense pressure the Athletic Department was under to "Feed the Beast" as raising money to support USC's athletics was referred to within the USC Athletic Department. Under the pressure of constantly trying to raise funds to Feed the Beast, USC Athletic Directors simply burned out.

This pressure was even greater during the academic years of 2017 and 2018. As the article attached as Exhibit 13 indicates, in 2011 USC launched a major fund-raising campaign, the second largest in college history up to that point, to improve the quality of USC Education. That campaign which ended on December 31, 2018 raised more than $7 Billion to restore USC. Because of the direct link between athletic success and the willingness of alumni to donate money to USC, the Athletic Department was under even more pressure to maintain excellence in Division I Athletics. Furthermore, the Athletics Department was then competing with the University in attracting donations making Feeding the Beast even more challenging than usual.

Although USC allotted a number of student admissions slots to the Athletic Department for athletic recruits in each sport, the Athletic Department did not have the budget to fill all the slots and maintain the remaining athletic teams. Thus, it was left to Defendant Heinel and other Defendants to exercise athletic *triage* in deciding which teams would contribute admission slots for AbyE to support the remaining programs.

The Crew Team competed at an elite level, but it did not achieve elite results. Attached as Exhibit 19 are the results for 2016, 2017 and 2018 seasons. During that period, it finished no higher than 3rd in the PAC-12 and 8th in the NCAA Championships when they made the Championships. Nevertheless, Crew maintained an Elite College Schedule. Attached as Exhibit 20 is the Rowing Schedule for 2017 – 18. The team competed as far north as Sacramento and as far south as San

Diego. It traveled as far east as South Carolina and if it was invited to the NCAA Championships, it would travel to Florida.

Crew is a money pit. It is a cash hog. It loses money hand over fist and the more members there are on the Crew Team, the more money it loses. In order to cut USC's loses and provide much needed funds for other USC Sports, members of the Athletic Department made what they considered to be business decisions to take a number of admission slots allotted to Crew and, through Singer, barter them to parents in return a significant financial donation and a priority student athlete admission for their child.

According to Team Lelling, an unindicted co-conspirator introduced Singer to Mossimo Giannulli. He agreed to represent their daughters in gaining admission to "ASU" which I believe stands for Arizona State University. After accepting the retainer, Singer requested copies of Isabella's entire academic record.

After Singer received Isabella's academic record, he realized that she met USC's admission requirements. He then offered to develop a plan for the Giannullis to gain admittance for Isabella into USC which they agreed to. Once the Giannullis agreed, Singer contacted one of his contacts at the USC Athletic Department, Donna Hensel. After some negotiation, Ms. Hensel agreed to present Isabella to the Independent Student Athlete Review Panel as a student recruit for crew in return for a $50,000 donation to the Athletic Department.

Contrary to what Team Lelling suggests, the Athletic Department does not have the authority to offer admission to athletic recruits. An independent panel drawn from other USC departments reviews the academic record of the candidate to make sure he or she met the

requirements for admission to USC. This is why Singer always screened the student's academic record before approaching a college client.

Once again, Team Lelling has not advised the Court or the public of the process of an athletic recruit gaining admission to USC. Therefore, I have attached as Exhibit 21 UCLA's statement of how the process works in the PAC-12. Although the Athletic Department submitted the name of a potential student athlete recruit, a panel totally independent of the Athletic Department reviewed the academic record of the candidate. The Athletic Department which presented the candidate was not represented on the panel. If, and only if, the candidate met the requirements for admission to USC under the standard criteria was the candidate issued a Conditional Letter of Acceptance. That conditional letter required the candidate to maintain his or her high school grades, to graduate and to provide whatever other information the required before she could be admitted to the University.

After a candidate such as Isabella fulfilled the requirements of the Conditional Letter of Acceptance, she was officially offered admission to USC. An Offer Letter was posted by USC on the USC Web Site setting out the terms of the Contract which Isabella, and later Olivia Jade, accepted by clicking on the "Affirm" button. Isabella accepted the contract on or about August 25, 2017. A copy of Contract of Acceptance offered by USC and accepted by Isabella, and later Olivia Jade, is attached as Exhibit 22.

A year later, Singer negotiated the same arrangement for Olivia Jade as he had negotiated for Isabella. Once again for a promise of a $50,000 donation to the Athletic Department, Ms. Hensel offered Olivia Jade to the Independent Panel and once again, based upon her academic credentials, she was offered a Conditional Offer of Admission. Once again, she completed the

conditions, was offered a Contract of Admission by USC on the Web Site and once again she clicked "Accept". Olivia Jade accepted the contract of admission on or about August 25, 2018.

Between September, 2017 and March, 2019, both Isabella and Olivia Jade successfully completed their academic courses and were in good academic standing on March 12, 2019 when the Indictments in the Varsity Blues Investigation were announced.

## CONCLUSIONS OF LAW

Parents such as Lori Loughlin and Mosimmo Gianilli have a Fundamental Right guaranteed by the Constitution to spend as much of their personal wealth as they see fit to educate their children and prepare them for future life.

Singer had a right guaranteed by the 14th Amendment to market his services as a College Admissions Consultant.

Lori Loughlin and Mossimo Giannulli had a right guaranteed by the 9th and 5th Amendments to retain a College Admissions Consultant to guide their children through the College Admissions process.

The contracts such as the one between Singer and the Giannullis have been found by the United States' Supreme Court to be protected by the United States Constitution.

Donna Hensel was an agent for a fully disclosed principal, USC, as that term is defined by the Restatement, Second, of Agency.

The Admission of both Isabella and Olivia Jane Giannulli was negotiated by Hensel on behalf of USC.

The Letter of Admission set forth on the USC Web Site which was accepted by both Isabella and Olivia Jade is, as a matter of law, a contract.

Since USC is located in Los Angeles, California and the acceptance of the contract by Isabella and Olivia Jade was made in California, California Law determines the meaning of the Letter of Acceptance Contract.

Under California law facts known to the Agent, in this case Hensel, are Imputed to the Principal, USC. Therefore, under California Law, USC, knew everything that Hensel had negotiated with Singer on behalf of the Giannullis including the facts that neither Isabell nor Olivia Jade knew Port from Starboard and had no rowing experience whatsoever.

USC is also charged with knowing the reason Isabella and Olivia Jade received priority athletic admissions had nothing to do with their athletic credentials but that the reason they received priority admission was the financial donations Lori Loughlin and Mossimo Giannulli made to the USC Athletic Department.

As members of Team Lelling have stated on the record, if USC had complete knowledge of the actions of agents such as Donna Hensel, there was no fraud in the contract between the Giannullis and USC. USC had not only constructive knowledge under contract law and the law of agency, USC had actual knowledge. Previously attached as Exhibit 3 is a Release issued by USC announcing that as a result of its internal investigation into the college admissions scandal, Steve Lopes, Chief Financial Officer of USC, was fired. The only fair inference of the C.F.O.'s termination is that he had actual knowledge of what was going on in the Athletic Department, And, if the C.F.O. knows, the University is charged with actual knowledge.

To avoid the impact of Imputation of the knowledge of agent Hensel to USC, Team Lelling in the Indictments, without clearly stating a rationale, allege that agent Hensel had an agenda adverse to the interests of USC and therefore, knowledge of her actions in bartering priority admissions for substantial donations to the Athletic Department is not Imputed to USC and therefore Team Lelling can pursue criminal persecutions.

The legal justification for Team Lelling's criminal fraud persecutions despite knowledge of Hensel's actions being Imputed to USC has been totally rejected by the Restatement, Third, of Agency. Simply because an agent has an interest adverse to his or her principal, without more, does not sever the le4gal relationship between the agent and the principal and it does not block Imputing the agent's knowledge to the principal.

The Contract between the Giannullis and USC is protected by the 5th Amendment to the Constitution. .Neither Team Lelling nor this Court have the legal authority to interfere in the contractual relations established by the Contract between the Giannullis and USC.

## JURISDICTION AND STANDING

The pending Motions and this Memorandum are predicated upon the U.S. Constitution, more specifically the 5th, 9th and 14th Amendments thereto, and the Dade Act, 28 U.S.C. Sec. 530B (a). This Court has jurisdiction under 28 U.S.C. Sec. 1331. The Intervenor has standing under Sec. Of the A.B.A. Code of Professional Responsibility.

## ARGUMENT

Dozens of parents guilty only of exercising their Fundamental Right created at Common Law, incorporated by the 9th Amendment of the Constitution and guaranteed by the 5th Amendment of the Constitution, of using their wealth to foster the education of their children have been pilloried by a team of federal persecutors unfettered by the Constitution, California Law

concerning Contracts and Agency or the A.B.A. Canons of Professional Ethics. Innocent parents who have committed no crime have been forced to confess to crimes they did not commit in order to protect their children from wrongful persecution by the unscrupulous agents of the DOJ. The Federal Judges in the District Court in Boston rather than protecting the parents and their children joined in the fun of waging class warfare on defenseless citizens of the United States.

This travesty was only made possible by the total failure of the officials of the DOJ in Washington charged with the supervision of U.S. Attorneys nationwide and the FBI to require those under their supervision to conduct their investigations and prosecutions in compliance with Constitution, the DOJ Manual and the Canons of Ethics as required by federal law. These supervisors are as responsible as their Gestapo agents in Boston for the wrongful persecution of these parents and children.

The People of the United States through their representatives in Congress have commanded that government officials comply with the Canons of Ethics in the discharge of their responsibilities. The DOJ both before and after the adoption of the Dade Act has opposed this command. Now we see clearly the result of this failure to obey the Canons. We also see that without the force of a Permanent Injunction aimed at the DOJ, its officials in Washington and agents in the field at the 600 offices of the United States Attorney and the FBI will the American People be safe in their freedom, their homes and their possessions. The greatest threat to the Constitution and the Freedom of the American People is the DOJ and Courts such as this. What is needed is a Permanent Injunction requiring strict adherence to the A.B.A. Code of Professional Responsibility enforce by command of the Supreme Court.

## THE DEFENDANTS ARE NOT GUILTY

After satisfying the Conditional Offer of Admission, Isabella and Olivia Jade were offered a Letter of Admission on the USC web site. A copy of that Letter of Admission is attached as Exhibit 22. After reading the letter, Isabella and Olivia Jade accepted the Letter by clicking "Accept" on the Web site. When first Isabella and then Olivia Jade clicked the "Accept" button on the USC Web-site, it crested a contract between USC, Isabella, Olivia Jade and their parents.

> The relationship between universities and their students has been analyzed by courts under many different legal doctrines. The most enduring and pervasive of these has been the theory that there exists an implied contract between the student and the institution. Over the years, a patchwork of holdings has created a common law of contract governing the student-university relationship. (citations omitted) Jonathan Flagg Buchter, Contract Law and the Student-University Relationship, 48 Indiana Law Journal 252 (1973) at 253.

Clearly, Isabella and Olivia Jade are parties to the Contract. Courts have extended the parties to the Contract to the parents as well.

> In the older cases, the parent was often considered one of the parties to the contract." More recently, a parent sued to enjoin a college from implementing new liberal parietal hours. The court found that the setting of students' hours was within the college's authority, but in finding no breach of contract, the decision implied that parents were still considered parties to university contracts involving their children. (citation omitted) *Ibid.* at 257-258.

Where, as here, the contracts are written by the University, the contracts are construed strictly against the University.

> First, since the institution maintains exclusive control over the drafting of the contract terms, the logic applied to contracts of adhesion could be employed. In viewing such agreements, the courts have construed ambiguous terms of the contract against the party who wrote them, reasoning that the drafter's advantage in being able to write the agreement should have resulted in a contract which clearly expressed his position. (citations omitted) *Ibid.* at 265.

Although private universities are not state actors and therefore are not limited in their actions by the 14th Amendment, rights under the Due Process Clause have been extended to students at private colleges and universities.

> Contract theory also has the potential to establish in the private university many of the substantive rights which are protected by the state action theory in the public university. When a court finds that there has been no meeting of the minds as to university rules or powers in these areas, either because there is nothing written or because the meaning of what is written is unclear, the court may imply a term which reflects an accommodation of the parties' reasonable expectations.
>
> It is unlikely that a student will perceive any rationale for differences in conduct regulation based on the private-public distinction unless there is something special about the character of the particular private institution which would draw this distinction to his attention. Therefore, in most cases he will expect the same freedoms on the private campus as he would enjoy at a public university.
> ...
> Thus a court, in defining a term based on the parties' expectations, could find that the substantive protections afforded students in the public university would have been adopted as an expression of their agreement (citations omitted) Ibid. at 266-267

The fact that the relationship between USC and the Giannullis is contractual in nature is important in a different context.

> Contracts constitute property within the meaning of the Fifth Amendment and are susceptible to a "taking" within the meaning of the Takings Clause. To determine whether a contract right has been taken, courts apply either a categorical test or, more commonly, the fact-dependent analysis employed in regulatory takings cases. There are strong arguments that the property seizure program is a taking under either approach. *See Lynch v. United States*, 292 U. S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States.");*see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984) (noting the range of "intangible interests," including contracts, that are "property for purposes of the Fifth Amendment's Takings Clause"). Tom W. Bell, "Property" in the Constitution: The View From the Third Amendment, William & Mary Bill of Rights Journal, Volume 20 Issue 4

Thus, the contract between the Giannullis and USC is protected by the 5th Amendment from Team Lelling and this Court as well as the Federal Government.

Finally, and most importantly, the contract between the Giannullis and USC is governed by the laws of the State of California. Applying California law to the contract between the Giannullis and USC is critically important to evaluating the criminal persecution of Lori Loughlin and her husband.

Under California law, Ms. Heinel, a Defendant in this case, was an agent for a fully disclosed principal, USC. California law is consistent with the Restatement, Second, of Agency Sec. 274 (1958) in that all knowledge of the agent is imputed to the principal to the same extent as if the Principal received the knowledge himself. Deborah A. DeMott, <u>When is a Principal Charged with an Agent's Knowledge?</u>, 13 Duke Journal of Comparative & International Law 291, 294 (2003) (citing *Gregg v. Cloney*, (*In re Marriage of James & Dana Cloney*) 110 Cal. Rptr. 2d 615, 623 (Cal. Ct App. 2001) (hereinafter DeMott, Agency) Therefore, USC is charged with full knowledge of all the events which led up to the issuance of the Contract of Acceptance including but not limited to, the fact that neither of the Giannulli daughters were going to participate in Crew physically..

In an effort to avoid knowledge of Ms. Heinel's knowledge being imputed to USC, Team Lelling in the indictments relies on an exception to the rule on Imputation set forth in the Restatement, Third, of Agency, namely that Ms. Heinel had a conflict of interest and therefore knowledge of the "fraud" should not be imputed to USC. However, the assumption by Team Lelling that Ms. Heinel's conflict of interest blocked Imputation to USC of Ms. Heinel knowledge as of how the Letter of Admission came to be issued has no foundation in the law of Agency.

> The "adverse interest" exception defeats imputation in a narrow range of cases involving third-party claims arising out of conduct by an agent that is so wholly antagonistic to the principal's interests that the relationship between principal and agent could be viewed as severed. In contrast, simply the fact that the agent acts with conflicted motives or interests does not trigger the adverse-interest exception to imputation. (citations omitted) DeMott, Agency at 309 – 310.

The potential conflict of interest on the part of an agent is an exception available to the Principal and potentially third parties to the contract if, and only if, the Principal elects upon learning the relevant information to reject the bargain. If the Principal upon being advised of all the facts elects to accept the bargain, the exception disappears. That is why any conflict of interest on the part of the agent does not automatically block Imputation of knowledge to the Principal. Until the Principal makes an election, Imputation is assumed. This rule of California law has been adopted as the majority rule by the Restatement, Third, of Agency.

Since as a matter of law USC knew how and why the Giannulli sisters were admitted to USC, there is no fraud and any use of the mails or wires is irrelevant. Contrary to the "wet dreams" of Team Lelling, there has been no violation of federal law and every plea accepted, every judgment entered and every sentence imposed is void.

## CONCLUSON

Lori Loughlin, Mosimmo Giannulli and their daughters have committed no crime. Admission by Exception has been a standard practice in California and elsewhere for many years including using AbyE to raise funds necessary to continue academic or athletic programs. Upon review by the California General Assembly in the wake of the Varsity Blues investigation, the decision was made not to ban using AbyE to solicit donations from parents of incoming Freshman.

Rick Singer designed his "Side Door" program to specifically cater to the AbyE market. He assisted universities and colleges to raise necessary funds for their programs. USC became a client due to the enormous financial strain on the Athletic Department to Feed the Beast and keep the USC athletic programs, including Crew, rolling. The admission slots bartered for substantial contributions were Crew slots which the athletic Department simply could not afford to fill. USC not only had constructive notice, it had actual notice through the Chief Financial Officer. Since

USC was on notice, there is no fraud and there is no basis for federal jurisdiction let alone criminal charges.

The travesty of justice which is he criminal case against Lori Loughlin and others was only made possible by the fact that Andew Lelling and his team totally ignored and violated the Model Rules as well as the DOJ manual. This case highlights why the People need a Permanent Injunction against the DOJ and all its attorneys and agents, including the F.B.I., requiring them to strictly adhere to the Model Rules adopted by Washington, D.C. as interpreted by the D.C. courts.

Robert A. Heghmann

P.O. Box 6342

Virginia Beach, VA 23456

(603) 866 - 3084

Bob_Heghmann@Reagan.com

## CERTIFICATE OF SERVICE

I certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing. /

Robert A. Heghmann